# EXHIBIT B

[Authorized Translation]

**JUDGMENT**

**RATIFICATION OF HOMOLOGATION**

Number: 59/Pdt.Sus-PKPU2014/PN.Niaga.JKT.PST

**PRO JUSTITIA BASED ON THE ONE ALMIGHTY GOD**

The Commercial Court of District Court of Central Jakarta examining and trying the Suspension of Debt Payment Obligation (PKPU = Penundaan Kewajiban Pembayaran Utang) in the first instance proceeding, has passed the Jusgment on Homologation as mentioned below in the petition filed by:

**PT. NETWAVE MULTI MEDIA**, a limited liability company, duly incorporated and established by virtue of the law of the state of the Republic of Indonesia, having domicile at Jalan Balikpapan Raya Number 28 C-D, Jakarta Pusat 10310, in this matter is represented, in his capacity as Director, who in this matter is represented by Sahari Banong, SH and Sandra Nangoy, SH, MH, the Advocates having their office at Banong-Nangoy-Juan Law Office, having its office at Plasa Centris 9th Floor, Jalan H.R. Rasuna Said Kav. B-5, Jakarta 12910, by virtue of the Special Power of Attorney dated September 1, 2014, hereinafter referred to as: Petitioner for PKPU;

Against:

**PT BAKRIE TELECOM, Tbk.**, a limited liability company duly established and organized by virtue of the law of the state of the Republic of Indonesia, having its address at Wisma Bakrie, 3rd Floor, Jalan H.R. Rasuna Said Kav. B-1, Jakarta Selatan 12920, hereinafter referred to as Petitionee for PKPU;

The said Commercial Court;

Having read the relevant case file;

Having heard the parties and examinied the exhibits of those parties;

Having heard and studied the report from the Supervisory Judge and Administrator Team;

## **REGARDING CASUS POSITIO**

Considering, that the Petitioner by virtue of the letter of application dated October 23, 2014 and registered with the Registrar of Commercial Court of District Court of Central Jakarta dated October 23, 2014 under Number: 59/Pdt.Sus-PKPU/2014/PN.Niaga.Jkt.Pst;

Considering, that by virtue of the Judgment of the Commercial Court of District Court of Central Jakarta Number 59/Pdt.Sus-PKPU/2014/PN.Niaga.Jkt.Pst dated November 10, 2014, PT. Bakri Telecom has been declared under the Temporary Suspension of Debt Payment Obligation (PKPU) for 30 (thirty) days.

Considering, that on the hearing day already adjudicated to hear the report, there had been present the Administrator Team Eduard Daniel, S.E., SH., LL.M., MBL and Imran Nating, SH., M.H, Debtor (PT. Bakrie Telecom Tbk) represented by Mr. Jastiro Abi as President Director of and Attorney in Law of the Debtor, and the said Creditors of PT. Bakrie Telecom Tbk, both directly present or represented by the attorney;

Considering, that the Reports of the Supervisory Judge dated December 8, 2014 which principally are as follows:

- That immediately after being appointed Supervising Judge as referred to in Judgment Number 59/Pdt.Sus-PKPU/2014/PN Niaga Jkt.Pst dated November 10, 2014, the Supervising Judge has issued the Adjudication Number 59/Pdt.Sus-PKPU/2014/PN Niaga Jkt.Pst dated November 13, 2014 regarding: Appointment of Newspaper, deadline of invoice submission, first creditor meeting, Receivables Verification meeting and meeting of the reconciliation plan and voting for the reconciliation plan;
- That the Supervising Judge has chaired the creditor meetings held in the Commercial Court at Central Jakarta, each on Wednesday, November 19, 2014 with the agenda of First Creditor Meeting and on Friday, December 5, 2014 with agenda Receivables Verification Meeting;
- That the Receivables Verification Meeting and Tax Verification Meeting (Creditor Meeting) had been held on Friday, December 5, 2014 at Commercial Court at District Court of Central Jakarta;

- That Creditors who have already filed their invoices to the Administrator are 414 (four hundred and fourteen) creditors;
- Of the 414 (four hundred and fourteen) Creditors, 389 (three hundred and eighty-nine) out of it were admitted consisting of 331 (three hundred and thirty-one) Concurrent Creditors, the invoices of 56 (fifty-six) Concurrent Creditors were admitted but they were late in filing their invoices to the Administrator, 2 (two) Secure Creditor Creditors. The Concurrent Credits invoices who were denied by Administrator Team are 13 (thirteen) namely:
  - ASM Asia Recovery (Master) Fund;
  - ASM Co-Investment Opportunity Trust I LP;
  - ASM Co-Investment Opportunity Trust II LP;
  - ASM Co-Investment Term Trust I;
  - ASM Hudson River Fund;
  - Claren Road Credit Master Fund Ltd.;
  - D.E. Shaw Galvanic International Inc;
  - Deutsche Bank AG London;
  - Parastar Echorindo;
  - Stockton Street Limited;
  - Tahan Asia Special Opportunities Fund;
  - TCM Asia Opportunities Master Fund Ltd;
  - The Bank of New York Mellon;
- That the amount of invoices of the creditors admitted or accepted well by the Debtor and Administrator shall be as contained in the list of invoices admitted and signed by the

Debtors, Administrator, Supervising Judge and Creditors, which list would be submitted to the Council of Judges by the Administrator;

- Based on the abovementioned Administrator Report which principally states that the creditors invoices had been classified as admitted and accepted;
- That the Debtors together with the Reply on this PKPU Petition had included and attached the Summary of Reconciliation Plan;
- That on Monday December 8, 2014 a Meeting had been held on Discussion of Reconciliation Plan and Voting on Reconciliation Plan. That before the voting the Supervising Judge had determined that the Creditors whose invoices were disclaimed by the Administrator Team could not participate in the voting with the consideration as contained in Adjudication Number 59/Pdt.Sus-PKPU/2014/PN Jkt.Pst dated December 8, 2014;
- The Debtors filed Reconciliation Plan Revision to the Creditors in the Reconciliation Plan Discussion Meeting on December 8, 2014 where based on such plan the Debtor would be able to pay their obligations to the Creditors in the manner principally as contained in the Reconciliation Plan contained herein;
- That based on this, the Voting was then held on such reconciliation plan attended by 343 (three hundred forty-three) Concurrent Creditors or their attorneys and 2 (two)

Secure Creditor Creditors. The result was the Creditors could agree with the Reconciliation Plan conveyed by the Debtors and the breakdown of such voting result was:

Concurrent Creditors:

- Affirmative: 325 (three hundred twenty-five) creditors or 94.56% (ninety-four point fifty-six percent) of total concurrent creditors' votes which rights were admitted or temporarily admitted and present in the voting;
- Against: 11 (eleven) creditors or 3.95% (three point ninety-five percent) of total concurrent creditors' votes which rights were admitted or temporarily admitted and present in the voting;
- Abstain: 7 (seven) creditors or 1.49% (one point forty-nine percent) of total concurrent creditors' votes which rights were admitted or temporarily admitted and present in the voting;

Secure Creditor Creditors:

- Affirmative: 2 (two) creditors or 100% (one hundred percent) of total Secure Creditor creditors' votes which rights were admitted or temporarily admitted and present in the voting;
- Against: nil.

Considering, that furthermore the Report of Administrator Team of PT Bakrie Telecom Tbk (In PKPU) dated December 8, 2014 was principally as follows:

PARTICULARS ON CASE

Interim Judgment of PKPU;

On October 23, 2014 PT Netwave Multi Media (Petitioner of PKPU) through its attorney had file the Petition for Suspension of Debt Payment Obligation against PT Bakrie Telecom Tbk in the Commercial Court at District Court of Central Jakarta registered in the Case Number 59/Pdt.Sus/PKPU/2014/PN Niaga.Jkt.Pst;

That on November 10, 2014 the Commercial Court at District Court of Central Jakarta ("Commercial Court") granted the Petition for PKPU filed by the Petitioner of PKPU by issuing the Judgment Number 59/Pdt.Sus/PKPU/2014/PN Niaga.Jkt.Pst ("Judgment"). The petitum of the Judgment shall be as follows:

1. Granting the Petition for Suspension of Debt Payment Obligation (PKPU) Temporarily of the Petitioner of PKPU for 30 days as of this judgment is pronounced;
2. Assigning Ms. Titik Tejaningsih, SH, MH, the Commercial Judge of the District Court of Central Jakarta as the Supervising Judge;
3. Appointing Mr. William Eduard Daniel SE., SH., LL.M., MBL., registered with the Department of Law and Human Rights of the Republic of Indonesia by the evidencing document of Curator and Administrator Registration Number AHU.AH.04.03-82 dated July 18, 2014 having his address of Law Office at William Soerjonegoro & Partners, Office 8, 19th Floor, SCBD Lot. 28 Jalan Sudirman Kav. 52-53 Jakarta, registered with the Department of Law and Human Rights of the Republic of

Indonesia dated July 18, 2014, and Imran Nating, SH., MH., Curator and Administrator, registered with the Department of Law and Human Rights Number AHU.AH.04.03-40 dated October 16, 2009, having the law office at Imran Nating & Partners, Nariba Plaza 2nd Floor Suite A-10, Jalan Mampang Prapatan Jakarta as the Management Team in the process of Suspension of Debt Payment Obligation of PT Bakrie Telecom Tbk;

4. Stipulating the subsequent hearing day on Tuesday December 9, 2014 at Commercial Court/District Court of Central Jakarta, Jalan Gajah Mada Number 17, Jakarta Pusat;
5. Instructing the Administrator to summon the Creditors known in the registered mail to appear before the hearing day already stipulated above;
6. Stipulating the administration and service fee for the Administrator will be stipulated later after the end of Suspension of Debt Payment Obligation (PKPU);
7. Deferring the charge of this Petition for this Suspension until the Suspension of Debt Payment Obligation (PKPU) is declared settled;

By the issue of such Judgment, all management affairs of PT Bakrie Telecom Tbk was under the authority of Administrator Team and all forms of company management must have prior approval from the Management as already determined in Article 240 of Law Number 37 of 2004 regarding Insolvency and Suspension of Debt Payment Obligation;

LEGISLATION:

The regulation applied to this Case shall be:

1. Law Number 37 of 2004 regarding Insolvency and Suspension of Debt Payment Obligation ("Law Number 37 of 2004");
2. Regulation of Government of Republic of Indonesia Number 10 of 2005 regarding Calculation of Total Voting Rights of the Creditor ("PP Number 10 of 2005");
3. Regulation of Minister of Law and Human Rights of Republic of Indonesia Number 01 of 2013 regarding Guidance for Service Fee for Curator and Administrator;

THE WORKS DONE BY THE ADMINISTRATOR IN CONNECTION WITH PKPU CASES OF PT BAKRIE TELECOM Tbk

Works done by the Administrator relating to PT Bakrie Telecom Tbk PKPU case shall be among others as follows:

1. Preparing the notice advertisement in *Investor Daily Indonesia* and *Neraca* Newspapers dated November 14, 2014 as well as in the State Gazette of Republic of Indonesia on the Judgment relating to PKPU of PT Bakrie Telecom Tbk as well as delivering the invitation to the Creditors known to attend the Creditor meetings to be held by the Administrator and the Hearing being the Judgment Deliberation Meeting. This action was taken to fulfill the terms of Article 226 paragraph (1) of Law Number 37 of 2004;

2. Delivering the notice on PKPU to the Debtors based on the Letter Number 002/PKPU-BTEL/WED/2014 dated November 14, 2014 regarding Notice on PKPU Status to the Board of Directors of PT Bakrie Telecom Tbk., where such letter principally notified the Debtors that at that time the Debtor was in PKPU condition and without the approval from the Administrator the management or ownership of all or part of assets could be taken based on article 240 paragraph (1) of Law Number 37 of 2004;
3. Holding the Creditor Meetings as follows:
   - First Creditor Meeting on Wednesday, November 19, 2014;
   - Creditor Meeting with agenda of receivable verification on Friday, December 5, 2014;
   - Reconciliation Plan Discussion Meeting and Voting on Reconciliation Plan on Monday, December 8, 2014;
4. Holding the informal meeting with the agenda to discuss the Reconciliation Plan on Wednesday, December 5, 2014 at Citywalk-Sudirman Function Hall, 5th Floor, Jalan K.H. Mas Mansyur Number 121, Jakarta Pusat;
5. Debt and receivables verification namely by preparing the creditor list, verifying the note and report of the Debtor (PT Bakrie Telecom Tbk), preparing the list of receivables resulted from the verification and providing such list for the Registrar Office of Commercial Court at District Court of Central Jakarta. This action was taken to comply with

the requirements of Article 271, 272 and 276 of Law on Insolvency;

6. Preparing the voting ballots;
7. Together with the Board of Directors and the Board of Commissioners manage PT Bakrie Telecom Tbk (In PKPU);
8. Making the approval for the actions taken by PT Bakrie Telecom Tbk (In PKPU);
9. As well as other actions deemed necessary and/or required by the law to be taken by an Administrator;

RECEIVABLES VERIFICATION CREDITORS MEETING:

I. Summon to the Meeting:

The summon to the Meeting to the Debtors and Creditors had been served respectively through the Letter Number 010/PKPU-BTEU/WED-IN/XI/2014 dated November 26, 2014, Letter Number 011/PKPU-BTEL/WED-IN/XI/2014 dated November 27, 2014, Letter Number 012/PKPU-BTEU/WED-IN/XI/2014 dated November 26, 2014, Letter Number 013/PKPU-BTEL/WED-IN/XI/2014 dated November 27, 2014 regarding Invitation To Attend the Creditor Meeting with agenda of Receivables and Tax Verifications which was already announced in the Investor Daily Indonesia and Ekonomi Neraca Newspapers as well as State Gazette of Republic of Indonesia dated Friday, November 14, 2014;

II. Claim or Invoice Filed By Creditors:

In connection with the PKPU Debtor, we had received the invoice or claim filed by the Creditors with breakdown as follows:

Total creditors already filing the invoice were 414 (four hundred and fourteen) with total invoice Rp 18,688,299,138,075.16 (eighteen trillion six hundred eighty eight billion two hundred ninety nine million one hundred thirty eight thousand seventy five rupiah point sixteen cents) with breakdown as follows:

1. Creditors filing the invoice until November 24, 2014:

   Concurrent

   Total Creditors : 334 (three hundred thirty-four)

   Total Invoice : Rp 10,715,099,414,933.80 (ten trillion seven hundred fifteen billion ninety-nine million four hundred fourteen thousand nine hundred thirty-three rupiah eighty cents);

   Secure Creditor:

   Total Creditors : 2 (two);

   Total Invoice : Rp 625,458,298,869.52 (six hundred twenty-five billion four hundred fifty-eight million two hundred ninety-eight thousand eight hundred sixty-nine rupiah fifty-two cents);

2. Creditors filing the invoice after November 24, 2014:

   Concurrent

   Total Creditors : 64 (sixty four);

Total Invoice : Rp 381,779,733,029.92 (three hundred eighty one billion seven hundred seventy nine million seven hundred thirty three thousand twenty nine rupiah ninety two cents);

Secured Creditor:

Total Creditors : 1 (one);

Total Invoice : Rp 2,582,458,687.00 (two billion five hundred eighty two million four hundred fifty eight thousand six hundred eighty seven rupiah);

3. Creditors filing the invoice until November 24, 2014 but not recorded in the record and report of Debtor

Total Creditors : 13 (thirteen)

Total Invoice : Rp 6,963,379,232,554.92 (six trillion nine hundred sixty three billion three hundred seventy nine million two hundred thirty two thousand five hundred fifty four rupiah ninety two cents);

Secure Creditor:

Total Creditors : 2 (two);

Total Invoice : Rp 625,458,298,869.52 (six hundred twenty five billion four hundred fifty eight million two hundred ninety eight thousand eight hundred sixty nine rupiah point fifty two cents);

III. Verification Result:

The following is the verification result of Creditors' invoice based on the verification meeting held on December

5, 2014 at Commercial Court of District Court of Central Jakarta and the invoice verification meetings held at the Administrator Office from November 20 through December 4, 2014:

1. Invoice Admitted by Administrator Team:

   A. Creditor filing the invoice until November 24, 2014:

      Concurrent

      Total Creditors : 331 (three hundred thirty one)

      Total Invoice : Rp 9,435,588,290,781.14 (nine trillion four hundred thirty five billion five hundred eighty eight million two hundred ninety thousand seven hundred eighty one rupiah fourteen cents);

      Secure Creditor:

      Total Creditors : 2 (two);

      Curator Total Invoice : Rp 101,281,772,903.14 (one hundred one billion two hundred eighty one million seven hundred seventy two thousand nine hundred and three rupiah fourteen cents);

   B. Creditor filing the invoice after November 24, 2014:

      Concurrent

      Total Creditors : 56 (fifty six)

[Authorized Translation]

Total Invoice : Rp 341,087,290,746.58 (three hundred forty one billion eighty seven million two hundred ninety thousand seven hundred forty six rupiah fifty eight cents);

Secure Creditor:

Total Creditors : None;

Total Invoice : None;

2. Invoice rejected by Administrator Team:

| No | Creditors' Name | Total Invoice (Rp) |
|---|---|---|
| 1 | ASM Asia Recovery (Master) Fund | 112,665,588,687.96 |
| 2 | ASM Co-Investment Opportunity Trust I LP | 189,281,037,595.02 |
| 3 | ASM Co-Investment Opportunity Trust II LP | 161,905,151,281.44 |
| 4 | ASM Co-Investment Term Trust I | 8,660,009,888.46 |
| 5 | ASM Hudson River Fund | 9,258,234,252.96 |
| 6 | Clearen Road Credit Master Fund Ltd | 270,916,518,600.00 |
| 7 | D.E. Shaw Galvanic International Inc | 370,430,181,306.36 |
| 8 | Deuthsche Bank AG London | 129,289,103,928.18 |
| 9 | Parastar Echorindo | 856,065,000.00 |
| 10 | Stockton Street Limited | 28,429,900,710.54 |
| 11 | Tahan Asia Special Opportunities Fund | 131,751,794,522.04 |
| 12 | TCM Asia Opportunities Master Fund Ltd | 131,751,794,522.04 |
| 13 | The Bank of New York Mellon | 5,418,183,852,259.92 |
| | Total | 6,963,379,232,554.92 |

Administrator Team disclaimed those 13 claims of the creditors because after being verified, the fact was

found that such claims were not contained in the record and report of the Debtor based on Article 271 of Law on Insolvency and Debt Payment Obligation Suspension ("Law on Insolvency");

IV. Implementation of Creditor Meeting

The Creditor Meeting was attended by Madam Supervising Judge, Madam Registrar/Secretary, Administrator Team, Debtor and its Attorney as well as the Creditors.

VOTING MEETING:

I. Summon to the Meeting

The summon to the Meeting for the Debtor and Creditors had been served respectively through the Letter Number 015/PKPU-BTEUWED-IN/XI/2014 dated November 27, 2014 and Letter Number 019/PKPU-BTEL/WED-IN/XI/2014 dated December 5, 2014 which was already announced before in Investor Daily Indonesia and Ekonomi Neraca newspapers and State Gazette of Republic of Indonesia dated Friday, November 14, 2014;

II. Claim or Invoice Filed by the Creditor:

In connection with PKPU of PT Bakrie Telecom Tbk (In PKPU) we have received the invoice or claim filed by the Creditors with breakdown as follows:

1. Creditors filing the invoice until the deadline of invoice filing namely November 24, 2014:

Total Creditors : 334 (three hundred thirty four)

Total Invoice : Rp 10,715,099,414,933.80 (ten trillion seven hundred fifteen billion ninety nine million four hundred fourteen thousand nine hundred thirty three rupiah eighty cents);

Secure Creditor:

Total Creditors : 2 (two);

Total Invoice : Rp 625,458,298,869.52 (six hundred twenty five billion four hundred fifty eight million two hundred ninety eight thousand eight hundred sixty nine rupiah fifty two cents);

2. Creditors filing the invoice after November 24, 2014:

Total Creditors : 64 (sixty-four);

Total Invoice : Rp 381,779,733,029.92 (three hundred eighty one billion seven hundred seventy nine million seven hundred thirty three thousand twenty nine rupiah ninety two cents);

Secure Creditor:

Total Creditors : 1 (one);

Total Invoice : Rp 2,582,458,687.00 (two billion five hundred eighty two million four hundred fifty eight thousand six hundred eighty seven rupiah);

3. Creditors filing the invoice up to November 24, 2014 but not contained in the record and report of the Debtor:

   Total Creditors : 13 (thirteen)

   Total Invoice : Rp 6,963,379,232,554.92 (six trillion nine hundred sixty three billion three hundred seventy nine million two hundred thirty two thousand five hundred fifty four rupiah ninety two cents);

III. Verification Result

The followings are verification result on the Creditors' invoice based on the verification meeting already held on December 5, 2014 at Commercial Court of District Court of Central Jakarta and the invoice verification meetings held at the Administrator Office from November 20 through December 4, 2014:

1. Invoice admitted by the Administrator Team:

   A. Creditors filing the invoice up to November 24, 2014:

      Concurrent:

      Total Creditors : 331 (three hundred thirty one)

      Total Invoice : Rp 9,435,588,290,781.14 (nine trillion four hundred thirty five billion five hundred eighty eight million two hundred ninety

thousand seven hundred eighty one rupiah fourteen cents);

Secure Creditor:

Total Creditors : 2 (two);

Curator Total Invoice: Rp 101,281,772,903.14 (one hundred one invoiceion two hundred eighty one million seven hundred seventy two thousand nine hundred and three rupiah fourteen cents);

B. Creditor filing the invoice after November 24, 2014:

Concurrent

Total Creditors : 56 (fifty six)

Total Invoice : Rp 341,087,290,746.58 (three hundred forty one billion eighty seven million two hundred ninety thousand seven hundred forty six rupiah fifty eight cents);

2. Invoice Denied or rejected By Administrator Team:

Administrator Team has disclaimed 13 (Thirteen) invoices filed by the creditors as follows:

| No | Creditors' Name | Total Invoice (Rp) |
|---|---|---|
| 1 | ASM Asia Recovery (Master) Fund | 112,665,588,687.96 |
| 2 | ASM Co-Investment Opportunity Trust I LP | 189,281,037,595.02 |
| 3 | ASM Co-Investment Opportunity Trust II LP | 161,905,151,281.44 |
| 4 | ASM Co-Investment Term Trust I | 8,660,009,888.46 |

| | | |
|---|---|---|
| 5 | ASM Hudson River Fund | 9,258,234,252.96 |
| 6 | Clearen Road Credit Master Fund Ltd | 270,916,518,600.00 |
| 7 | D.E. Shaw Galvanic International Inc | 370,430,181,306.36 |
| 8 | Deuthsche Bank AG London | 129,289,103,928.18 |
| 9 | Parastar Echorindo | 856,065,000.00 |
| 10 | Stockton Street Limited | 28,429,900,710.54 |
| 11 | Tahan Asia Special Opportunities Fund | 131,751,794,522.04 |
| 12 | TCM Asia Opportunities Master Fund Ltd | 131,751,794,522.04 |
| 13 | The Bank of New York Mellon | 5,418,183,852,259.92 |
| | Total | 6,963,379,232,554.92 |

Administrator Team disclaimed those 13 invoices of the creditors because after being verified, the fact was found that such claims were not contained in the record and report of the Debtor whereas based on Article 271 of Law on Insolvency and Debt Payment Obligation Suspension ("Law on Insolvency") all calculations already incorporated by Administrator Team must be verified to the record and report of the Debtor.

IV. Implementation of Creditor Meeting

The Creditor Meeting was attended by Madam Supervising Judge, Madam Registrar/Secretary, Administrator Team, Debtor and its Attorney as well as the Creditors as follows:

a. 343 (three hundred forty three) concurrent creditors qualified to vote attended in person or represented by their attorneys representing the invoice Rp 9,680,786,529.18 (nine trillion six hundred eighty billion seven hundred eighty six million ninety seven thousand five hundred twenty nine rupiah eighteen cents); and

b. 2 (two) Secure Creditors qualified to vote attended in person or represented by their attorneys represented the invoice Rp 101,281,772,903.14 (one hundred one billion two hundred eighty one million seven hundred seventy two thousand nine hundred three rupiah fourteen cents);

The votes were counted referring to the provision of Article 3 of Regulation of Government Number 10 of 2005 regarding Counting of Creditors' Voting Rights under the terms as follows:

1. Total invoice up to Rp 10,000,000.00 (ten million rupiah) shall be entitled to one vote and its multiplication;
2. Total balance of the invoice above Rp 5,000,000.00 (five million rupiah) shall be entitled to one vote; and

3. Total balance of the invoice below Rp 5,000,000.00 (five million rupiah) shall not be entitled to additional vote;

Therefore, total vote present for voting shall be as follows:

1. Concurrent Creditors were 968,079 votes; and
2. Secure Creditors were 10,128 votes;

After the voting where each Creditor present in person or represented by the attorney signing the voting sheet, the following result was obtained:

A. Concurrent Creditors:

   1. Total concurrent creditors approving the reconciliation plan shall be:

      325 (three hundred twenty five) creditors with 915,377 (nine hundred fifteen thousand and three hundred seventy seven) votes or 94.56% (ninety four point fifty six percent) of total votes of creditors present in the voting;

   2. Total concurrent creditors disapproving the reconciliation plan shall be:

      11 (eleven) creditors with 38,227 (thirty eight thousand and two hundred twenty seven) votes or 3.95% (three point ninety five percent) of total votes of creditors present in the voting;

3. Total abstain concurrent creditors in reconciliation plan shall be:

   7 (seven) creditors with 14,470 (fourteen thousand and four hundred seventy) votes or 1.49 (one point forty nine) of total votes of creditors present in the voting;

B. Secure Creditors:

Total Secure creditors approving the reconciliation plan shall be:

2 (two) creditors with 10,128 (ten thousand one hundred and twenty eight) votes or 100% (one hundred percent) of total votes of creditors present in the voting;

That in accordance with Article 281 paragraph (1) of Law Number 37 of 2004 regarding Insolvency and Suspension of Debt Payment Obligation ("PKPU") it is declared that the reconciliation plan shall be acceptable based on:

a. *Approval from more than 1/2 (half) of total concurrent creditors which rights are admitted or temporarily admitted present in the creditor meeting as referred to in Article 268 including the Creditors as referred to in Article 280, which jointly representing at least 2/3 (two thirds) of total invoices admitted or temporarily*

*admitted of the Concurrent Creditors or their attorneys present in such meeting; and*

*b. Approval from more than 1/2 (half) of total Creditors whose receivables is encumbered by pledge, Fiduciary Security, mortgage, hypotech, or collateral right of other material present and representing at least 2/3 (two thirds) of total invoices of such Creditors or their attorneys present in the meeting;*

That from such voting result it can be concluded that total creditors approving the reconciliation plan have fulfilled the quorum as referred to in Article 281 paragraph (1) of Law on Insolvency above;

Therefore, the Creditors have given their approval for the reconciliation plant filed by the Debtor;

Considering, that besides, PT Bakrie Telecom Tbk had submitted its Reconciliation Agreement Plan together with the Response on Petition for Suspension of Debt Payment Obligation of this case, which Reconciliation Plan was revised on December 8, 2014 namely as follows:

1. RECONCILIATION PLAN:

1.1 This Reconciliation Plan was prepared by considering and based on the current business condition of the

Company. The Telecommunication Network Organizing Business Activity Merger Agreement between the Company and PT Smartfren Telecom Tbk dated October 30, 2014, Telecommunication Network Lease Agreement between the Company and PT Smartfren Telecom Tbk dated October 30, 2014, and the market condition, as well as the capacities of the Company's creditors in connection with the securities held by the Secure creditors and the terms and conditions relevant to the given securities;

1.2 *Cash Waterfall*. The Company will try to allocate the Operational Cash Remnant (outside the New Debt and issue of New Stocks) and the Company's main business activity into an account of the Company and will be applied for the priority scale sequence as follows:

I. All taxes including Tax Debt relating to the Company operational activity in accordance with the prevailing tax regulation;

II. All costs and expenses relating to the Company's PKPU process, including but not limited to the honorarium of the administrators, case charges and costs, fee for the legal consultants and financial advisors of the Company, costs and expenses arising from the Reconciliation Plan under homologation process, both notarial fee or

other expenses as deemed necessary or obligatory by the Company;

III. Operational expenditure reserve of the Company including the payments of BHP, USO and tax of the current year as well as other operational costs maximum for 1 month to come. The capital expenditure reserve relating to the business activity for maximum 6 months to come, and dismantling cost of telecommunication equipment of the Company from the telecommunication infrastructure plant, including the telecommunication tower leased by the Company from the creditor, power provider's debt and other operational cost;

IV. New Debt obligation payment in connection with the working capital and the capital expenditure loan (if any);

V. To fulfill the cash fund reserve maximum Rp 100,000,000.00 (one hundred million rupiah);

VI. Payment of BHP and USO Debts already due and Reserve of payment of BHP Debt installment for one current year;

VII. Payment of debt installment already due for Tranche A category debt and reserve of debt installment payment of Tranche A category debt for one current year; payment of interest and

principal already due on pro rate basis of Tranche B category debt; payment of interest and principal already due on pro rate basis of Tranche C category debt; and payment of interest and principal already due on pro rate basis of Tranche D category debt; payment of interest and principal already due on pro rate basis and payment of principal installment payable in the current year for the debts of Tranches A, B, C and D categories;

VIII. *Cash Sweep*. In case of excess fund after the fulfillment of the abovementioned Cash Waterfall priority ("Excess Fund"), it will be applied for the earlier debt payment as set out in this Reconciliation Plan which will due on the nearest subsequent due date by remaining following the above Cash Waterfall priority sequence from points VI through VII;

The Cash Waterfall calculation is made on every 4th month after the semiannually financial statement at the end of June and the annual financial statement in December each year, and for the first time it will be made to the Company's financial statement of June 2015, whereas the debt payment based on this Reconciliation Plan will be made in June each year after the Cash Waterfall calculation, and the debt

first payment based on this Reconciliation Plan will be made at the latest in the 18th month after the date of Homologation;

The Company will appoint the independent monitoring accountant who will supervise the implementation of Cash Waterfall in accordance with the above priority sequence;

1.3 Waiver of other obligation. This reconciliation plan does not bind or does not apply to the payment or implementation of the Company's obligations to any party relating to the implementation of telecommunication network organizing business activity merger agreement between the Company and PT Smartfren Telecom Tbk dated October 30, 2014 and telecommunication network lease agreement between the company and PT Smartfren Telecom Tbk dated October 30, 2014 together with its derivative agreement (if any);

1.4 Assignment of Right. Creditors may assign the right of their invoices to other party based on the prevailing legislation and by remaining subjected to the following:

I. Each third party transferee or assignee of the invoice based on the Reconciliation Plan on Homologation basis will remain be bound and subjected to all provisions set forth in the homologated Reconciliation Plan.

II. The creditor transferring or assigning its claim right to the third party shall deliver the written notice to the Company on the transfer of such claim right in accordance with the legislation prevailed in Indonesia. The failure to deliver the written notice will be considered such claim right transfer is not yet occurred.

1.5 Restructuring General Provision. The restructuring general provisions applied to the Creditors shall be as follows:

I. Reconciliation Plan and the restructuring measures already under homologation basis shall apply and bind the respective:

1) Creditor on Verified Debt
The Verification debt shall be the claim already filed by the creditors to and admitted as well as verified by the Company's Administrator and the Company;

2) Creditor of Unverified Debt
Unverified debt shall mean the claim not filed by the Creditors to and not verified by the Company Administrator but recorded and admitted by the Company.

3) Creditor of Debt Outside Verification (as referred to in Clause 3.5.V below);

II. All interests, penalties and/or fine already arisen until the Date of Homologation due to the Company's Debt will be written off entirely, unless expressly set forth otherwise and specifically by the Company in this Reconciliation Plan;

III. If the Company imposed an interest for the debt payment as set forth in this Reconciliation Plan, then in accordance with the prevailing tax regulation the Company shall be entitled to deduct all taxes arising in connection with the interest imposition where such interest payment admitted shall be the interest already paid in the current year;

IV. As of the date of Homologation, all titles to the thing or goods or other form that can be declared as thing or goods not delivered by the Creditors to the Company related to the debt as set forth in this Reconciliation Plan shall become and must be transferred to the Company;

V. Against other claims which:

1) were not identified yet until the homologation of this Reconciliation Plan; or
2) were just identified after the homologation of this Reconciliation Plan but the claims were derived or arisen from the condition,

legal action, commencement or series of occurrence, or the legal provisions existed prior to the homologation of this Reconciliation Plan containing the judgment of the judicative board or the arbitration board having the force of law shall remain admitted by Indonesian law;

then other claims as referred to in clause 3.5 V 1) and 2) above (referred to as "Debt Outside Verification") shall be subjected to the provisions as follows:

a) Such claims can be accepted by the Company but it must conform to the Indonesian Financial Accounting Standard/IFAS = PSAK) and the prevailing legislation; and

b) Only when the abovementioned provision has been fulfilled and the claim is accepted and admitted by the Company, then such claim will be payable by the Company from the 31st year after the date of Homologation;

VI. The Classification or determination of type of debt as set forth in clause 3.6 below is aimed at making it is easy to present the scheme or pattern of adjustment of each type of debt. The debt categorization into Tranche A, Tranche B, Tranche C and Tranche D in this Reconciliation

Plan is intended for the favor of Cash Waterfall arrangement as referred to in clause 3.2 above;

1.6 Special provisions of Restructuring below shall be the restructuring plan of each debt of the Company:

I. OPERATING DEBT

The operating debt is classified into two namely (i) Operating Debt Rp 1 through Rp 3,000,000,000 (three billion rupiah) and (ii) Operating Debt above Rp 3,000,000,000 (three billion rupiah) against the Operating Debt above Rp 3,000,000,000 (three billion rupiah) shall be subjected to calculation as follows:

- Against the first Rp 3,000,000,000 (three billion rupiah) the special restructuring provisions as set forth in clause I.A.e) below will apply;
- Against all remaining Operating Debt after deducted Rp 3,000,000,000 (three billion rupiah) the special restructuring provisions as set forth in clause I.B below will apply;

Below is the special restructuring provisions for Operating Debt:

A. Operating Debt Rp 1 through Rp 3,000,000,000 (three billion rupiah) (Tranche A Category Debt):

The Company will make cash payment for the debt under the terms as follows:

a) Operating Debt Rp 1.00 through Rp 100,000,000.00 (one hundred million rupiah) the payment shall be as follows:
   i) 50% (fifty percent) of the said Operating Debt will be paid at the latest in 18th month;
   ii) 50% (fifty percent) of the said Operating Debt will be paid at the latest in 30th month;
   After the date of Homologation;
b) Operating Debt above Rp 100,000,000.00 (one hundred million rupiah) up to Rp 500,000,000.00 (five hundred million rupiah), the payment shall be as follows:
   i) 20% (twenty percent) of the said Operating Debt will be paid at the latest in 24th month;
   ii) 35% (thirty-five percent) of the said Operating Debt will be paid at the latest in 36th month;
   iii) 45% (forty-five percent) of the said Operating Debt will be paid at the latest in 36th month;
   After the date of Homologation;

c) Operating Debt above Rp 500,000,000.00 (five hundred million) up to Rp 1,000,000,000.00 (one billion rupiah), the payment shall be as follows:
   i) 10% (ten percent) of the said Operating Debt will be paid at the latest in 24th month;
   ii) 15% (fifteen percent) of the said Operating Debt will be paid at the latest in 36th month;
   iii) 20% (twenty percent) of the said Operating Debt will be paid at the latest in 48th month;
   iv) 55% (fifty five percent) of the said Operating Debt will be paid at the latest in 60th month;
   After the date of Homologation;
d) Operating Debt above Rp 1,000,000,000.00 (one billion rupiah) up to Rp 2,000,000,000.00 (two billion rupiah), the payment shall be as follows:
   i) 5% (five percent) of the said Operating Debt will be paid at the latest in 24th month;

ii) 10% (ten percent) of the said Operating Debt will be paid at the latest in 36th month;

iii) 15% (fifteen percent) of the said Operating Debt will be paid at the latest in 48th month;

iv) 25% (twenty-five percent) of the said Operating Debt will be paid at the latest in 60th month;

v) 45% (forty-five percent) of the said Operating Debt will be paid at the latest in 72th month;

After the date of Homologation;

e) Operating Debt above Rp 2,000,000,000.00 (two billion rupiah) up to Rp 3,000,000,000.00 (three billion rupiah), the payment shall be as follows:

i) 5% (five percent) of the said Operating Debt will be paid at the latest in 24th month;

ii) 5% (five percent) of the said Operating Debt will be paid at the latest in 36th month;

iii) 10% (ten percent) of the said Operating Debt will be paid at the latest in 48th month;

iv) 10% (ten percent) of the said Operating Debt will be paid at the latest in 60th month;

v) 25% (twenty-five percent) of the said Operating Debt will be paid at the latest in 72th month;

vi) 45% (forty-five percent) of the said Operating Debt will be paid at the latest in 84th month;

After the date of Homologation;

f) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the Operating Debt Rp 1.00 up to Rp 3,000,000,000 (three billion rupiah) (Tranche A category debt), the payment of remaining debt value not paid at each due date will be deferred and combined to the debt payment of the subsequent due date and so forth until the last due date;

g) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the rest of the debt in accordance with the

schedule in point 1) until the last due date, such remaining debt will be paid at the latest at the end of 15th year after the date of Homologation;

B. Operating Debt above Rp 3,000,000,000 (three billion rupiah) (Tranche C Category Debt) and that above Rp 3,000,000,000 (three billion rupiah) in rupiah currency (Tranche D category debt)

1) Operating Debt Value up to the first Rp 3,000,000,000 (three billion rupiah) will be paid in accordance with Clause I.A.e) above;

2) 30% (thirty percent) of the remaining Operating Debt after being deducted the value according to point 1) will be paid in cash ("Cash Portion") to as follows:

(a) 7.5% of Cash Portion will be paid in 18th month;

(b) 17.5% of Cash Portion will be paid in 30th month;

(c) 17.5% of Cash Portion will be paid in 42nd month;

(d) 17.5% of Cash Portion will be paid in 54th month;

(e) 40.0% of Cash Portion will be paid in 66th month;

after Homologation Date;

3) The Company will impose the interest on the Cash Portion of the Tranche C category debt by 4% and Tranche D category debt by 6% per annum, to be paid by following the above Cash Portion payment schedule;

4) 70% of the remaining Operating Debt after being deducted according to point 1) will be paid by the Company's Mandatory Convertible Bond (MCB-A) with tenor 10 years as of the Effective Date with the implementation price Rp 200/share by taking into account the prevailing legislation on Capital Market and the provisions of Law Number 40 of 2007 regarding the Limited Liability Company together with the amendments and/or supplement ("Company Law");

5) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the Cash Portion and its interest as set

forth in clause 3.6.I.B.2) and 3) above, then the payment of the remaining Cash Portion and interest cannot be paid on each due date will be deferred and combined to the Cash Portion payment on the subsequent due date and so forth until the last due date;

6) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the Cash Portion and its interest not paid according to the schedule as referred to in point 5) above until the 66th month after the Date of Homologation ("Remaining Cash Portion"), then such Remaining Cash Portion will be paid within the period of 5 years after the 66th month on pro rate basis each year;

7) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the Remaining Cash Portion at each due date as referred to in point 6) above, the payment of the Remaining Cash Portion not

paid will be deferred and combined to the Remaining Cash Portion payment at the subsequent due date and so forth until the last due date (at the end of the 5th year);

8) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the Remaining Cash Portion with the schedule as referred to the above point 7) then the remaining cash portion will be paid by Company’s Mandatory Convertible Bond (MCB-A) with tenor 2 years with the procedure and conversion implementation price minimum according to the provisions of Capital Market applied and the provisions of Company Law;

9) To avoid the doubt, the Company will not impose the interest to the principal of 70% as referred to in point 4) above, which will be converted into the stock according to the above provision;

II. DEBT TO TOWER PROVIDER

The Debt of Tower Provider consists of: i) Debt of tower lease already due and not paid yet and

arising until November 10, 2014, and ii) Lease value for the remaining tower lease period based on the existing tower lease agreement between the Company and each Tower Provider Debt Creditor calculated as of November 10, 2014 until the end of tower lease period in accordance with the lease agreement;

A. The following is the restructuring provision for Tower Provider Debt for the tower lease already due and not paid yet, and arising up to November 10, 2014:

A.1 RoI debt up to Rp 3,000,000,000 (Tranche A category debt);

1) The payment for the debt Rp 1 up to Rp 100,000,000.00 shall be as follows:

a) 50% of such debt will be paid at the latest in 18th month;

b) 50% of such debt will be paid at the latest in 30th month;

After the date of Homologation;

2) The payment for the debt above Rp 100,000,000.00 up to Rp 500,000,000 shall be as follows:

a) 20% of such debt will be paid at the latest in 24th month;

b) 35% of such debt will be paid at the latest in 36th month;

c) 45% of such debt will be paid at the latest in 48th month;

After the date of Homologation;

3) The payment for the debt above Rp 500,000,000.00 up to Rp 1,000,000,000 shall be as follows:

a) 10% of such debt will be paid at the latest in 24th month;

b) 15% of such debt will be paid at the latest in 36th month;

c) 20% of such debt will be paid at the latest in 48th month;

d) 55% of such debt will be paid at the latest in 60th month;

After the date of Homologation;

4) The payment for the debt above Rp 1,000,000,000.00 up to Rp 2,000,000,000 shall be as follows:

a) 5% of such debt will be paid at the latest in 24th month;

b) 10% of such debt will be paid at the latest in 36th month;

c) 15% of such debt will be paid at the latest in 48th month;

d) 25% of such debt will be paid at the latest in 60th month;

e) 45% of such debt will be paid at the latest in 72th month;

After the date of Homologation;

5) The payment for the debt above Rp 2,000,000,000.00 up to Rp 3,000,000,000 shall be as follows:

a) 5% of such debt will be paid at the latest in 24th month;

b) 5% of such debt will be paid at the latest in 36th month;

c) 10% of such debt will be paid at the latest in 48th month;

d) 10% of such debt will be paid at the latest in 60th month;

e) 25% of such debt will be paid at the latest in 72th month;

f) 45% of such debt will be paid at the latest in 84th month;

After the date of Homologation;

6) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the debt as referred to

in clause A.A1 (Tranche A category debt), the payment of the remaining debt value not paid at each due date will be deferred and combined to the debt payment at the subsequent due date and so forth until the last due date;

7) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the Remaining Cash Portion at each due date as referred to in point 6) until the last due date, such remaining debt will be paid at the latest in the 15th year after the date of Homologation;

A.2 Debt above Rp 3,000,000,000:

1) Debt Value up to the first Rp 3,000,000,000 will be paid in accordance with Clause II.A.A.1.5);

2) 30% of the remaining debt after being deducted the value according to abovementioned point A.2.1) (Tranche D category debt), together with interest 6% per annum of such

value will be paid in cash ("Cash Portion") to as follows:

(a) 7.5% of Cash Portion will be paid in 18th month;
(b) 17.5% of Cash Portion will be paid in 30th month;
(c) 17.5% of Cash Portion will be paid in 42th month;
(d) 17.5% of Cash Portion will be paid in 54th month;
(e) 40.0% of Cash Portion will be paid in 66th month;

After the date of Homologation;

3) 70% of the remaining debt after being deducted according to point A.2.1) above will be paid by the Company's Mandatory Convertible Bond (MCB-A) with tenor 10 years as of the Effective Date with the implementation price Rp 200/share by taking into account the prevailing legislation on Capital Market and the provisions of Company Law;

4) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth

in Clause 3.2 there is no sufficient fund to pay the Cash Portion as set forth in clause 3.6.II.A.2.1) and 2) above, then the payment of the remaining Cash Portion not paid on each due date will be deferred and combined to the Cash Portion payment on the subsequent due date and so forth until the last due date;

5) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the remaining Cash Portion and interest up to the 66th month after the Homologation Date ("Remaining Cash Portion"), such Remaining Cash Portion will be paid within the period of 5 years after the 66th month on pro rate basis every year;

6) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the Remaining Cash

Portion in accordance with the schedule as referred to in point 5) above, then the payment of the Remaining Cash Portion not paid yet will be deferred and combined with the Remaining Cash Portion payment on the subsequent due date and so forth until the last due date (at the end of 5th year);

7) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the Remaining Cash Portion up to the end of the 5th year as referred to in point 6), then the Remaining Cash Portion will be paid by Company's Mandatory Convertible Bond (MCB-B) with tenor 2 years upon the procedure and conversion implementation price minimum according to the provisions of Capital Market applied and the provisions of Company Law;

8) To avoid the doubt, the Company will not impose the interest to the

principal of 70% as referred to in point 3) above, which will be converted into the stock according to the above provision;

B. **Remaining Lease Period.** The following are the restructuring provisions for Tower Provider Debt based on the existing tower lease agreement between the Company and each Creditor on the Tower Provider Debt calculated as of November 10, 2014 up to the end of the tower lease period in accordance with the respective lease agreement:

1) 100% and the remaining lease period value will be exchanged to Mandatory Convertible Bond (MCB-A) with tenor 10 years issued by the Company on the Effective Date with the conversion implementation price Rp 200/share by taking into account the prevailing provisions on Capital Market and Company Law;

2) To avoid the doubt the Company will not impose the interest on the value as referred to in point B.1 above exchanged into MCB-A according to the abovementioned terms.

C. **Cessation of Tower Procurement Facility.** The Creditor of Tower Provider Debt may cease the service of use of tower leased by the Company at the end of June 2015, unless stipulated otherwise by the Company and the related creditor of Tower Provider Debt;

III. USE RIGHTS CHARGE DEBT (BHP) AND UNIVERSAL SERVICE OBLIGATION (USO):

A. BHP and USO principal shall be the debt admitted by the Company in writing up to November 10, 2014 ("BHP Principal") consist of:

1) Band Frequency BHP Debt;

2) ISR Frequency BHP Debt;

3) Telecommunication BHP Debt;

4) USO Debt;

5)

B. In the event of excess payment of BHP Principal, such excess will be counted as the subsequent payment of BHP Principal Installment.

C. Payment of BHP Principal shall be made upon the payment schedule as follows:

1) Band Frequency BHP Debt:

a) 2.9% of Band Frequency BHP Debt will be paid at the latest at the end of the 2nd year;

b) 2.9% of Band Frequency BHP Debt will be paid at the latest at the end of the 3rd year;

c) 2.9% of Band Frequency BHP Debt will be paid at the latest at the end of the 4th year;

d) 2.9% of Band Frequency BHP Debt will be paid at the latest at the end of the 5th year;

e) 5.8% of Band Frequency BHP Debt will be paid at the latest at the end of the 6th year;

f) 5.8% of Band Frequency BHP Debt will be paid at the latest at the end of the 7th year;

g) 5.8% of Band Frequency BHP Debt will be paid at the latest at the end of the 8th year;

h) 5.8% of Band Frequency BHP Debt will be paid at the latest at the end of the 9th year;

i) The remaining Band Frequency BHP Debt still outstanding will be paid at the latest at the end of the 10th year;

After the date of Homologation;

2) ISR Frequency BHP Debt:

a) 2.9% of ISR Frequency BHP Debt will be paid at the latest at the end of the 2nd year;

b) 2.9% of ISR Frequency BHP Debt will be paid at the latest at the end of the 3rd year;

c) 2.9% of ISR Frequency BHP Debt will be paid at the latest at the end of the 4th year;

d) 2.9% of ISR Frequency BHP Debt will be paid at the latest at the end of the 5th year;

e) 5.8% of ISR Frequency BHP Debt will be paid at the latest at the end of the 6th year;

f) 5.8% of ISR Frequency BHP Debt will be paid at the latest at the end of the 7th year;

g) 5.8% of ISR Frequency BHP Debt will be paid at the latest at the end of the 8th year;

h) 5.8% of ISR Frequency BHP Debt will be paid at the latest at the end of the 9th year;

i) The remaining ISR Frequency BHP Debt still outstanding will be paid at the latest at the end of the 10th year;

After the date of Homologation;

3) Telecommunication BHP Debt:

a) 2.9% of Telecommunication BHP Debt will be paid at the latest at the end of the 2nd year;

b) 2.9% of Telecommunication BHP Debt will be paid at the latest at the end of the 3rd year;

c) 2.9% of Telecommunication BHP Debt will be paid at the latest at the end of the 4th year;

d) 2.9% of Telecommunication BHP Debt will be paid at the latest at the end of the 5th year;

e) 5.8% of Telecommunication BHP Debt will be paid at the latest at the end of the 6th year;

f) 5.8% of Telecommunication BHP Debt will be paid at the latest at the end of the 7th year;

g) 5.8% of Telecommunication BHP Debt will be paid at the latest at the end of the 8th year;

h) 5.8% of Telecommunication BHP Debt will be paid at the latest at the end of the 9th year;

i) The remaining Telecommunication BHP Debt still outstanding will be paid at the latest at the end of the 10th year;

After the date of Homologation;

4) USO Debt:

a) 2.9% of USOI Debt will be paid at the latest at the end of the 2nd year;

b) 2.9% of USO Debt will be paid at the latest at the end of the 3rd year;

c) 2.9% of USO Debt will be paid at the latest at the end of the 4th year;

d) 2.9% of USO Debt will be paid at the latest at the end of the 5th year;

e) 5.8% of USO Debt will be paid at the latest at the end of the 6th year;

f) 5.8% of USO Debt will be paid at the latest at the end of the 7th year;

g) 5.8% of USO Debt will be paid at the latest at the end of the 8th year;

h) 5.8% of USO Debt will be paid at the latest at the end of the 9th year;

i) The remaining USO Debt still outstanding will be paid at the latest at the end of the 10th year;

After the date of homologation;

D. If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the debt as set forth in the abovementioned Clause III.C, then the payment of such remaining debt will be paid and combined to the debt payment at the subsequent due date and so forth until the last due date.

E. If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the debt in accordance with the schedule as referred to in point D) above, then the debt payment not paid yet will be deferred and combined with the remaining debt payment on the subsequent due date and so forth until the last due date (at the end of 5th year);

F. In the event of security on BHP Principal payment and such security is then due and become effective/is drawn before the end of the abovementioned BHP Principal payment schedule, such payment schedule shall no longer be valid unless there is still the related remaining BHP Principal which payment schedule will remain refer to the payment schedule of BHP Principal as in the provision of clause III.C of this Reconciliation Plan;

IV. DEBT OF SENIOR NOTES PROCEEDS

A. Payment of Debt of Senior Notes Proceeds will be made by the Company in the manners as follows:

1) 30% of the Debt of Senior Notes Proceeds (Tranche C category debt) will be paid in cash ("Cash Portion") to as follows:

(a) 7.5% of Cash Portion will be paid in 18th month;

(b) 17.5% of Cash Portion will be paid in 30th month;

(c) 17.5% of Cash Portion will be paid in 42nd month;

(d) 17.5% of Cash Portion will be paid in 54th month;

(e) 40.0% of Cash Portion will be paid in 66th month;

After the date of Homologation;

2) The Company will impose the interest on the Cash Portion of the Tranche C category debt by 4% to be paid in accordance with the payment schedule as referred to in clause IV.A.1);

3) 70% (seventy percent) of Affiliate Debt will be paid by the Company's Mandatory Convertible Bond (MCB-A) with tenor 10 years as of the Effective Date and extendable by the Company at implementation price Rp 200/share by taking into account the prevailing legislation on Capital Market and the provisions of Law Number 40 of 2007 regarding the Limited Liability Company;

4) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the Cash Portion and its interest as set forth in clause IV.A.1) then the payment of the remaining Cash Portion and interest not paid on each due date will

be deferred and combined to the Cash Portion payment on the subsequent due date and so forth;

5) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the Cash Portion and its interest until the 66th month after the Date of Homologation ("Remaining Cash Portion"), then such Remaining Cash Portion will be paid within the period of 5 years after the 66th month on pro rate basis each year;

6) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the Remaining Cash Portion at each due date as referred to in point 5) above, the payment of the Remaining Cash Portion not paid will be deferred and combined to the Remaining Cash Portion payment at the subsequent due date and so forth until the last due date (at the end of the 5th year);

7) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the Remaining Cash Portion after the end of the 5th year as referred to the above point 6), then the Remaining Cash Portion will be paid by Company's Mandatory Convertible Bond (MCB-B) with tenor 2 years with the procedure and conversion implementation price minimum according to the provisions of Capital Market applied and the provisions of Company Law;

8) To avoid the doubt, the Company will not impose the interest to the principal of 70% as referred to in point 3) above, which will be converted into the stock according to the above provision;

9) If required, the Company will try to request for or take a required effort/action in order the Debt of Senior Notes Proceeds will be settled/paid in accordance with the provision of point IV including but not limited to the action and provisions as follows:

a) Specially request for the attention of the court that in the frame of fulfilling the United States securities acts, it is allowed to be guided by the exception of the registration based on Article 3(a)(10) of Securities Act 1933 of United States of America. Whereas Article 3(a)(1) allows a process outside the court of United States of America (in this matter Company PKPU process) to do an exchange of Senior Notes with the Senior Notes holder in United States of America if the certain provisions are complied with. To this end, the Company may request the court to determine the conditions which are fair for all creditors including the foreign Senior Notes holder by remaining subjected to the approval from the reconciliation plan by the majority needed creditors.

b) The Cash Portion can be issued into the security and can be offered to all holders of Senior Notes as the exchange offer) based on the

prevailing capital market regulation including the appropriate registration exception based on United States Securities Acts. For the new securities acceptance (exchange), the foreign Senior Notes holder existed in a state outside Indonesia shall be obliged to sign the confirmations generally stated that they are the sophisticated investors fulfilling the requirements to receive the new securities. If they cannot give such confirmation, they may choose to sell the new securities having the reputation and receive the cash money from such sale;

c) In case of Senior Notes Holder outside the territory of Indonesia, they are obliged to issue the general confirmation as the full and final settlement of all claims they have relating to the existing Debt of Senior Notes Proceeds Fund based on other law wherever prevailed and undertakes to revoke each current

legal process/remedy overseas. In case of Senior Notes holders not willing to release the invoice based on any law, they are not entitled to receive the new securities. This provision does not specially reduce the right of the Company to ask for recognition for this PKPU process based on Article 15 of Bankruptcy Code of United Sates of America or each other provision of any national law allowing the recognition on the foreign court process;

d) Senior Notes Holders outside the territory of Indonesia are obliged to provide the stock account breakdown to receive the new securities;

e) Taking the reasonable effort in order the foreign Senior Notes Holders are contactable through the clearing system. However, in case of those who are uncontactable or cannot provide the required documentation to receive the new securities within 6 months as of the notice, all of their rights will be forfeited. A reputable stock

custodian will be appointed to sell such new securities and distribute the yields to the Company for the Company general purpose. The Company will not specially be responsible for any obligation or tasks of the foreign stock companies, custodian or mediator to provide the information for the ultimate holders;

10) To avoid the doubt:

a) Debt of Senior Notes Proceeds Fund shall be the Company's debt to BTPL by USD380,000,000 based on Intercompany Loan Agreement and Supplemental Intercompany Loan Agreement dated respectively May 7, 2010 and January 27, 2011 ("Intercompany Loan Agreement") where the company as guarantor and BTPL as lender;

b) Senior Notes Proceeds Fund earned by the Company pursuant to Intercompany Loan Agreement shall be the fund derived from the issue of Senior Notes that must be provided by BTPL in terms of loan for the Company

through the Intercompany Loan in accordance with the provisions of Offering Memorandum USD250 Million 11.5% Guaranteed Senior Notes Due 2015 and USD 130 Million Senior Notes at 107% issued by BTPL;

c) In accordance with the provision of Offering Memorandum USD 250 Million 11.5% Guaranteed Senior Notes Due 2015 and USD 130 Million Senior Notes at 107% issued by BTPL, any repayment or settlement of loan by the Company to BTPL will be applied by BTPL specially and limitedly for repayment or settlement of Senior Notes to Senior Notes Holders;

d) Payment or settlement of the Company obligations on the loan based on the Intercompany Loan Agreement set forth in this Reconciliation Plan must be intended as the repayment of settlement of loan as referred to in the abovementioned point 10) b) and c). Therefore, all payments or settlements of the Company's obligations received by BTPL will

legally become the right of acceptance of Senior Notes settlement for such Senior Notes holders;

e) By the homologation of this Reconciliation Plan which also covers the settlements scheme or pattern of Debt of Senior Notes Proceeds Fund by the Company as set forth in Clause IV, as of such date of Homologation, the Company will no longer have obligation to fulfill all agreements or documents relating to the issue of Senior Notes which expire, including but not limited to the fulfillment of all existing guarantees in the frame of issue of Senior Notes namely the Corporate Guarantee provided by the Company, guarantee provided by the Grantor, as well as other guarantee if any. In the event of judgment of the judicative board already having the permanent force of law and admitted by the Indonesian law stating that the Company and Grantors are obliged to make payment due to the drawdown of any guarantee

provided in the issue of Senior Notes, then such obligation payment will be made by the Company by following the provision of Clause 3.6.IV and the obligation payment portion will reduce the payment portion of Senior Notes Proceeds Fund Debt equally;

11) Upon the Senior Notes Proceeds Fund Debt the Company and the Creditors can distribute MCB-A, and Cash Portion or MCB-B to a certain value stipulated by them on such Senior Notes Proceeds Fund Debt and then transferable to other party provided that such other party is subjected to and bound by this Reconciliation Plan;

12) With the consideration the Company deems appropriate, the Company may provide the material guarantee for the existing fixed assets of the Company until the date of Homologation for the implementation of Cash Portion payment obligation which will be below the par to other creditors together with their affiliate in this Reconciliation Plan which has total claim

admitted by the Company more than USD140,000,000.00 which can be provided as the material guarantee for the same fixed assets;

V. AFFILIATE DEBT:

Affiliate Debt will be paid in the manner as follows:

1) 100% of Affiliate Debt will be exchanged into Mandatory Convertible Bonds (MCB-A) of the Company with tenor 10 years as of the effective date at the conversion implementation price Rp 200/share by taking into account the Capital Market prevailing provisions and Company Law;
2) To avoid the doubt, the Company will not impose the interest for the value as referred to in point 1) above which will be converted into MCB-A according to the above terms.

VI. DEBT WITH GUARANTEE (Tranche B Category Debt):

1) Debt With Guarantee shall mean as defined in the definition section.
2) Upon the debt with guarantee in this reconciliation plan calculated and admitted shall mean all values of principal only;

3) All debts with guarantee will be paid in cash in accordance with the amortization schedule as follows:
   (a) 5.25% of total Debt with Guarantee will be paid in 18th month;
   (b) 10.50% of total Debt with Guarantee will be paid in 30th month;
   (c) 10.50% of total Debt with Guarantee will be paid in 42nd month;
   (d) 15.00% of total Debt with Guarantee will be paid in 54th month;
   (e) 58.75% of total Debt with Guarantee will be paid in 66th month;

   After the date of Homologation;
4) The Company will impose the interest on Debt with Guarantee by 4% to be paid in accordance with the payment schedule as referred to in clause VI.3);
5) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the Debt with Guarantee and its interest as set forth in clause VI.3) and 4), then the payment of the remaining Debt with Guarantee value and interest cannot be paid on each due date will

be deferred and combined to the subsequent payment on the subsequent due date and so forth;

6) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the remaining Debt with Guarantee and its interest not paid yet after the 66th month after the date of Homologation ("Remaining Debt With Guarantee"), then such Remaining Debt With Guarantee will be paid within the period of 5 years on pro rate basis each year;

7) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the Remaining Debt with Guarantee when due according to the schedule as referred to in point 6) above, the payment of the Remaining Debt with Guarantee not paid yet will be deferred and combined to the payment of Debt with Guarantee at the subsequent due date and so forth until the last due date (at the end of the 5th year);

8) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the Remaining Debt with Guarantee, and after the 5th year as referred to in point 7) above, there is still the Remaining Debt with Guarantee not paid yet, then the Remaining Debt with Guarantee will be paid by Company's Mandatory Convertible Bond (MCB-B) with tenor 2 years issued by the Company with the procedure and conversion implementation price minimum according to the provisions of Capital Market applied and the provisions of Company Law;

9) Creditor of Debt With Guarantee is provided with option right to request for the payment of Debt With Guarantee convertible to the Company New Stock in accordance with amortization value and payment schedule as referred to in point 3) above with the procedure and implementation price/share conversion minimum in accordance with the prevailing Capital Market regulation and Company Law;

10) Conversion of share in the Company is conducted with the calculation of rupiah currency and the exchange rate of initial currency of Debt In Guarantee according to the middle rate of Bank Indonesia at each due date of Debt With Guarantee payment in this Reconciliation Plan;

VII. DEBT DUE TO DERRIVATIVE (Tranche C category debt):

1) 30% of the remaining Debt In Derivative will be paid in cash ("Cash Portion") to as follows:

(a) 7.5% of Cash Portion will be paid in 18th month;

(b) 17.5% of Cash Portion will be paid in 30th month;

(c) 17.5% of Cash Portion will be paid in 42nd month;

(d) 17.5% of Cash Portion will be paid in 54th month;

(e) 40.0% of Cash Portion will be paid in 66th month;

After the date of Homologation;

2) The Company will impose the interest on the Cash Portion 4% per annum to be paid in

accordance with the payment schedule as referred to in clause VII.1);

3) 70% of Debt In Derivative will be exchanged to Mandatory Convertible Bond (MCB-A) with tenor 10 years issued by the Company on the Effective Date at conversion implementation price Rp 200/share by taking into account the prevailing legislation on Capital Market and Company Law;

4) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the Cash Portion and its interest as set forth in clause VII. 1) and 2), then the payment of the remaining Cash Portion and interest not being able to pay on each due date will be deferred and combined to the Cash Portion payment on the subsequent due date and so forth;

5) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the remaining Cash Portion and its interest not paid yet after the 66th month after the Date

of Homologation ("Remaining Cash Portion"), then such Remaining Cash Portion will be paid within the period of 5 years after the 66th month on pro rate basis each year;

6) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the Remaining Cash Portion at each due date according to the schedule as referred to in point 5) above, the payment of the Remaining Cash Portion not paid yet will be deferred and combined to the Remaining Cash Portion payment at the subsequent due date and so forth until the last due date (at the end of the 5th year);

7) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 3.2 there is no sufficient fund to pay the Remaining Cash Portion after the end of the 5th year as referred to the above point 6) not paid yet, then the Remaining Cash Portion will be exchanged into the Company's Mandatory Convertible Bond (MCB-B) with tenor 2 years issued by the Company upon the

procedure and conversion implementation price minimum according to the provisions of Capital Market applied and the provisions of Company Law;

8) To avoid the doubt, the Company will not impose the interest to the principal of 70% as referred to in point 3) above, which will be converted into the stock according to the above provision;

VIII. VEHICLE FINANCING DEBT

1) Vehicle Financing Debt including the interest will be paid in accordance with the terms of contract between the Company and the creditor upon the existing Vehicle Financing Debt before this Reconciliation Plan;

2) To avoid the doubt, the negligence or failure of implementation of the Company's obligations to the Creditors of the Vehicle Financing Debt based on the contract already existed before this Reconciliation Plan resulting in the cause or consequence as set forth in such contract will not cause or will not be considered the failure occurred in this Reconciliation Plan implementation;

1.7 Foreign Exchange

1) Any Company's debt in this Reconciliation Plan which since the arising of debt used the currency other than Indonesian currency (Rupiah), then for the interest of claim calculation, the voting right in this Reconciliation Plan voting, issue of each MCB-A will be calculated first in rupiah currency using the middle rate of Bank Indonesia on the date of issue of PKPU provisional judgment by the Council of Judges for Case 59/Pdt.Sus/PKPU/2014/PN Niaga.Jkt.Pst namely November 10, 2014;

2) Each issue of MCB-B based on this Reconciliation Plan other than as referred to in point 1) above will be calculated in rupiah currency using Bank Indonesia middle rate one day prior to the date of issue of such MCB-B;

1.8 Prioritized Cash Payment. By taking into account the terms of clause 3.2 and so long not in contravention of the prevailing legislation, the Company at its own consideration will reasonably try to prioritize the cash payment to BHP and USO Debts as well as to the creditors for the debt Rp 3,000,000,000 below by taking into account the business sustainability of each creditor. The failure of the Company to implement this good faith is not one of the causes possibly

resulting in the default to or cancellation/possibly cancellation of this Reconciliation Plan;

1.9 Other Provisions on Restructuring:

1) Other creditors not included in the Creditor for Verified Debt but already recorded in the and which claim values are in accordance with the Company's accounting until November 10, 2014 will be bound and subjected to the Reconciliation Plan already homologated by taking into account all general provisions of Restructuring, Restructuring Special Provisions and Restructuring Other Provisions in this Reconciliation Plan in accordance with the type and amount of their respective claim.

2) Unfulfillment of debt payment in this Reconciliation Plan already due so long due to the fulfillment of priority of Cash Waterfall as referred to in clause 3.2 above cannot be declared as the default of the Company on this Reconciliation Plan;

3) If after the issue/payment in accordance with the priority based on Cash Waterfall as referred to in clause 3.2 there is no sufficient fund for the payment of each Cash Portion on the last due date based on this Reconciliation Plan, then for that remaining Cash Portion MCB-B will be issued upon

the approval from the General Meeting of Shareholders of the Company held at the soonest 90 days after the last due date unless requested in writing by the creditor(s) representing at least 75% (seventy five percent) of the remaining arrear of Cash Portion up to the last due date to first of all discuss with the Company on the MCB-B issue plan or other settlement alternative, where such written request must have been received by the Company 60 days after the last due date;

4) No material security and/or new corporate guarantee is provided relating to the homologated Reconciliation Plan unless stipulated otherwise by the Company;

5) The issue of New Stock resulted from the conversion of each Mandatory Convertible Bonds (MCB) will be made under the terms as follows:

   a) Specially for MCB-A conversion, the issue of the New Stock phase one will be made within the period of 3 months after the Effective Date and provided for the creditors holding MCB-A which has within the period of 3 months after the Effective Date submitted to the Company the acceptance account in the name of such creditor to receive the New Stock;

b) Specially for MCB-B conversion, the issue of the New Stock phase one will be made within the period of 3 months after the Company obtains the approval from the Company General Meeting of Shareholders on the issue of MCB-B and the New Stock will be submitted to the creditors holding MCB-B which within the period of 3 months after the date of such General Meeting of Shareholders approval has submitted to the Company the acceptance account in the name of such creditor to receive the New Stock;

c) Further New Stock issue will be made every 3 months and starting in March of the current year and provided for the creditor holding MCB-A or MCB-B which has filed the written conversion request and submitted to the Company the acceptance account in the name of the creditor to receive the New Stock 2 months prior to such conversion date;

d) The cost arising (if any) relating to the opening or ownership of the stock acceptance account by the creditor and the New Stock transfer cost to the creditor account will be borne by the relevant creditor. The Company will bear the expenses which reasonably

becomes the obligation of those issuing the new stock; and

e) Each MCB-A or MCB-B which conversion into the stock is not requested by the creditor and/or not providing the New Stock acceptance account for the Company until the end of period of MCB-A or MCB-B, such MCB-A or MCB-B will expire and the Company does not have any obligation to such creditor as the creditor does not has any claim right to the Company;

6) In the event before the issue of the Company's New Stock there is the Stock Reserve or Stock Split then the Creditor's right to the Company's New Stock arising based on this Reconciliation Plan will be adjusted to the New Stock acquisition proportion as set forth in this Reconciliation Plan prior to the Stock Reserve or Stock Split;

7) For any issue of Mandatory Convertible Bonds (MCB) and the issue of the New Stock, the Company is obliged to fulfill all terms as set forth in the provisions on Capital Market, Company Law and other legislation including but not limited to the approval from the General Meeting of Shareholders of the Company. The delay of issue of the Mandatory Convertible Bonds (MCB) and New Stock according to the given time due to the necessity

of fulfillment of the provisions of Capital Market, Company Law and other legislation will not be considered the failure to implement this Reconciliation Plan.

8) Any terms and conditions of this Reconciliation Plan and the terms and conditions of the Reconciliation Agreement being the Reconciliation Plan already approved by the creditor meeting and ratified by the Commercial Court word per word cancel and supersede any agreement and covenant both in writing and orally existed already before the Date of Homologation including but not limited to any written agreement and covenant relating to the Operating Debt, Tower Provider Debt, BMP Debt, Senior Notes Proceeds Fund Debt, Debt In Guarantee, Debt Due To Derivative, Affiliate Debt and Vehicle Financing Debt together with the undertaking, agreement and covenant provided by the Company both in writing and orally relating to the Subsidiaries’ debts, including the judgments of the judicative board or arbitration board in any jurisdiction and relating to the debts of the Company and its Subsidiaries existed before the date of homologation. Therefore, all agreements, covenants both in writing or orally including the judgments of the judicative and arbitration boards

in any jurisdiction word per word have been superseded by the terms and conditions in this Reconciliation Plan and the terms and conditions in the Reconciliation Agreement, being the Reconciliation Plan already approved by the creditor meeting and ratified by the Court. And therefore, those binding are only the terms and conditions of this Reconciliation Plan and the terms and conditions of the Reconciliation Agreement being the Reconciliation Plan already approved by the creditor meeting and ratified by the Court.

9) The Company does not impose the interest nor incentive to any Mandatory Convertible Bonds (MCB) issued based on this Reconciliation Plan;

10) For each Cash Portion not converted into MCB-B and/or Tranche A category debt:

A) Creditor may at any time requests the Company to convert all total Cash Portion and/or Tranche A category debts into the New Stock under the terms as follows:

a) The approval for the conversion into the New Stock will be simultaneously requested in the implementation of the nearest Annual General Meeting of Shareholders of

the Company after the date of conversion request;

b) If such conversion request is received less than 2 months prior to the date of Annual General Meeting of Shareholders as referred to in point a) above, the approval for the New Stock conversion will be requested in the subsequent Annual General Meeting of Shareholders;

c) The conversion into the New Stock will be made within the period of 3 months after the date of the General Meeting of Shareholders approving the New Stock conversion;

d) The request for conversion of Cash Portion and/or Tranche A category debt into the New Stock can only be filed simultaneously for the entire Cash Portion value and/or Tranche A category debt;

e) The conversion of Cash Portion and/or Tranche A category debt into the New Stock will only be implemented by the Company only in case of the request for conversion by the creditor(s) which Cash Portion value and/or Tranche A category debt is accumulatedly at least Rp 3,000,000,000

(three billion rupiah) or other value stipulated by the Company;

f) The conversion into the New Stock will be implemented at the procedure and conversion implementation price minimum in accordance with the prevailing regulation on Capital Market and Company Law;

B) The Company may at any time or if possible but not obliged both directly or indirectly offer the purchase of the entire or part of any claim of Cash Portion and/or Tranche A category debt not converted into MCB-B owned by the creditor(s) at the offering price stipulated by the Company. In the event the fund owned by the Company to offer the purchase does not cover the price of all claims which creditors agreed to buy the claim, such claim purchase will be made proportionally in accordance with the claim amount of the respective creditors. The creditors are entitled not to receive the purchase offering.

11) In case of doubt of the Company to determine the debt to be categorized in the debt classification as set forth in this Reconciliation Plan, such

debt will be put into the Operating Debt category unless stipulated otherwise by the Company;

2. IMPLEMENTATION OF RECONCILIATION PLAN AND FURTHER MEASURES:

2.1 After the voting of the creditor meeting on this Reconciliation Plan is conducted and approved by the majority creditors in accordance with the provisions as referred to in Article 281 paragraph (1) of UUK, the Council of Judges in Case 59/Pdt.Sus/PKPU/2014/PN Niaga.Jkt.Pst in accordance with the provision of Article 285 paragraph (1) UUK will ratify (homologation) the Reconciliation Plan on December 9, 2014 or other date stipulated further by the creditor meeting;

2.2 To avoid the doubt, the Controlling Shareholders who at the time this Reconciliation Plan is homologated control the Company are the party being entitled to determine and nominate the management of and supervise the Company, including to nominate, appoint and dismiss the board of directors and commissioners of the Company so long they are still the shareholders of the Company;

2.3 If this Reconciliation Plan is already approved by the majority creditor in the voting of the Creditor Meeting, then this Reconciliation Plan

will become effective as the Reconciliation Agreement binding the Company and all creditors nothing excepted, in accordance with the provision as referred to in Article 286 UUK;

2.4 For the interest of debt payment in case to the creditors based on this Reconciliation Plan, the creditors are obliged to provide the written notice for the Company on the creditor account for the debt payment in cash, and the Company will only pay the debt in cash if it has received the letter of notification on such account. The absence of notice on the creditor account until the due date of debt payment by the Company will not be deemed as the failure of the Company to implement this Reconciliation Plan;

2.5 In the event there is still the remaining debt distribution against the converted stock then it will be rounded up to the nearest stock unit;

2.6 In the event there is still the remaining debt distribution against Mandatory Convertible Bonds (MCB), it will be rounded up to the nearest MCB unit value;

2.7 Each Mandatory Convertible Bond (MCB) issued based on this Reconciliation Plan which conversion into the Company’s stocks is not requested by the relevant creditor until the MCB

due date, such MCB will expire and in case of claim to such MCB value by the creditor, the payment will be made from the 31st year after the Date of Homologation;

2.8 Creditor holding Mandatory Convertible Bonds (MCB) may request the Company to issue the New Stock at any time during the MCB term and the Company will issue the New Stock at the latest in the Company's nearest Annual General Meeting of Shareholders by taking into account the Capital Market regulation and other prevailing regulation.

2.9 The implementation of Reconciliation Plan already homologated shall be subjected and conducted based on the provisions as referred to in UUK.

Considering, that at the hearing day already determined namely Tuesday, December 9, 2014, the Creditors and the Debtor justified what was contained in the above-mentioned reports of the Administrator and Supervising Judge and kindly request the Council of Judges to ratify such reconciliation already approved by the Debtor and its creditors in accordance with Article 281 paragraph (1) of Law Number 37 of 2004;

Considering, that to shorten this judgment description, to furthermore refer the matters contained in the minutes of hearing;

[Authorized Translation]

Considering, that because there is nothing to be conveyed by the parties, the Court furthermore gives its judgment;

REGARDING LEGAL CONSIDERATION:

Considering, that the aim and objective of the petition for Reconciliation Ratification shall be as mentioned above;

Considering, that such Reconciliation Agreement is reached by the Voting as referred to in Article 281 paragraph (1) of Law No. 37 of 2004;

Considering, that upon the voting the Creditors attending and already casting their vote on December 8, 2014 shall be as follows:

| NO | NAME OF CREDITOR | TOTAL VERIFIED INVOICE Rp | TOTAL VOTES AS PER Rp 10,000,000.00 | PERCENTAGE (%) | RECONCILIATION PLAN | | |
|---|---|---|---|---|---|---|---|
| | | | | | AFFIRMATIVE | NEGATIVE | ABSTAIN |
| A | **Up To Invoice Filing Deadline** | | | | | | |
| 1 | Agus Madjid SH | 93,000,000.00 | 9 | 0.0010 | 9 | | |
| 2 | Altemmyth | 61,107,223.00 | 6 | 0.0006 | 6 | | |
| 3 | Altrust Technologies | 4,960,317,872.00 | 496 | 0.0512 | 496 | | |
| 4 | Alvotel | 8,933,446,681.00 | 893 | 0.0923 | 893 | | |
| 5 | Antar Mitra Prakarsa | 48,969,600.00 | 5 | 0.0005 | 5 | | |
| 6 | Artajasa Pembayaran Electronis | 159,274,500.00 | 16 | 0.0016 | 16 | | |
| 7 | B-Generasi Asia (d/h Andika Multi Karya) | 52,692,420,000.00 | 5,269 | 0.5443 | 5269 | | |
| 8 | Bach Multi Global | 334,503,000.00 | 33 | 0.0035 | 33 | | |
| 9 | Bakrie Swasakti Utama | 2,814,959,374.00 | 281 | 0.0291 | 281 | | |
| 10 | Bakrie Telecom Pte Ltd | 5,408,085,900,000.00 | 540,809 | 55.8641 | 540809 | | |
| 11 | Bakti Taruna Sejati | 648,948,029.00 | 65 | 0.0067 | 65 | | |
| 12 | Bali Telekom | 12,667,605,142.00 | 1,267 | 0.1309 | 1267 | | |
| 13 | Batavia Towerindo | 7,016,330,206.00 | 702 | 0.0725 | 702 | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 14 | Bintang Media Mandiri | 989,947,888.00 | 99 | 0.0102 | 99 | | |
| 15 | Bintang Mediathama Indonesia | 991,863,931.00 | 99 | 0.0102 | 99 | | |
| 16 | Bintang Multi Mediathama | 993,563,890.00 | 99 | 0.0103 | 99 | | |
| 17 | Bintang Timur Persada | 703,800,000.00 | 70 | 0.0073 | 70 | | |
| 18 | Cahaya Televisi Indonesia | 200,000,000.00 | 20 | 0.0021 | 20 | | |
| 19 | Central Investindo (PT) | 1,244,160,000.00 | 124 | 0.0129 | | 124 | |
| 20 | Cipaganti Citra Graha | 502,419,240.00 | 50 | 0.0052 | 50 | | |
| 21 | Citra Lentera Abadi (PT) | 220,000,000.00 | 22 | 0.0023 | 22 | | |
| 22 | Colibri Networks | 10,366,620,550.00 | 1,037 | 0.1071 | | | 1037 |
| 23 | Creative Juice Indonesia | 903,841,625.00 | 90 | 0.0093 | 90 | | |
| 24 | Deanova Mitra Mandiri | 574,694,000.00 | 57 | 0.0059 | 57 | | |
| 25 | Denbe Anugerah Solusindo | 51,799,000.00 | 5 | 0.0005 | 5 | | |
| 26 | Dimension Data Indonesia | 15.967.819,365.00 | 1,597 | 0.1649 | 1597 | | |
| 27 | Dongah Elecomm Indonesia | 353,640,630.00 | 35 | 0.0037 | 35 | | |
| 28 | Emerson Indonesia | 545,259.584.00 55 | | 0.0056 | 55 | | |
| 29 | Ericsson Indonesia | 49.864,423,500.00 | 4,986 | 0.5151 | 4986 | | |
| 30 | Fajar Mitra Krida Abadi | 78,057,000.00 | 8 | 0.0008 | 8 | | |
| 31 | Falcon (d/h Falcon Interactive) | 4.178,751,702.00 | 418 | 0.0432 | | | |
| 32 | Falcon Winner Mobile | 17,280,831.360.00 | 1,728 | 0.1785 | | | 1728 |
| 33 | Gihon Telekomunikasi Indonesia | 1,694,616,000.00 | 169 | 0.0175 | | 169 | |
| 34 | Global Indonesia Komunikatama | 388,800,000.00 | 39 | 0.0040 | 39 | | |
| 35 | Gurita Kencana Wirausaha | 3340,000,000.00 | 34 | 0.0035 | 34 | | |
| 36 | Howden Insurance Broker Indonesia | 1,779,112,106.00 | 178 | 0.0184 | 178 | | |
| 37 | Huawei International Pte, Ltd | 945,082,755,545.46 | 94,508 | 9,7625 | 94508 | | |
| 38 | Huawei Tech Investment Co. Ltd | 210,202,822,008.12 | 21,020 | 2.1713 | 21,020 | | |
| 39 | Ida Sri Widianingsih | 97,665,000.00 | 10 | 0.0010 | 10 | | |
| 40 | Informasi Teknologi Indonesia | 2,830,186,288.00 | 283 | 0.0292 | 283 | | |
| 41 | Infastruktur | 4,171,676,134.00 | 417 | 0.0431 | 417 | | |

[Authorized Translation]

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Bisnis Sejahtera | | | | | | |
| 42 | Integrated Cards Solution | 101,674,550.00 | 10 | 0.0011 | 10 | | |
| 43 | Inti Bangun Sejahtera | 54.536,337,753.00 | 5,454 | 0.5633 | 5454 | | |
| 44 | Jakarta International School | 934,069,594.00 | 93 | 0.0096 | | 93 | |
| 45 | Jasnita Telekomindo | 198,054,000.00 | 20 | 0.0020 | 20 | | |
| 46 | Kereta Api Indonesia | 401,411,009.00 | 40 | 0.0041 | | | |
| 47 | Kharisma Bhakti Mulya | 2,804,403,341.00 | 280 | 0.0290 | 280 | | |
| 48 | Komet Infra Nusantara | 9,471,551,797.00 | 947 | 0.0978 | 947 | | |
| 49 | Komet Konsorsium | 16.009.431,478.00 | 1,601 | 0.1654 | 1,601 | | |
| 50 | Koperasi Karyawan Mitra Usaha | 10,302,173,476.00 | 1,030 | 0.1064 | 1.030 | | |
| 51 | Kreasi Daya Sentosa | 388,800,000.00 | 39 | 0.0040 | 39 | | |
| 52 | Kreasi Online Indonesia | 132,000,000.00 | 13 | 0.0014 | 13 | | |
| 53 | Kreatif Bersama | 3,418,525,543.00 | 342 | 0.0353 | | 342 | |
| 54 | Madison Pacific Trust | 524,176,525,966.38 | 52,418 | 5.4146 | 52,418 | | |
| 55 | Manunggal Indah Abadi | 2,502,548,963.00 | 250 | 0.0259 | 250 | | |
| 56 | Menara Seluler Nusantara | 2,096,713,683.00 | 210 | 0.0217 | 210 | | |
| 57 | Mitrayasa Sarana Informasi | 2,434,846,488.00 | 243 | 0.0252 | 243 | | |
| 58 | Mora Telematika Indonesia | 10,438,711,592.00 | 1,044 | 0.1078 | 1.064 | | |
| 59 | Morgan Stanley | 111,625,852,584.54 | 11,163 | 1.1531 | | 11,163 | |
| 60 | Multi Kontrol Nusantara | 11,012,835,343.00 | 1,101 | 0.1138 | 1,101 | | |
| 61 | Multigraph Digital | 56,037,016.00 | 6 | 0.0006 | 6 | | |
| 62 | Mustika Alam Makmur | 3,603,012,557.00 | 360 | 0.0372 | 360 | | |
| 63 | Muzakki | 249,664,787.00 | 25 | 0.0026 | 25 | | |
| 64 | Mythic Perspektif Indonesia | 139,385,345.00 | 14 | 0.0014 | 14 | | |
| 65 | Naragita Dinamika Komunika | 3,091,400,000.00 | 309 | 0.0319 | 309 | | |
| 66 | Nasio Karya Pratama | 5,294,604,708.00 | 529 | 0.0547 | 529 | | |
| 67 | Nec Indonesia | 81,180,714,343.98 | 8,118 | 0.8386 | 8,118 | | |
| 68 | Netwave Multimedia | 4,737,244,000.00 | 474 | 0.0489 | 474 | | |
| 69 | Parastar Distrindo | 592,824,197.00 | 59 | 0.0061 | 59 | | |
| 70 | Pass Tujuh Belas Associates | 443,244,700.00 | 44 | 0.0046 | 44 | | |
| 71 | Plus Digital | 289,236,753.00 | 29 | 0.0030 | | 29 | |
| 72 | Ppat Dina Hindrasari | 31,200,000.00 | 3 | 0.0003 | 3 | | |

[Authorized Translation]

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Sunarhadi | | | | | | |
| 73 | Ppat Drs. Soebiantoro | 66,068,197.00 | 7 | 0.0007 | 7 | | |
| 74 | Prima Media Selaras | 6,623,206,928.00 | 662 | 0.0684 | 662 | | |
| 75 | Prima Citra Persada | 213,835,146.00 | 21 | 0.0022 | 21 | | |
| 76 | Pro Aktif Mediathama | 986,956,879.00 | 99 | 0.0102 | 99 | | |
| 77 | Profesional Telekomunikasi Indonesia | 431,251,395,541.00 | 43,125 | 4.4547 | 43,125 | | |
| 78 | PT Huawei Tech Investment | 622,089,845,444.76 | 62,209 | 6.4260 | 62209 | | |
| 79 | Quantum Pratama Media | 997,908,288.00 | 98 | 0.0101 | 98 | | |
| 80 | Quartee Technologies | 802,820,276.36 | 80 | 0.083 | | | 80 |
| 81 | Rd Rita Diana Syarifah Sh | 35,535,000.00 | 4 | 0.004 | 4 | | |
| 82 | Rekajasa Akses | 49.499,460,912.00 | 4,950 | 0.5113 | 4,950 | | |
| 83 | Rouse Consulting International | 140,788,176.48 | 14 | 0.0015 | l14 | | |
| 84 | Royal Standard Jaya Lestari | 80,686,718.00 | 8 | 0.0008 | 8 | | |
| 85 | Samafitro | 170,431,910.00 | 17 | 0.0018 | 17 | | |
| 86 | Sarana Inti Persada | 13,504,646,400.00 | 1,350 | 0.1395 | 1,35 | | |
| 87 | Sianyu Perkasa | 1,222,949,982.00 | 122 | 0.0126 | 122 | | |
| 88 | Sisindokom Lintasbuana | 1,296,374,207.10 | 130 | 0.0134 | 130 | | |
| 89 | Solu Sindo Kreasi Pratama | 54,634,956,894.00 | 5,463 | 0.5644 | 5463 | | |
| 90 | Solusi Tunas Pratama | 399,512,207,498.00 | 39,951 | 4.1269 | 39,95 | | |
| 91 | Summit Lautan Mas | 958,543,111.00 | 96 | 0.0099 | 96 | | |
| 92 | Talace Indonesia | 208,957 ,56200 | 21 | 0.0022 | 21 | | |
| 93 | Tanjung Putra Pertiwi | 361,000,000.00 | 36 | 0.0037 | 36 | | |
| 94 | Teknologi Multimedia Indonesia | 880,000,000.00 | 88 | 0.0091 | 88 | | |
| 95 | Telekomunikasi Indonesia (Persero) | 137,723,295,600.00 | 13,772 | 1.4226 | | 13,77 | |
| 96 | Telenet Internusa | 6,936,144,598.00 | 694 | 0.0716 | 694 | | |
| 97 | Terrabit Networks | 4,293,817 ,500.00 | 429 | 0.0444 | 429 | | |
| 98 | Total Integrity Service | 186,052,599.00 | 19 | 0.0019 | 19 | | |
| 99 | Tower Bersama | 41,435,483,410.00 | 4.144 | 0.4280 | 4144 | | |
| 100 | Triyakom | 1,164,374,126.00 | 116 | 0.0120 | | 116 | |
| 101 | Unipak Sarana Antaran | 13,055,764.00 | 1 | 0.0001 | 1 | | |
| 102 | United Towerindo | 5,800,741,928.00 | 580 | 0.0599 | 580 | | |
| 103 | Violet Indonesia | 93,750,000.00 | 9 | 0.0010 | 9 | | |
| 104 | Viva Media Baru | 2,875,876,267.00 | 288 | 0.0297 | 288 | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 105 | Wahana Ajitama | 161,665,020.00 | 16 | 0.0017 | 16 | | |
| 106 | Wahana Lintassentral Telekom | 351,796,387.00 | 35 | 0.0036 | 35 | | |
| 107 | Warner Music Indonesia | 41,605,824.00 | 4 | 0.0004 | 4 | | |
| 108 | Zentech Prima Kreasindo | 521,292,886.00 | 52 | 0.0054 | 52 | | |
| | **Subtotal (A)** | **9,420,928,678,581.18** | **942,093** | **97.3157** | **912978** | **14646** | **14466** |
| B | **Holders of 118 Promisorry Notes** | | | | | | |
| 109 | Faiq Azmi | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 110 | Wahyu Hery Purbowo | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 111 | Nana Ikhlas | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 112 | Ramadiansyah | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 113 | Muhammad Bayhaki | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 114 | Wisnu Widya Wirawan | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 115 | Didi Yunanto | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 116 | Adrizal | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 117 | Teuku Gandrawan | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 118 | Rineke Herviansy | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 119 | Fredi Raharja | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 120 | Vidi Rosen | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 121 | Arief Rahman | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 122 | Sandhi Armansyah | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 123 | M. Arief Bakhtiar | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 124 | Noor Makkie Azwia | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 125 | Rahma Damayanti | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 126 | Nuke Puspita | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 127 | Annisa Rahmayani | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 128 | Daud Widjaja | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 129 | Siswanto | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 130 | Andreas Andrianto | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 131 | Dian Mirza | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 132 | Agung Nugroho | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 133 | Al Reyno De Qorbba | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 134 | Aryo Ekatama Putra | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 135 | Chandra Yarottama | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 136 | Hendra | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 137 | Endah Puspa W. | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 138 | Ari Wiyanto | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 139 | Meutia Novinka | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 140 | Kurnia Dewi | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 141 | Nucholifah | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 142 | Lisa Angraeny | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 143 | Indah Indriati | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 144 | Nunuk Rahmawati | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 145 | Noor Millah Anbiya | 10,000,000.00 | 1 | 0.0001 | 1 | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 146 | Agung Novianto | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 147 | Fustama Amus | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 148 | Sunendar | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 149 | Dian Flora M | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 150 | Oche Gotawa | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 151 | Alevirityas Novalah | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 152 | Jolo Priyantono | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 153 | Jerryt | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 154 | Aprilianta Florensia | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 155 | Mardhatilah | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 156 | Sasmito Aryo Riswidagdo | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 157 | Ibrahim | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 158 | Anjar Pratisto | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 159 | Imas Susilowati | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 160 | Imron Badra | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 161 | Jayatri Corline | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 162 | Elis Satipah | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 163 | Arie Adriansyah | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 164 | Christin Simon | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 165 | Mahir AbiTholib | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 166 | Fadri Puri S | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 167 | Gita Asriyanti | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 168 | Nanda Occtarina | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 169 | Furqon Chandra | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 170 | M. Erik Rangga | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 171 | Gatut Brahmantyo | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 172 | Muahmmad Chairil Aman | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 173 | Feni Riani | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 174 | Katia Lastanti | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 175 | Audiba Rezkiningsum | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 176 | Putri Utari Dwiningsih | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 177 | Achmad Rizal | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 178 | Rio Ferdian | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 179 | Suud Iswanto | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 180 | Victor Arief Maulana | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 181 | Andini S | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 182 | DiniHayati | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 183 | Sri Langgeng A. | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 184 | Pompi Saefudin | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 185 | Ridwan Arifin | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 186 | Fahmi Maulana | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 187 | Moh Hafiz Zaini | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 188 | Adriadiansyah | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 189 | Siti Suwartika | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 190 | Ratna Komalasari | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 191 | Rahma Ayuningtyas | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 192 | Evi Dian Pudjiastuti | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 193 | Vertic Eridani | 10,000,000.00 | 1 | 0.0001 | 1 | | |

[Authorized Translation]

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 194 | Siti Sofiah | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 195 | Rudi Setiawan | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 196 | Elvira | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 197 | Syahril Iqdam | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 198 | Ahmad Fauzi | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 199 | Budi Wahyono | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 200 | Dwi Ratnawati | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 201 | Bofa Hadiwibowo | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 202 | Mariali | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 203 | Abdul Chopur | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 204 | Mustajb | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 205 | Edi Saputra Rusman | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 206 | Stefanus Gusti | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 207 | Ade Akbar Maulana | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 208 | Erwin Djulkarnaen | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 209 | Ivan Hermawan | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 210 | Daniel Suhadjin | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 211 | Noor Patria Eka | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 212 | Rudi Aerianto | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 213 | Laode Jalaludin | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 214 | Masli Indra | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 215 | Fatimahg Tuzzahra | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 216 | Adhi Pamingkas | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 217 | Nunik Marlina | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 218 | Boy Aulia | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 219 | Adam Firmansyah | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 220 | I Gusti Putu | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 221 | Inggrid Mulaan | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 222 | Asep Hendrawan | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 223 | Maulidin Zulfikar | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 224 | R. Adityawati | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 225 | Heni Rofiya Heliana | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 226 | Ferdy Firsah | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| **Subtotal (B)** | | **1,180,000,000.00** | **118** | **0.0122** | **118** | | |
| **C** | **Holders of 84 Promissory Notes** | | | | | | |
| 227 | Purwoko Duatmadji | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 228 | Kadek Ayu Mayang Tunjung Sari | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 229 | Agustinus Harimurti | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 230 | Ir. Indrawardi, M.A. | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 231 | Harry Prabowo | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 232 | Syamsir Mohar | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 233 | Khamindra J.A | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 234 | Sumirna Wiwaha | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 235 | Victor Alex | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 236 | Fajar Sidik | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 237 | Robbi Ardhiansad | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 238 | Ronny Rusmawan | 10,000,000.00 | 1 | 0.0001 | 1 | | |

[Authorized Translation]

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 239 | Dwinita Handayani | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 240 | Rakhmi Mandraini | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 241 | Ferri Firmansyah | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 242 | Dedy Mulvi | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 243 | Jovan Septian Paulus | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 244 | Ferry Kusrianto | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 245 | Denny Anugerah Akbar | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 246 | Hasnan | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 247 | Ira Mutia | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 248 | Eni Hartini | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 249 | Tri Wibowo | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 250 | Eka Pratiwi Wulandari | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 251 | Rika Wuri Ika Setia | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 252 | R.M Hendro Sulistyo | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 253 | Eri Susanto | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 254 | Bambang Priyo Cahyono | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 255 | Ermanto Widodo | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 256 | Abdi Wangsa | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 257 | Amalia Juwono | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 258 | Y.K. Pungky Wibowo | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 259 | Wardoyo | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 260 | Feri Zaenal Abidin | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 261 | Enggria Wundari | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 262 | Okta Ariamsyah | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 263 | Aas Nur Asiyah | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 264 | Ika Lita Octarina | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 265 | Ardian Yuniando | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 266 | Eggi Moch Iqbal S | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 267 | Benny Irawan | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 268 | Agus Triyono | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 269 | Wiby Endriko | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 270 | Rudy Gustriono | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 271 | Dewagny Radiquires | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 272 | Heri Usman | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 273 | Edi Widodo | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 274 | Khoerul Anwar | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 275 | Sulistyo | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 276 | Sunarno | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 277 | Faraitady Sakadisatra | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 278 | Tisa Handriasti | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 279 | Bismoko Dwi | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 280 | Iscamerindra | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 281 | Amri Rukmana | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 282 | Trijatmoko | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 283 | Slamet Sucipto | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 284 | Oo Priyatno | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 285 | Andik Widya | 10,000,000.00 | 1 | 0.0001 | 1 | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 286 | Beni toto | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 287 | Yenny Ramayandini | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 288 | Astri Widyanti | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 289 | Winarmi | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 290 | Supriyatno | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 291 | Imron Satriyawan | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 292 | Diki Kaurika H | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 293 | Suparlan Alamsyah | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 294 | Fitriyani | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 295 | Shamira | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 296 | Irvan Rustam | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 297 | Irshad Ishaq Pohan | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 298 | Agus Rudianto | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 299 | Tubagus Yusuf Adi | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 300 | Ahmad Iqbal | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 301 | Rifka | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 302 | Claudiana | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 303 | Rully Octaliany | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 304 | M.Olni Ashara | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 305 | M.Fajar al Husain | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 306 | Mayliain Eduard L. Bawile | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 307 | Putu Gede Adiputra | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 308 | Tanaya Muda | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 309 | Hary Priyantono | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| 310 | Subhan Milady | 10,000,000.00 | 1 | 0.0001 | 1 | | |
| | **Subtotal (C)** | **840,000,000.00** | **84** | **0.0087** | **84** | | |
| | | | | | | | |
| D | **Delayed** | | | | | | |
| 311 | Angkasa Buana Cipta Telekomunikasi | 3,373,440,050.00 | 3370 | 0.0348 | 337 | | |
| 312 | Angkasa Pura I | 149,500,000.00 | 15 | 0.0015 | 15 | | |
| 313 | Angkasa Pura II (Persero) (PT) | 384,000,000.00 | 38 | 0.0040 | 38 | | |
| 314 | Bakrie Pesona Rasuna | 58,730,250.00 | 6 | 0.0006 | 6 | | |
| 315 | Bintang Mahameru Utama | 72,442,350.00 | 7 | 0.0007 | 7 | | |
| 316 | Celcius Inspira Kreativa | 200,060,000.00 | 20 | 0.0021 | 20 | | |
| 317 | Dayamitra Telekomunikasi | 11,491,859,510.00 | 1149 | 0.1187 | 1149 | | |
| 318 | Dua Empat Tujuh | 125,950,000.00 | 13 | 0.0013 | 13 | | |
| 319 | Duta Manurung | 73,636,364.00 | 7 | 0.0008 | 7 | | |
| 320 | Duta Pertiwi | 178,001,890.00 | 18 | 0.0018 | 18 | | |
| 321 | Gametraco Tunggal | 220,320,000.00 | 22 | 0.0023 | 22 | | |
| 322 | Indosat Tbk | 26,460,853,618.00 | 2646 | 0.2733 | | 2646 | |
| 323 | Kreasi Cakrawala Utama | 194,098,840.00 | 19 | 0.0020 | 19 | | |
| 324 | Lentera Agung Kencana | 60,639,280.00 | 6 | 0.0006 | 6 | | |
| 325 | Megah Makmur | 496,083.273.00 | 50 | 0.0051 | 50 | | |
| 326 | Metaplas | 59,292,400.00 | 6 | 0.0006 | 6 | | |

[Authorized Translation]

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Harmoni | | | | | | |
| 327 | Mitracomm Ekasarana | 149,327,255.00 | 15 | 0.0015 | 15 | | |
| 328 | MNC Skyvision Tbk | 314,417,753.00 | 31 | 0.0032 | 31 | | |
| 329 | NTT Indonesia | 606,471,771.00 | 61 | 0.0063 | 61 | | |
| 330 | Olivia Indah | 70,950,000.00 | 7 | 0.0007 | 7 | | |
| 331 | Onmobile Global | 9,300,410,890.00 | 930 | 0.0961 | | 930 | |
| 332 | Pos Indonesia (Persero) | 239,568,400.00 | 24 | 0.0025 | 24 | | |
| 333 | Priamanaya Telekomunikasi | 707,600,000.00 | 71 | 0.0073 | 71 | | |
| 334 | Sani Sentosa Abadi | 121,885,902.00 | 12 | 0.0013 | 12 | | |
| 335 | Sentosa Electric | 352,944,741.00 | 35 | 0.0036 | 35 | | |
| 336 | Snet Indonesia (PT) | 833,750,997.00 | 83 | 0.0086 | 83 | | |
| 337 | Sony Music Entertainment | 1,698,064,433.00 | 170 | 0.0175 | 170 | | |
| 338 | Sprint Asia Technology | 76,565,280.00 | 8 | 0.0008 | 8 | | |
| 339 | Tamesti Palikssa Sejahtera | 45,000,000.00 | 5 | 0.0005 | | | 5 |
| 340 | Tempindo Pratamasurya Jaya | 104,487,620.00 | 11 | 0.0011 | 11 | | |
| 341 | Trinity Optima Production | 104,487,620.00 | 10 | 0.0011 | 10 | | |
| 342 | Wahana Semesta Lampung | 58,909,092.00 | 6 | 0.0006 | 6 | | |
| 343 | XL Axiata | 199,450,059,729.00 | 19945 | 2.0603 | | 19945 | |
| | **Subtotal (D)** | **257,837,418,948.00** | **25,784** | **2.6634** | **2197** | **23582** | **5** |
| Total (A+B+C+D) | | **9,580,786,097,529.18** | **968,079** | **100,000** | 915377 | 38227 | **14**<br>**47**<br>5 |
| | | | | Percentage (%) | 94.56 | | 14 |
| | | | | | | 3.95 | 9 |

| No | NAME OF CREDITORS | TOTAL VERIFIED INVOICE Rp | TOTAL VOTES PER Rp 10,000,000 | PERCENTAGE (%) | RECONCILIATION PLAN | | |
|---|---|---|---|---|---|---|---|
| | | | | | AGREE | DISAGREE | ABSTAIN |
| 1 | Madison Pacific Trust | 101,222,800,042.14 | 10.122 | 99.94 | 10.122 | | |
| 2 | Koperasi Karyawan Mitra Usaha Dinamika | 58,972,861.00 | 6 | 0.06 | 6 | | |
| Total | | 101,281,772,903.14 | 10.128 | 100 | 10.128 | | |
| Percentage of Voters (%) | | | | | 100 | | |
| Total Votes Cast | | | | | 10.128 | | |
| Total Votes of Absent Creditors | | | | | - | | |
| Percentage of Absent Creditor (%) | | | | | 0 | | |

Considering, that based on such voting composition, the Reconciliation Plan has been approved by 325 (three hundred and twenty-five) Concurrent Creditors representing 94.56%

(ninety four point fifty six percent) of total votes of the concurrent creditors which rights are acknowledged or temporarily acknowledged attending the voting, and those denying are 11 (elevent) Concurrent Creditors representing 3.95 (three point ninety five percent) of total votes of the concurrent creditors which rights are acknowledged and attending the voting, meanwhile there are 7 (seven) abstain concurrent creditors representing 1.49% (one point forty nine percent) of total votes of the concurrent creditor votes which rights are acknowledged or temporarily acknowledged and attending the voting.

Considering, that composition of voting indicates that it has been approved by 2 (two) Secure Creditors representing 100% (one hundred percent) of total votes of the Secure Creditors which rights are acknowledged or temporarily acknowledged and attending the voting;

Considering, therefore based on article 281 paragraph (1) of Law No. 37 of 2004 regarding Insolvency and Syspension of Debt Payment Obligation, the Council of Judges is of the opinion that the quorum of voting for the approval for reconciliation plan has been fulfilled and validly bind the parties;

Considering, that after hearing and studying the Report of the Supervising Judge, Administrator Team, the Debtors and Creditors, it is proven that the Creditors were reported that no reasons for denying the reconciliation ratification is

found as required by Article 285 paragraph (2) of Law No. 47 of 2004 regarding Insolvency and Suspension of Debt Payment Obligation.

Considering, that the reconciliation agreement agreed between the Debtor and the Creditors for the receivables payment from the respective creditors has determined the terms and conditions as follows:

On this day, Monday, dated December 8, 2014, in the Commercial Court of District Court of Central Jakarta, there had been made and executed a Reconciliation Agreement by and between the Company (as described hereinbelow) and the Creditors (as described hereinbelow) as an eveidence and approval signal between the Company and the Creditors for the Reconciliation Plan dated December 8, 2014 ("Reconciliation Plan"), namely:

1. PT. Bakrie Telecom Tbk, a limited liability company established pursuant to and by virtue of the law of the Republic of Indonesia, having its address and legal domicile at Wisma Bakrie, 3rd Floor, Jl. H.R. Rasuna Said Kav. B1, Jakarta Selatan, 12920, which in this matter is represented by Jastiro Abi and Bachtiar Bachtarudin, in their respective capacities as President Director and Director, of and therefore validly acting for and on behalf of the Company;

   Hereinafter referred to as "Company"

   and

2. Creditors, as referred to in Attachment II, provided that the Creditors approving the Reconciliation Plan are those affixing their signatures in the agree column in Attachment II;

   Hereinafter they shall be severally and collectively referred to as the "Parties".

The Company and the Creditors shall first of all declare as follows:

A. That on October 23, 2014 a Petition for Suspension of Debt Payment Obligation ("PKPU Petition") has been filed for the Company by one of its creditors namely PT. Netwave Multi Media with case registration No. 59/PDt.Sus/PKPU/2014/PN.Niaga.Jkt.Pst;

B. That on November 3, 2014 in the hearing I of PKPU Petition, the Company has filed the Reconciliation Plan as messaged by the provision of Article 224 paragraph (4) of Law No. 37 of 2014 regarding Insolvency and Suspension of Debt Payment Obligation ("UUK");

C. That regarding such PKPU Petition, the Council of Judges of Commercial Court of District Court of Central Jakarta has granted the PKPU Petition and granted Temporary PKPU to the Company, as referred to in No. 59/Pdt.Sus/PKPU/2014/PN.Niaga.Jkt.Pst ("PKPU Judgment") pronounced in the hearing dated November 10, 2014;

D. That, in such PKPU Judgment, the Council of Judges of Commercial Court of District Court of Central Jakarta has assigned Ms. Titik Tejaningsih, SH, MH as the Supervising Judge and appointed Mr. William Eduard Daniel SE., SH., LL.M., MBL., having address at the Law Office of William Soerjonegoro & Partners, Office 8, 19th Floor, SCBD Lot. 28 Jalan Sudirman Kav. 52-53 Jakarta 12190, and Imran Nating, SH., MH., having the address at the law office of at Imran Nating & Partners, Nariba Plaza 2nd Floor Suite A-10, Jalan Mampang Prapatan Jakarta 12790, as the Management Team of the Company;

E. That at November 19, 2014 Creditor Meeting I has been held at Commercial Court of District Court of Central Jakarta. In this meeting the Company has also given the presentation to the Creditors, Administrator Team and the Supervising Judge about the Reconciliation Plan;

F. That on December 3, 2014 the meeting has been held at the initiation of the Company between the Company, Creditors and Administrator Team at Citywalk – Sudirman Function Hall, Extension Building, 5th Floor, Jl. K.H. Mas Mansyur No. 121, Tanah Abang, Jakarta Pusat – 10230, which principally gave the presentation to the Creditors and Administrator Team on the Reconcililation Plan brought forward by the Company;

G. That on December 5, 2014 the Verification Meeting has been held at Commercial Court of District Court of Central Jakarta;

H. That the Creditor Meeting held today, Monday, December 8, 2014 at Commercial Court of District Court of Central Jakarta with the agenda of Discussion of Reconciliation Plan and voting to approve or refuse the Reconciliation Plan has been attended by the Creditors as evidenced in the list of attendance prepared by the Administrator Team with the voting result as referred to in Attachment II;

I. That in respect of the voting as referred to in point H above, the Company and the Creditors approving the Reconciliation Plan intended to enter into and sign the Reconciliation Plan as an evidence and signal that the reconciliation has been reached between the Company and the Creditors;

J. The capitalized words used herein unless stipulated otherwise shall have the meaning as defined in Attachment I;

Furthermore by virtue of the foregoing, in this Reconciliation Agreement the Company and the Creditors intend to mutually agree with the matters already set forth in the Reconciliation Plan to as follows:

RECONCILIATION AGREEMENT

1.1 This Reconciliation Plan was prepared by considering and based on the current business condition of the Company,

the Telecommunication Network Organizing Business Activity Merger Agreement between the Company and PT Smartfren Telecom Tbk dated October 30, 2014, Telecommunication Network Lease Agreement between the Company and PT Smartfren Telecom Tbk dated October 30, 2014, and the market condition, as well as the capacities of the Company's creditors in connection with the securities held by the Separate creditors and the terms and conditions relevant to the given securities;

1.2 Cash Waterfall. The Company will try to allocate the Operational Cash Remnant (outside the New Debt and issue of New Stocks) and the Company's main business activity into an account of the Company and will be applied for the priority scale sequence as follows:

I. All taxes including Tax Debt relating to the Company operational activity in accordance with the prevailing tax regulation;

II. All costs and expenses relating to the Company's PKPU process, including but not limited to the honorarium of the administrators, case charges and costs, fee for the legal consultants and financial advisors of the Company, costs and expenses arising from the Reconciliation Plan under homologation process, both notarial fee or other expenses as deemed necessary or obligatory by the Company;

III. Operational expenditure reserve of the Company including the payments of BHP, USO and tax of the current year as well as other operational costs maximum for 1 month to come. The capital expenditure reserve relating to the business activity for maximum 6 months to come, and dismantling cost of telecommunication equipment of the Company from the telecommunication infrastructure plant, including the telecommunication tower leased by the Company from the creditor, power provider's debt and other operational cost;

IV. New Debt obligation payment in connection with the working capital and the capital expenditure loan (if any);

V. To fulfill the cash fund reserve maximum Rp 100,000,000.00 (one hundred million rupiah);

VI. Payment of BMP and USO Debts already due and Reserve of payment of BMP Debt installment for one current year;

VII. Payment of debt installment already due for Tranche A category debt and reserve of debt installment payment of Tranche A category debt for one current year; payment of interest and principal already due on pro rate basis of Tranche B category debt; payment of interest and principal already due on pro rate basis of Tranche C category debt; and payment of interest

and principal already due on pro rate basis of Tranche D category debt; payment of interest and principal already due on pro rate basis and payment of principal installment payable in the current year for the debts of Tranche A, B, C and D categories;

VIII. Cash Sweep. In case of excess fund after the fulfillment of the abovementioned Cash Waterfall priority ("Excess Fund"), it will be applied for the earlier debt payment as set out in this Reconciliation Plan which will due on the nearest subsequent due date by still following the above Cash Waterfall priority sequence from points VI through VII;

The Cash Waterfall calculation is made on every 4th month after the semiannually financial statement at the end of June and the annual financial statement in December each year, and for the first time it will be made to the Company's financial statement of June 2015, whereas the debt payment based on this Reconciliation Plan will be made in June each year after the Cash Waterfall calculation, and the debt first payment based on this Reconciliation Plan will be made at the latest in the 18th month after the date of Homologation;

The Company will appoint the independent monitoring accountant who will supervise the implementation of

Cash Waterfall in accordance with the above priority sequence;

1.3 Waiver of other obligation. This reconciliation plan does not bind or does not apply to the payment or implementation of the Company's obligations to any party relating to the implementation of telecommunication network organizing business activity merger agreement between the Company and PT Smartfren Telecom Tbk dated October 30, 2014 and telecommunication network lease agreement between the company and PT Smartfren Telecom Tbk dated October 30, 2014 together with its derivative agreement (if any);

1.4 Assignment of Right. Creditors may assign the right of their bills to other party based on the prevailing legislation and by remaining subjected to the following:

1.4.1 Each third party transferee or assignee of the bill based on the Reconciliation Plan on Homologation basis will remain be bound and subjected to all provisions set forth in the homologated Reconciliation Plan;

1.4.2 The creditor transferring or assigning its claim right to the third party shall deliver the written notice to the Company on the transfer of such claim right in accordance with the legislation prevailed in Indonesia. The failure to deliver the written

notice will be considered such claim right transfer is not yet occurred.

1.5 Restructuring General Provision. The restructuring general provisions applied to the Creditors shall be as follows:

1.5.1 Reconciliation Plan and the restructuring measures already under homologation basis shall apply and bind the respective:

a. Creditor on Verified Debt

The Verification debt shall be the claim already filed by the creditors to and admitted as well as verified by the Company's Administrator and the Company;

b. Creditor of Unverified Debt

Unverified debt shall mean the claim not filed by the Creditors to and not verified by the Company Administrator but recorded and admitted by the Company;

c. Creditor of Debt Outside Verification (as referred to in Clause 3.5.V below);

1.5.2 All interests, penalties and/or fine already arisen until the Date of Homologation due to the Company's Debt will be written off entirely, unless expressly set forth otherwise and specifically by the Company in this Reconciliation Plan;

1.5.3 If the Company imposed an interest for the debt payment as set forth in this Reconciliation Plan,

then in accordance with the prevailing tax regulation the Company shall be entitled to deduct all taxes arising in connection with the interest imposition where such interest payment admitted shall be the interest already paid in the current year;

1.5.4 As of the date of Homologation, all titles to the thing or goods or other form that can be declared as thing or goods not delivered by the Creditors to the Company related to the debt as set forth in this Reconciliation Plan shall become and must be transferred to the Company;

1.5.5 Against other claims which:

1) were not identified yet until the homologation of this Reconciliation Plan; or

2) were just identified after the homologation of this Reconciliation Agreement but the claims were derived or arisen from the condition, legal action, commencement or series of occurrence, or the legal provisions existed prior to the homologation of this Reconciliation Agreement containing the judgment of the judicative board or the arbitration board having the force of law shall remain admitted by Indonesian law;

Then other invoices as referred to in clause 1.5 V 1) and 2) above (referred to as "Debt Outside Verification") shall be subjected to the provisions as follows:

a) such claims can be accepted by the Company but it must conform to the Indonesian Financial Accounting Standard/IFAS = PSAK) and the prevailing legislation; and

b) only when the abovementioned provision has been fulfilled and the claim is accepted and admitted by the Company, then such claim will be payable by the Company from the 31st year after the date of Homologation;

1.5.6 The Classification or determination of type of debt as set forth in clause 1.6 below is aimed at making it is easy to present the scheme or pattern of adjustment of each type of debt. The debt categorization into Tranche A, Tranche B, Tranche C and Tranche D in this Reconciliation Plan is intended for the favor of Cash Waterfall arrangement as referred to in clause 1.2 above;

1.6 Special provisions of Restructuring below shall be the restructuring plan of each debt of the Company:

I. OPERATING DEBT

The operating debt is classified into two namely (i) Operating Debt Rp 1 through Rp 3,000,000,000 and (ii)

Operating Debt above Rp 3,000,000,000 against the Operating Debt above Rp 3,000,000,000 shall be subjected to calculation as follows:

- Against the first Rp 3,000,000,000 the special restructuring provisions as set forth in clause I.A.e) below will apply;
- Against all remaining Operating Debt after deducted Rp 3,000,000,000 the special restructuring provisions as set forth in clause I.B below will apply;

Below are the special restructuring provisions for Operating Debt:

A. Operating Debt Rp 1 through Rp 3,000,000,000 (Tranche A Category Debt):

The Company will make cash payment for the debt under the terms as follows:

a) Operating Debt Rp 1 through Rp 100,000,000.00 the payment shall be as follows:

i) 50% of the said Operating Debt will be paid at the latest in 18th month;

ii) 50% of the said Operating Debt will be paid at the latest in 30th month;

After the date of Homologation;

b) Operating Debt above Rp 100,000,000.00 up to Rp 500,000,000.00, the payment shall be as follows:

i) 20% of the said Operating Debt will be paid at the latest in 24th month;

ii) 35% of the said Operating Debt will be paid at the latest in 36th month;

iii) 45% of the said Operating Debt will be paid at the latest in 48th month;

After the date of Homologation;

c) Operating Debt above Rp 500,000,000.00 up to Rp 1,000,000,000.00, the payment shall be as follows:

i) 10% of the said Operating Debt will be paid at the latest in 24th month;

ii) 15% of the said Operating Debt will be paid at the latest in 36th month;

iii) 20% of the said Operating Debt will be paid at the latest in 48th month;

iv) 55% of the said Operating Debt will be paid at the latest in 60th month;

After the date of Homologation;

d) Operating Debt above Rp 1,000,000,000.00 up to Rp 2,000,000,000.00, the payment shall be as follows:

i) 5% of the said Operating Debt will be paid at the latest in 24th month;

ii) 10% of the said Operating Debt will be paid at the latest in 36th month;

iii) 15% of the said Operating Debt will be paid at the latest in 48th month;

iv) 25% of the said Operating Debt will be paid at the latest in 60th month;

v) 45% of the said Operating Debt will be paid at the latest in $72^{th}$ month;

After the date of Homologation;

e) Operating Debt above Rp 2,000,000,000.00 up to Rp 3,000,000,000.00, the payment shall be as follows:

i) 5% of the said Operating Debt will be paid at the latest in 24th month;

ii) 5% of the said Operating Debt will be paid at the latest in 36th month;

iii) 10% of the said Operating Debt will be paid at the latest in 48th month;

iv) 10% of the said Operating Debt will be paid at the latest in 60th month;

v) 25% of the said Operating Debt will be paid at the latest in $72^{th}$ month;

vi) 45% of the said Operating Debt will be paid at the latest in 84th month;

After the date of Homologation;

f) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 1.2

there is no sufficient fund to pay the Operating Debt Rp 1 up to Rp 3,000,000,000 (Tranche A category debt), the payment of remaining debt value not paid at each due date will be deferred and combined to the debt payment of the subsequent due date and so forth until the last due date;

g) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund to pay the rest of the debt in accordance with the schedule in point f) until the last due date, such remaining debt will be paid at the latest at the end of 15th year after the date of Homologation;

B. Operating Debt above Rp 3,000,000,000 (Tranche C Category Debt) and that above Rp 3,000,000,000 in rupiah currency (Tranche D category debt)

1) Operating Debt Value up to the first Rp 3,000,000,000 will be paid in accordance with Clause I.A.e) above;

2) 30% of the remaining Operating Debt after being deducted the value according to point 1) will be paid in cash ("Cash Portion") to as follows:

(a) 7.5% of Cash Portion will be paid in 18th month;

(b) 17.5% of Cash Portion will be paid in 30th month;

(c) 17.5% of Cash Portion will be paid in 42nd month;

(d) 17.5% of Cash Portion will be paid in 54th month;

(e) 40.0% of Cash Portion will be paid in 66th month;

after the date of Homologation;

3) The Company will impose the interest on the Cash Portion of the Tranche C category debt by 4% per annum and for Cash Portion of Tranche D category debt by 6% per annum, to be paid by following the above Cash Portion payment schedule;

4) 70% of the remaining Operating Debt after being deducted according to point 1) will be paid by the Company's Mandatory Convertible Bond (MCB-A) with tenor 10 years as of the Effective Date with the implementation price Rp 200/share by taking into account the prevailing legislation on Capital Market and the provisions of Law Number 40 of 2007 regarding the Limited Liability Company

together with the amendments and/or supplement ("Company Law");

5) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund to pay the Cash Portion and its interest as set forth in clause 1.6.I.B.2) and 3) above, then the payment of the remaining Cash Portion and interest cannot be paid on each due date will be deferred and combined to the Cash Portion payment on the subsequent due date and so forth until the last due date;

6) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund to pay the Cash Portion and its interest not paid according to the schedule as referred to in point 5) above until the 66th month after the Date of Homologation ("Remaining Cash Portion"), then such Remaining Cash Portion will be paid within the period of 5 years after the 66th month on pro rate basis each year;

7) If after the expenditure/payment in accordance with the priority based on the

Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund to pay the Remaining Cash Portion at each due date as referred to in point 6) above, the payment of the Remaining Cash Portion not paid will be deferred and combined to the Remaining Cash Portion payment at the subsequent due date and so forth until the last due date (at the end of the 5th year);

8) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund to pay the Remaining Cash Portion with the schedule as referred to the above point 7) then the remaining cash portion will be paid by Company's Mandatory Convertible Bond (MCB-B) with tenor 2 years with the procedure and conversion implementation price minimum according to the provisions of Capital Market applied and the provisions of Company Law;

9) To avoid the doubt, the Company will not impose the interest to the principal of 70% (seventy percent) as referred to in point 4) above, which will be converted into the stock according to the above provision;

II. DEBT OF TOWER PROVIDER

The Debt of Tower Provider consists of: i) Debt of tower lease already due and not paid yet and arising until November 10, 2014, and ii) Lease value for the remaining tower lease period based on the existing tower lease agreement between the Company and each Tower Provider Debt Creditor calculated as of November 10, 2014 until the end of tower lease period in accordance with the lease agreement;

A. The following is the restructuring provision for Tower Provider Debt for the tower lease already due and not paid yet, and arising up to November 10, 2014:

A.1 RoI debt up to Rp 3,000,000,000 (Tranche A category debt);

1) The payment for the debt Rp 1 up to Rp 100,000,000.00 shall be as follows:

a. 50% of such debt will be paid at the latest in 18th month;

b. 50% of such debt will be paid at the latest in 30th month;

after the date of Homologation;

2) The payment for the debt above Rp 100,000,000.00 up to Rp 500,000,000 shall be as follows:

a. 20% of such debt will be paid at the latest in 24th month;

b. 35% of such debt will be paid at the latest in 36th month;

c. 45% of such debt will be paid at the latest in 48th month;

after the date of Homologation;

3) The payment for the debt above Rp 500,000,000.00 up to Rp 1,000,000,000 shall be as follows:

a. 10% of such debt will be paid at the latest in 24th month;

b. 15% of such debt will be paid at the latest in 36th month;

c. 20% of such debt will be paid at the latest in 48th month;

d. 55% of such debt will be paid at the latest in 60th month;

after the date of Homologation;

4) The payment for the debt above Rp 1,000,000,000.00 up to Rp 2,000,000,000 shall be as follows:

a) 5% of such debt will be paid at the latest in 24th month;

b. 10% of such debt will be paid at the latest in 36th month;

c. 15% of such debt will be paid at the latest in 48th month;

d. 25% of such debt will be paid at the latest in 60th month;

e. 45% of such debt will be paid at the latest in 72th month;

after the date of Homologation;

5) The payment for the debt above Rp 2,000,000,000.00 up to Rp 3,000,000,000 shall be as follows:

a. 5% of such debt will be paid at the latest in 24th month;

b. 5% of such debt will be paid at the latest in 36th month;

c. 10% of such debt will be paid at the latest in 48th month;

d. 10% of such debt will be paid at the latest in 60th month;

e. 25% of such debt will be paid at the latest in 72th month;

f. 45% of such debt will be paid at the latest in 84th month;

after the date of Homologation;

6) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in

Clause 1.2 there is no sufficient fund to pay the debt as referred to in clause A.A1 (Tranche A category debt), the payment of the remaining debt value not paid at each due date will be deferred and combined to the debt payment at the subsequent due date and so forth until the last due date;

7) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund to pay the Remaining Cash Portion at each due date as referred to in point 6) until the last due date, such remaining debt will be paid at the latest in the 15th year after the date of Homologation;

A.2 Debt above Rp 3,000,000,000:

1) Debt Value up to the first Rp 3,000,000,000 will be paid in accordance with Clause II.A.A.1.5);

2) 30% of the remaining debt after being deducted the value according to abovementioned point A.2.1) (Tranche D category debt), together with interest

6% per annum of such value will be paid in cash ("Cash Portion") to as follows:

a) 7.5% of Cash Portion will be paid in 18th month;

b) 17.5% of Cash Portion will be paid in 30th month;

c) 17.5% of Cash Portion will be paid in 42th month;

d) 17.5% of Cash Portion will be paid in 54th month;

e) 40.0% of Cash Portion will be paid in 66th month;

after the date of Homologation;

3) 70% of the remaining debt after being deducted according to point A.2.1) above will be paid by the Company's Mandatory Convertible Bond (MCB-A) with tenor 10 years as of the Effective Date with the implementation price Rp 200/share by taking into account the prevailing legislation on Capital Market and the provisions of Company Law;

4) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund

to pay the Cash Portion as set forth in clause 1.6.II.A.2.1) and 2) above, then the payment of the remaining Cash Portion not paid on each due date will be deferred and combined to the Cash Portion payment on the subsequent due date and so forth until the last due date;

5) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund to pay the remaining Cash Portion and interest up to the 66th month after the Homologation Date ("Remaining Cash Portion"), then the Remaining Cash Portion will be paid within the period of 5 years after the 66th mongh on pro rate basis every year;

6) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund to pay the remaining Cash Portion in accordance with the schedule as referred to in point 5) above, then the payment

of the Remaining Cash Portion not paid yet will be deferred and combined with the Remaining Cash Portion payment on the subsequent due date and so forth until the last due date (at the end of 5th year);

7) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund to pay the Remaining Cash Portion up to the end of the 5th year as referred to in point 6), then the Remaining Cash Portion will be paid by Company's Mandatory Convertible Bond (MCB-B) with tenor 2 years upon the procedure and conversion implementation price minimum according to the provisions of Capital Market applied and the provisions of Company Law;

8) To avoid the doubt, the Company will not impose the interest to the principal of 70% as referred to in point 3) above, which will be converted into the stock according to the above provision;

B. Remaining Lease Period. The following are the restructuring provisions for Tower Provider Debt based on the existing tower lease agreement between the Company and each Creditor on the Tower Provider Debt calculated as of November 10, 2014 up to the end of the tower lease period in accordance with the respective lease agreement:

1) 100% and the remaining lease period value will be exchanged to Mandatory Convertible Bond (MCB-A) with tenor 10 years issued by the Company on the Effective Date with the conversion implementation price Rp 200/share by taking into account the prevailing provisions on Capital Market and Company Law;
2) To avoid the doubt the Company will not impose the interest on the value as referred to in point B.1 above exchanged into MCB-A according to the abovementioned terms.

C. Cessation of Tower Procurement Facility. The Creditor of Tower Provider Debt may cease the service of use of tower leased by the Company at the end of June 2015, unless stipulated otherwise by the Company and the related creditor of Tower Provider Debt;

III. USE RIGHTS CHARGE DEBT (BHP) AND UIVERSAL SERVICE OBLIGATION (USO):

[Authorized Translation]

1. BHP and USO principal shall be the debt admitted by the Company in writing up to November 10, 2014 ("BHP Principal") consist of:
   a. Band Frequency BHP Debt;
   b. ISR Frequency BHP Debt;
   c. Telecommunication BHP Debt;
   d. USO Debt;
2. In the event of excess payment of BHP Principal, such excess will be counted as the subsequent payment of BHP Principal Installment.
3. Payment of BHP Principal shall be made upon the payment schedule as follows:
   a. Band Frequency BHP Debt:
      a) 2.9% of Band Frequency BHP Debt will be paid at the latest at the end of the 2nd year;
      b) 2.9% of Band Frequency BHP Debt will be paid at the latest at the end of the 3rd year;
      c) 2.9% of Band Frequency BHP Debt will be paid at the latest at the end of the 4th year;
      d) 2.9% of Band Frequency BHP Debt will be paid at the latest at the end of the 5th year;

e) 5.8% of Band Frequency BHP Debt will be paid at the latest at the end of the 6th year;

f) 5.8% of Band Frequency BHP Debt will be paid at the latest at the end of the 7th year;

g) 5.8% of Band Frequency BHP Debt will be paid at the latest at the end of the 8th year;

h) 5.8% of Band Frequency BHP Debt will be paid at the latest at the end of the 9th year;

i) The remaining Band Frequency BHP Debt still outstanding will be paid at the latest at the end of the 10th year;

after the date of Homologation;

b. ISR Frequency BHP Debt:

a) 2.9% of ISR Frequency BHP Debt will be paid at the latest at the end of the 2nd year;

b) 2.9% of ISR Frequency BHP Debt will be paid at the latest at the end of the 3rd year;

c) 2.9% of ISR Frequency BHP Debt will be paid at the latest at the end of the 4th year;

d) 2.9% of ISR Frequency BHP Debt will be paid at the latest at the end of the 5th year;

e) 5.8% of ISR Frequency BHP Debt will be paid at the latest at the end of the 6th year;

f) 5.8% of ISR Frequency BHP Debt will be paid at the latest at the end of the 7th year;

g) 5.8% of ISR Frequency BHP Debt will be paid at the latest at the end of the 8th year;

h) 5.8% of ISR Frequency BHP Debt will be paid at the latest at the end of the 9th year;

i) The remaining ISR Frequency BHP Debt still outstanding will be paid at the latest at the end of the 10th year;

after the date of Homologation;

c. Telecommunication BHP Debt:

a) 2.9% of Telecommunication BHP Debt will be paid at the latest at the end of the 2nd year;

b) 2.9% of Telecommunication BHP Debt will be paid at the latest at the end of the 3rd year;

c) 2.9% of Telecommunication BHP Debt will be paid at the latest at the end of the 4th year;

d) 2.9% of Telecommunication BHP Debt will be paid at the latest at the end of the 5th year;

e) 5.8% of Telecommunication BHP Debt will be paid at the latest at the end of the 6th year;

f) 5.8% of Telecommunication BHP Debt will be paid at the latest at the end of the 7th year;

g) 5.8% of Telecommunication BHP Debt will be paid at the latest at the end of the 8th year;

h) 5.8% of Telecommunication BHP Debt will be paid at the latest at the end of the 9th year;

i) The remaining Telecommunication BHP Debt still outstanding will be paid at the latest at the end of the 10th year;

after the date of Homologation;

d. USO Debt:

a) 2.9% of USO Debt will be paid at the latest at the end of the 2nd year;

b) 2.9% of USO Debt will be paid at the latest at the end of the 3rd year;

c) 2.9% of USO Debt will be paid at the latest at the end of the 4th year;

d) 2.9% of USO Debt will be paid at the latest at the end of the 5th year;

e) 5.8% of USO Debt will be paid at the latest at the end of the 6th year;

f) 5.8% of USO Debt will be paid at the latest at the end of the 7th year;

g) 5.8% of USO Debt will be paid at the latest at the end of the 8th year;

h) 5.8% of USO Debt will be paid at the latest at the end of the 9th year;

i) The remaining USO Debt still outstanding will be paid at the latest at the end of the 10th year;

after the date of homologation;

4. If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund to pay the debt as set forth in the abovementioned Clause III.C, then the payment of such remaining debt which cannot be paid on each due date will be deferred and combined to the debt payment at the subsequent due date and so

forth until the last due date. If there is still the remaining debt not paid yet after the 10th year after the Homologation Date, it will be paid within the period of 5 (five) subsequent years on pro rate basis each year;

5. If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund to pay the debt in accordance with the schedule as referred to in point D above, then the debt payment not paid yet will be deferred and combined with the remaining debt payment on the subsequent due date and so forth until the last due date (at the end of 5th year);

6. In the event of security on BHP Principal payment and such security is then due and become effective/is drawn before the end of the abovementioned BHP Principal payment schedule, such payment schedule shall no longer be valid unless there is still the related remaining BHP Principal which payment schedule will remain refer to the payment schedule of BHP Principal as in the provision of clause III.C of this Reconciliation Agreement;

IV. DEBT OF SENIOR NOTES PROCEEEDS

A. Payment of Debt of Senior Notes Proceeds will be made by the Company in the manners as follows:

1. 30% of the Debt of Senior Notes Proceeds (Tranche C category debt) will be paid in cash ("Cash Portion") to as follows:
   a) 7.5% of Cash Portion will be paid in 18th month;
   b) 17.5% of Cash Portion will be paid in 30th month;
   c) 17.5% of Cash Portion will be paid in 42nd month;
   d) 17.5% of Cash Portion will be paid in 54th month;
   (e) 40.0% of Cash Portion will be paid in 66th month;

   after the date of Homologation;
2. The Company will impose the interest on the Cash Portion of the Tranche C category debt by 4% to be paid in accordance with the payment schedule as referred to in clause IV.A.1);
3. 70% of Affiliate Debt will be paid by the Company's Mandatory Convertible Bond (MCB-A) with tenor 10 (ten) years as of the Effective Date and extendable by the Company at implementation price Rp 200/share by taking

into account the prevailing legislation on Capital Market and the provisions of Law Number 40 of 2007 regarding the Limited Liability Company;

4. If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund to pay the Cash Portion and its interest as set forth in clause IV.A.1) then the payment of the remaining Cash Portion and interest not paid on each due date will be deferred and combined to the Cash Portion payment on the subsequent due date and so forth;

5. If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund to pay the Cash Portion and its interest until the 66th month after the Date of Homologation ("Remaining Cash Portion"), then such Remaining Cash Portion will be paid within the period of 5 (five) years after the 66th month on pro rate basis each year;

6. If after the expenditure/payment in accordance with the priority based on the

Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund to pay the Remaining Cash Portion at each due date as referred to in point 5) above, the payment of the Remaining Cash Portion not paid will be deferred and combined to the Remaining Cash Portion payment at the subsequent due date and so forth until the last due date (at the end of the 5th year);

7. If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund to pay the Remaining Cash Portion after the end of the 5th year as referred to the above point 6), then the Remaining Cash Portion will be paid by Company’s Mandatory Convertible Bond (MCB-B) with tenor 2 (two) years with the procedure and conversion implementation price minimum according to the provisions of Capital Market applied and the provisions of Company Law;

8. To avoid the doubt, the Company will not impose the interest to the principal of 70% as referred to in point 3) above, which will

be converted into the stock according to the above provision;

9. If required, the Company will try to request for or take a required effort/action in order the Debt of Senior Notes Proceeds will be settled/paid in accordance with the provision of point IV including but not limited to the action and provisions as follows:

   a) Specially request for the attention of the court that in the frame of fulfilling the United States securities acts, it is allowed to be guided by the exception of the registration based on Article 3(a)(1) of Securities Act 1933 of United States of America. Whereas Article 3(a)(1) allows a process outside the court of United States of America (in this matter Company PKPU process) to do an exchange of Senior Notes with the Senior Notes holder in United States of America if the certain provisions are complied with. To this end, the Company may request the court to determine the conditions which are fair for all creditors including the foreign Senior Notes holder by remaining subjected to the approval from the

reconciliation plan by the majority needed creditors.

b) The Cash Portion can be issued into the security and can be offered to all holders of Senior Notes as the exchange offer) based on the prevailing capital market regulation including the appropriate registration exception based on United States Securities Acts. For the new securities acceptance (exchange), the foreign Senior Notes holder existed in a state outside Indonesia shall be obliged to sign the confirmations generally stated that they are the sophisticated investors fulfilling the requirements to receive the new securities. If they cannot give such confirmation, they may choose to sell the new securities having the reputation and receive the cash money from such sale;

c) In case of Senior Notes Holder outside the territory of Indonesia, they are obliged to issue the general confirmation as the full and final settlement of all claims they have relating to the existing Debt of Senior Notes Proceeds Fund based

on other law wherever prevailed and undertakes to revoke each current legal process/remedy overseas. In case of Senior Notes holders not willing to release the invoice based on any law, they are not entitled to receive the new securities. This provision does not specially reduce the right of the Company to ask for recognition for this PKPU process based on Article 15 of Bankruptcy Code of United Sates of America or each other provision of any national law allowing the recognition on the foreign court process;

d) Senior Notes Holders outside the territory of Indonesia are obliged to provide the stock account breakdown to receive the new securities;

e) Taking the reasonable effort in order the foreign Senior Notes Holders are contactable through the clearing system. However, in case of those who are uncontactable or cannot provide the required documentation to receive the new securities within 6 (six) months as of the notice, all of their rights will be

forfeited. A reputable stock custodian will be appointed to sell such new securities and distribute the yields to the Company for the Company general purpose. The Company will not specially be responsible for any obligation or tasks of the foreign stock companies, custodian or mediator to provide the information for the ultimate holders;

10) To avoid the doubt:

a) Debt of Senior Notes Proceeds Fund shall be the Company's debt to BTPL by USD380,000,000 based on Intercompany Loan Agreement and Supplemental Intercompany Loan Agreement dated respectively May 7, 2010 and January 27, 2011 ("Intercompany Loan Agreement") where the company as guarantor and BTPL as lender;

b) Senior Notes Proceeds Fund earned by the Company pursuant to Intercompany Loan Agreement shall be the fund derived from the issue of Senior Notes that must be provided by BTPL in terms of loan for the Company through the Intercompany Loan in accordance with the provisions of Offering Memorandum USD250 Million 11.5%

Guaranteed Senior Notes Due 2015 and USD 130 Million Senior Notes at 107% issued by BTPL;

c) In accordance with the provision of Offering Memorandum USD250 Million 11.5% Guaranteed Senior Notes Due 2015 and USD 130 Million Senior Notes at 107% issued by BTPL, any repayment or settlement of loan by the Company to BTPL will be applied by BTPL specially and limitedly for repayment or settlement of Senior Notes to Senior Notes Holders;

d) Payment or settlement of the Company obligations on the loan based on the Intercompany Loan Agreement set forth in this Reconciliation Plan must be intended as the repayment of settlement of loan as referred to in the abovementioned point 10) b) and c). Therefore, all payments or settlements of the Company's obligations received by BTPL will legally become the right of acceptance of Senior Notes settlement for such Senior Notes holders;

e) By the homologation of this Reconciliation Plan which also covers the settlements scheme or pattern of Debt of

Senior Notes Proceeds Fund by the Company as set forth in Clause IV, as of such date of Homologation, the Company will no longer have obligation to fulfill all agreements or documents relating to the issue of Senior Notes which expire, including but not limited to the fulfillment of all existing guarantees in the frame of issue of Senior Notes namely the Corporate Guarantee provided by the Company, guarantee provided by the Grantor, as well as other guarantee if any. In the event of judgment of the judicative board already having the permanent force of law and admitted by the Indonesian law stating that the Company and Grantors are obliged to make payment due to the drawdown of any guarantee provided in the issue of Senior Notes, then such obligation payment will be made by the Company by following the provision of Clause 1.6.IV and the obligation payment portion will reduce the payment portion of Senior Notes Proceeds Fund Debt equally;

11. Upon the Senior Notes Proceeds Fund Debt the Company and the Creditors can distribute MCB-A, and Cash Portion or MCB-B to a certain value stipulated by them on such Senior Notes Proceeds Fund Debt and then transferable to other party provided that such other party is subjected to and bound by this Reconciliation Agreement;
12. With the consideration the Company deems appropriate, the Company may provide the material guarantee for the existing fixed assets of the Company until the date of Homologation for the implementation of Cash Portion payment obligation which will be below the par to other creditors together with their affiliate in this Reconciliation Plan which has total claim admitted by the Company more than USD140,000,000.00 (one hundred forty million United States Dollar) which can be provided as the material guarantee for the same fixed assets;

V. AFFILIATE'S DEBT

Affiliate Debt will be paid in the manner as follows:

a. 100% of Affiliate Debt will be exchanged into Mandatory Convertible Bonds (MCB-A) of the

Company with tenor 10 years as of the effective date at the conversion implementation price Rp 200/share by taking into account the Capital Market prevailing provisions and Company Law;

b. To avoid the doubt, the Company will not impose the interest for the value as referred to in point 1) above which will be converted into MCB-A according to the above terms.

VI. DEBT WITH GUARANTEE (Tranche B Category Debt):

1) Debt With Guarantee shall mean as defined in the definition section.

2) Upon the debt with guarantee in this Reconciliation Agreement calculated and admitted shall mean all values of principal only;

3) All debts with guarantee will be paid in cash in accordance with the amortization schedule as follows:

a) 5.25% of total Debt with Guarantee will be paid in 18th month;

b) 10.50% of total Debt with Guarantee will be paid in 30th month;

c) 10.50% of total Debt with Guarantee will be paid in 42nd month;

d) 15.00% of total Debt with Guarantee will be paid in 54th month; and

e) 58.75% of total Debt with Guarantee will be paid in 66th month;

after the date of Homologation;

4) The Company will impose the interest on Debt with Guarantee by 4% (four percent) to be paid in accordance with the payment schedule as referred to in clause VI.3);

5) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund to pay the Debt with Guarantee and its interest as set forth in clause VI.3) and 4), then the payment of the remaining Debt with Guarantee value and interest cannot be paid on each due date will be deferred and combined to the subsequent payment on the subsequent due date and so forth;

6) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund to pay the remaining Debt with Guarantee and its interest not paid yet after the 66th month after the date of Homologation ("Remaining Debt With Guarantee"), then such Remaining Debt With Guarantee will be paid within the period of 5 (five) years on pro rate basis each year;

7) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund to pay the Remaining Debt with Guarantee when due according to the schedule as referred to in point 6) above, the payment of the Remaining Debt with Guarantee not paid yet will be deferred and combined to the payment of Debt with Guarantee at the subsequent due date and so forth until the last due date (at the end of the 5th year);

8) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund to pay the Remaining Debt with Guarantee, and after the 5th year as referred to in point 7) above, there is still the Remaining Debt with Guarantee not paid yet, then the Remaining Debt with Guarantee will be paid by Company's Mandatory Convertible Bond (MCB-B) with tenor 2 years issued by the Company with the procedure and conversion implementation price minimum according to the provisions of Capital Market applied and the provisions of Company Law;

9) Creditor of Debt With Guarantee is provided with option right to request for the payment of Debt

With Guarantee convertible to the Company New Stock in accordance with amortization value and payment schedule as referred to in point 3) above with the procedure and implementation price/share conversion minimum in accordance with the prevailing Capital Market regulation and Company Law;

10) Conversion of share in the Company is conducted with the calculation of rupiah currency and the exchange rate of initial currency of Debt In Guarantee according to the middle rate of Bank Indonesia at each due date of Debt With Guarantee payment in this Reconciliation Plan;

VII. DEBT DUE TO DERRIVATIVE (Tranche C category debt):

1) 30% of the remaining Debt Due To Derivative will be paid in cash ("Cash Portion") to as follows:
   a) 7.5% of Cash Portion will be paid in 18th month;
   b) 17.5% of Cash Portion will be paid in 30th month;
   c) 17.5% of Cash Portion will be paid in 42nd month;
   d) 17.5% of Cash Portion will be paid in 54th month;
   e) 40.0% of Cash Portion will be paid in 66th month;

after the date of Homologation;

2) The Company will impose the interest on the Cash Portion 4% per annum to be paid in accordance with the payment schedule as referred to in clause IV.1) above;

3) 70% of Debt Due To Derivative will be exchanged to Mandatory Convertible Bond (MCB-A) with tenor 10 (ten) years issued by the Company on the Effective Date at conversion implementation price Rp 200/share by taking into account the prevailing legislation on Capital Market and Company Law;

4) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund to pay the Cash Portion and its interest as set forth in clause VII. 1) and 2), then the payment of the remaining Cash Portion and interest not being able to pay on each due date will be deferred and combined to the Cash Portion payment on the subsequent due date and so forth;

5) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund to pay the Cash Portion and its interest not paid yet after the 66th month after the Date of

Homologation ("Remaining Cash Portion"), then such Remaining Cash Portion will be paid within the period of 5 years after the 66th month on pro rate basis each year;

6) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund to pay the Remaining Cash Portion at each due date according to the schedule as referred to in point 5) above, the payment of the Remaining Cash Portion not paid yet will be deferred and combined to the Remaining Cash Portion payment at the subsequent due date and so forth until the last due date (at the end of the 5th year);

7) If after the expenditure/payment in accordance with the priority based on the Cash Waterfall as set forth in Clause 1.2 there is no sufficient fund to pay the Remaining Cash Portion after the end of the 5th year as referred to the above point 6) not paid yet, then the Remaining Cash Portion will be exchanged into the Company's Mandatory Convertible Bond (MCB-B) with tenor 2 years issued by the Company upon the procedure and conversion implementation price minimum according to the provisions of Capital Market applied and the provisions of Company Law;

8) To avoid the doubt, the Company will not impose the interest to the principal of 70% as referred to in point 3) above, which will be converted into the stock according to the above provision;

VIII. VEHICLE FINANCING DEBT

1) Vehicle Financing Debt including the interest will be paid in accordance with the terms of contract between the Company and the creditor upon the existing Vehicle Financing Debt before this Reconciliation Plan;

2) To avoid the doubt, the negligence or failure of implementation of the Company's obligations to the Creditors of the Vehicle Financing Debt based on the contract already existed before this Reconciliation Plan resulting in the cause or consequence as set forth in such contract will not cause or will not be considered the failure occurred in this Reconciliation Agreement implementation;

1.7 Foreign Exchange

1) Any Company's debt in this Reconciliation Plan which since the arising of debt used the currency other than Indonesian currency (Rupiah), then for the interest of claim calculation, the voting right in this Reconciliation Plan voting, issue of each MCB-A will be calculated first in Rupiah currency using the

middle rate of Bank Indonesia on the date of issue of PKPU provisional judgment by the Council of Judges for Case 59/Pdt.Sus/PKPU/2014/PN Niaga.Jkt.Pst namely November 10, 2014;

2) Each issue of MCB-B based on this Reconciliation Plan other than as referred to in point 1) above will be calculated in rupiah currency using Bank Indonesia middle rate one day prior to the date of issue of such MCB-B;

1.8 Prioritized Cash Payment. By taking into account the terms of clause 1.2 and so long not in contravention of the prevailing legislation, the Company at its own consideration will reasonably try to prioritize the cash payment to BHP and USO Debts as well as to the creditors for the debt Rp 3,000,000,000 below by taking into account the business sustainability of each creditor. The failure of the Company to implement this good faith is not one of the causes possibly resulting in the default to or cancellation/possibly cancellation of this Reconciliation Agreement;

1.9 Other Provisions on Restructuring:

1) Other creditors not included in the Creditor for Verified Debt but already recorded in the and which claim values are in accordance with the Company's accounting until November 10, 2014 will be bound and subjected to the Reconciliation Agreement already

homologated by taking into account all general provisions of Restructuring, Restructuring Special Provisions and Restructuring Other Provisions in this Reconciliation Plan in accordance with the type and amount of their respective claim.

2) Unfulfillment of debt payment in this Reconciliation Agreement already due so long due to the fulfillment of priority of Cash Waterfall as referred to in clause 1.2 above cannot be declared as the default of the Company on this Reconciliation Agreement;

3) If after the issue/payment in accordance with the priority based on Cash Waterfall as referred to in clause 1.2 there is no sufficient fund for the payment of each Cash Portion on the last due date based on this Reconciliation Agreement, then for that remaining Cash Portion MCB-B will be issued upon the approval from the General Meeting of Shareholders of the Company held at the soonest 90 days after the last due date unless requested in writing by the creditor(s) representing at least 75% of the remaining arrear of Cash Portion up to the last due date to first of all discuss with the Company on the MCB-B issue plan or other settlement alternative, where such written request must have been received by the Company 60 days after the last due date;

4) No material security and/or new corporate guarantee is provided relating to the homologated Reconciliation Agreement unless stipulated otherwise by the Company;

5) The issue of New Stock resulted from the conversion of each Mandatory Convertible Bonds (MCB) will be made under the terms as follows:

   a) Specially for MCB-A conversion, the issue of the New Stock phase one will be made within the period of 3 (three) months after the Effective Date and provided for the creditors holding MCB-A which has within the period of 3 (three) months after the Effective Date submitted to the Company the acceptance account in the name of such creditor to receive the New Stock;

   b) Specially for MCB-B conversion, the issue of the New Stock phase one will be made within the period of 3 (three) months after the Company obtains the approval from the Company General Meeting of Shareholders on the issue of MCB-B and the New Stock will be submitted to the creditors holding MCB-B which within the period of 3 (three) months after the date of such General Meeting of Shareholders approval has submitted to the Company the acceptance account in the name of such creditor to receive the New Stock;

c) Further New Stock issue will be made every 3 (three) months and starting in March of the current year and provided for the creditor holding MCB-A or MCB-B which has filed the written conversion request and submitted to the Company the acceptance account in the name of the creditor to receive the New Stock 2 (two) months prior to such conversion date;

d) The cost arising (if any) relating to the opening or ownership of the stock acceptance account by the creditor and the New Stock transfer cost to the creditor account will be borne by the relevant creditor. The Company will bear the expenses which reasonably becomes the obligation of those issuing the new stock; and

e) Each MCB-A or MCB-B which conversion into the stock is not requested by the creditor and/or not providing the New Stock acceptance account for the Company until the end of period of MCB-A or MCB-B, such MCB-A or MCB-B will expire and the Company does not have any obligation to such creditor as the creditor does not has any claim right to the Company;

6) In the event before the issue of the Company's New Stock there is the Stock Reserve or Stock Split then the Creditor's right to the Company's New Stock

arising based on this Reconciliation Agreement will be adjusted to the New Stock acquisition proportion as set forth in this Reconciliation Agreement prior to the Stock Reserve or Stock Split;

7) For any issue of Mandatory Convertible Bonds (MCB) and the issue of the New Stock, the Company is obliged to fulfill all terms as set forth in the provisions on Capital Market, Company Law and other legislation including but not limited to the approval from the General Meeting of Shareholders of the Company. The delay of issue of the Mandatory Convertible Bonds (MCB) and New Stock according to the given time due to the necessity of fulfillment of the provisions of Capital Market, Company Law and other legislation will not be considered the failure to implement this Reconciliation Agreement;

8) Any terms and conditions of this Reconciliation Plan and the terms and conditions of the Reconciliation Agreement being the Reconciliation Plan already approved by the creditor meeting held by the Creditors ratified by the Commercial Court of District Court of Central Jakarta word per word cancel and supersede any agreement and covenant both in writing and orally existed already before the date of Homologation including but not limited to any written agreement and covenant relating to the Operating Debt, Tower

Provider Debt, BMP Debt, Senior Notes Proceeds Fund Debt, Debt In Guarantee, Debt In Derivative, Affiliate Debt and Vehicle Financing Debt together with the undertaking, agreement and covenant provided by the Company both in writing and orally relating to the Subsidiaries' debts, including the judgments of the judicative board or arbitration board in any jurisdiction and relating to the debts of the Company and its Subsidiaries existed before the Date of Homologation. Therefore, all agreements, covenants both in writing or orally including the judgments of the judicative and arbitration boards in any jurisdiction word per word have been superseded by the terms and conditions in this Reconciliation Agreement. And therefore, those binding are only the terms and conditions of this Reconciliation Agreement already approved by the creditor meeting held by the Creditors and ratified by the Commercial Court of District Court of Central Jakarta;

9) The Company does not impose the interest nor incentive to any Mandatory Convertible Bonds (MCB) issued based on this Reconciliation Agreement;

10) For each Cash Portion not converted into MCB-B and/or Tranche A category debt:

A) Creditor may at any time requests the Company to convert all total Cash Portions and/or Tranche A

category debts into the New Stock under the terms as follows:

a) The approval for the conversion into the New Stock will be simultaneously requested in the implementation of the nearest Annual General Meeting of Shareholders of the Company after the date of conversion request;

b) If such conversion request is received less than 2 months prior to the date of Annual General Meeting of Shareholders as referred to in point a) above, the approval for the New Stock conversion will be requested in the subsequent Annual General Meeting of Shareholders;

c) The conversion into the New Stock will be made within the period of 3 (three) months after the date of the General Meeting of Shareholders approving the New Stock conversion;

d) The request for conversion of Cash Portion and/or Tranche A category debt into the New Stock can only be filed simultaneously for the entire Cash Portion value and/or Tranche A category debt;

e) The conversion of Cash Portion and/or Tranche A category debt into the New Stock will only

be implemented by the Company only in case of the request for conversion by the creditor(s) which Cash Portion value and/or Tranche A category debt is accumulatedly at least Rp 3,000,000,000 or other value stipulated by the Company;

f) The conversion into the New Stock will be implemented at the procedure and conversion implementation price minimum in accordance with the prevailing regulation on Capital Market and Company Law;

B) The Company may at any time or if possible but not obliged both directly or indirectly offer the purchase of the entire or part of any claim of Cash Portion and/or Tranche A category debt not converted into MCB-B owned by the creditor(s) at the offering price stipulated by the Company. In the event the fund owned by the Company to offer the purchase does not cover the price of all claims which creditors agreed to buy the claim, such claim purchase will be made proportionally in accordance with the claim amount of the respective creditors. The creditors are entitled not to receive the purchase offering.

11) In case of doubt of the Company to determine the debt to be categorized in the debt classification as set

forth in this Reconciliation Plan, such debt will be put into the Operating Debt category unless stipulated otherwise by the Company;

2. IMPLEMENTATION OF RECONCILIATION AGREEMENT AND FURTHER MEASURES

2.1 After the voting of the creditor meeting on this Reconciliation Plan is conducted and approved by the majority creditors in accordance with the provisions as referred to in Article 281 paragraph (1) of UUK, the Council of Judges in Case 59/Pdt.Sus/PKPU/2014/PN Niaga.Jkt.Pst in accordance with the provision of Article 285 paragraph (1) UUK will ratify (homologation) the Reconciliation Plan on December 9, 2014 or other date stipulated further by the creditor meeting;

2.2 To avoid the doubt, the Controlling Shareholders who at the time this Reconciliation Agreement is homologated control the Company are the party being entitled to determine and nominate the management of and supervise the Company, including to nominate, appoint and dismiss the board of directors and commissioners of the Company so long they are still the shareholders of the Company;

2.3 If this Reconciliation Plan is already approved by the majority creditor in the voting of the Creditor Meeting, then this Reconciliation Plan will become

effective as the Reconciliation Agreement binding the Company and all creditors nothing excepted, in accordance with the provision as referred to in Article 286 UUK;

2.4 For the interest of debt payment in cash to the creditors based on this Reconciliation Agreement, the creditors are obliged to provide the written notice for the Company on the creditor account for the debt payment in cash, and the Company will only pay the debt in cash if it has received the letter of notification on such account. The absence of notice on the creditor account until the due date of debt payment by the Company will not be deemed as the failure of the Company to implement this Reconciliation Agreement;

2.5 In the event there is still the remaining debt distribution against the converted stock then it will be rounded up to the nearest stock unit;

2.6 In the event there is still the remaining debt distribution against Mandatory Convertible Bonds (MCB), it will be rounded up to the nearest MCB unit value;

2.7 Each Mandatory Convertible Bond (MCB) issued based on this Reconciliation Agreement which conversion into the Company's stocks is not requested by the relevant creditor until the MCB due date, such MCB will expire

and in case of claim to such MCB value by the creditor, the payment will be made from the 31st year after the date of Homologation;

2.8 Creditor holding Mandatory Convertible Bonds (MCB) may request the Company to issue the New Stock at any time during the MCB term and the Company will issue the New Stock at the latest in the Company's nearest Annual General Meeting of Shareholders by taking into account the Capital Market regulation and other prevailing regulation.

2.9 The implementation of Reconciliation Plan already homologated shall be subjected and conducted based on the provisions as referred to in UUK.

3. HOMOLOGATION

In accordance with the provision of Article 285 paragraph (1) of UUK, the Reconciliation Agreement has been agreed and signed by the Company and the Creditors after being ratified by the Commercial Court of District Court of Central Jakarta, being the rights to the Company and the Creditors to be exercised as referred to in Article 287 of UUK, as well as simultaneously to cease the Suspension of Debt Payment Obligation (PKPU) to the Company in the case registration No. 59/Pdt.Sus/PKPU/2014/PN.Jkt.Pst pronounced on December 9, 2014 or other date stipulated later as referred to in the provision of Article 288 of UUK.

The Reconciliation Plan which after being agreed with in the creditor meeting by the Creditors on the date the same as this Reconciliation Agreement namely December 8, 2014 and after being ratified by the Commercial Court of District Court of Central Jakarta in the case registration No. 59/Pdt.Sus/PKPU/2014/PN.Jkt.Pst, then in accordance with the provision of Article 286 of UUK binds all Creditors.

4. MISCELLANEOUS

4.1 That the Company hereby undertakes and binds itself to fulfill and adhere to all contents of the Reconciliation Plan being an integral and inseparable part to this Reconciliation Agreement;

4.2 The Creditors hereby both severally and collectively undertake and bind themselves to accept and coply with the Reconciliation Plan being an integral and inseparable part to this Reconciliation Agreement;

4.3 After the implementation of all obligations of the Company to the Creditors hereunder, the debts of the Company to the Debtors will be settled. Therefore, the Company and the Creditors hereby undertake and bind themselves to mutually discharge and give acquittal to each other accordingly.

4.4 The Company and the Creditors are hereby covenanted and declare that this Reconciliation Agreement supersedes all auxiliary agreements and/or other

covenants relating/pertaining to the obligations of the Company to the Creditors, thereby all agreements and/or auxiliary agreements and/or such covenants are hereby declared invalid;

4.5 That the Company hereby declares truly and the Creditors have also understood that this Reconciliation Agreement is entered into in good faith and has considered the provision of Article 285 paragraph (2) of UUK which principally declares that:

a. The Company guarantees that the assets of the Debtor is comparable to the amount conveyed in the Reconciliation Plan;

b. The Company ensures the implementation of this reconciliation;

c. The Company ensures that this reconciliation is not reached by fraud and/or conspiracy with one or more Creditors; or due to other dishonest effort;

d. The Company guarantees to pay the Service Fee and Expenses incurred in the process of Suspension of Debt Payment Obligation, including but not limited to guarantee the payment of the Administrator's Service Fee.

That in case of failure of the Company to implement the content of this Reconciliation Agreement a quo, for the sake of the law the Company can be declared

insolvent and in case of being declared insolvente due to the failure to implement the content of the Reconciliation Agreement, the Company cannot file the Reconciliation Plan any longer and will be put into the Insolvency phase;

4.6 That upon the implementation of this Reconciliation Agreement together with all legal consequences, the Parties are covenanted to choose the permanent legal domicile in the Registrar Office of Commercial Court of District Court of Central Jakarta in Jakarta;

Thus, this Reconciliation Agreement is entered into and signed by the legal representatives of the parties before the Supervising Judges, Ms. Titik Tedjaningsih, S.H., M.H as well as Administrator Team, Mr. William Eduard Daniel, S.E., S.H., LL.M., MBL and Mr. Imran NAting, S.H., M.H., on the day and date as mentioned at the preamble hereof.

Considering, that because the Court does not find the reasons to refuse to ratify the reconciliation as and the Reconciliation Plan has been changed into Reconciliation Agreement, then in accordance with the provision of Articles 159, 285 of Law No. 37 of 2004 regarding Insolvency and Suspension of Debt Payment Obligation, the Council of Judges shall be obliged to pass the judgment on the ratification of such Reconciliation Agreement;

Considering, that by the judgment of ratification of reconciliation agreement, the Suspension of Debt Payment Obligation (PKPU) shall lawfully end;

Considering, that regarding the Service Fee of the Administrator PT. Bakrie Telecom Tbk (in PKPU) will be determined later;

Considering, that regarding the case charges in this PKPU process it shall reasonably be imposed on the Debtor;

Taking into account Article 222 paragraph (3) jo. Article 281 paragraph (1) letters a and b, jo. 284 paragraph (1) jo Article 285 paragraph (1) as well as other articles of Law No. 37 of 2004 regarding Insolvency and Suspension of Debt Payment Obligation as well as other relevant provision;

To ADJUDICATE

1. To pronounce the Reconciliation Agreement dated December 8, 2014 already signed by the President Director and Director of PT Bakrie Telecom Tbk (in PKPU) and its Creditors shall be valid and lawfully binding namely as follows:
   1. Adi Group Technology Indonesia
   2. Agus Madjid SH
   3. Agus Widjaja
   4. Aix Indologis Express
   5. Alam Negeri Cahaya Terang
   6. Alfa Antara

7. Alfa Kreasitama
8. Altermyth
9. Altruist Technologies
10. Alvotel
11. Amazon Web Services
12. Andika Multi Karya
13. Andromeda
14. Angipana Mutiara
15. Angkasa Buana Cipta Telekomunikasi
16. Angkasa Pura I
17. Arah Tunggal Mandiri
18. Artajasa Pembayaran Elektronis
19. Aryanti Artisari
20. Asia Media Network
21. Askomindo Dinamika
22. Asosiasi Kliring Interkoneksi
23. Asosiasi Telekomunikasi Selular
24. Astute Systems Technology
25. Axindo Infotama
26. Axis Telekom Indonesia
27. Bach Multi Global
28. Bakrie Pesona Rasuna
29. Bakrie Swasakti Utama
30. Bakrie Telecom Pte. Ltd
31. Bakti Taruna Sejati
32. Balai Pemuda Dan Olah Raga DISDIKPOR

33. Bali Telekom
34. Bank Mandiri
35. Batavia Towerindo
36. Bendahara Pengeluaran Balai Besar
37. Bintang Mahameru Utama
38. Bintang Media Mandiri
39. Bintang Mediathama Indonesia
40. Bintang Multi Mediathama
41. Bintang Timur Persada
42. Blackberry Singapore
43. Bloomberg Finance Lp
44. Bremenindo Jaya
45. Broadhop
46. Buzzwork
47. Cahaya Televisi Indonesia
48. Celsius Inspira Kreativa
49. Central Investindo
50. Cipaganti Citra Usaha
51. Citra Protecta Semesta
52. Coda Payments
53. Colibri Networks
54. Creative Juice Indonesia
55. Credit Suisse
56. Darta Media Indonesia
57. Dawang Lestari Indah
58. Dayamitra Telekomunikasi

59. Daydie Tjahyono
60. Deanova Mitra Mandiri
61. Deltacomsel Indonesia
62. Denbe Anugerah Solusindo
63. Dewandaru
64. Dian Mentari Pratama
65. Dian Swastatika Sentosa
66. Digi Telecommunications Sdn Bhd
67. Dimension Data Indonesia
68. Dinamika Karya Utama
69. Dongah Elecomm
70. Dua Empat Tujuh
71. Duta Manuntung
72. Duta Pertiwi
73. Dwimitra Graha Sempurna
74. Eddy Susanto
75. Edelweiss
76. Electronic Arts Asia Pasific
77. Embitel Technologies
78. Emc Information Systems Internation
79. Emerson Indonesia
80. Era Bangun Jaya
81. Era Supplies Indonesia
82. Ericcson Ab
83. Ericcson Indonesia
84. Esia Indoraya

85. Excelindo Chandra Mulia
86. Expodia Kartayuda Indonesia
87. FA Hukum Muliawan & Partners
88. Fa Kjpp Martokoesoemo, Prasetyo
89. Fajar Mitra Krida Abadi
90. Falcon Interactive
91. Falcon Winner Mobile
92. Fitch Ratings Indonesia
93. Forte Entertainment
94. Fti Consulting Indonesia
95. Futureorgs Consulting
96. Futureorgs Hr Solutions
97. Gamerja Transnusa
98. Gametraco Tunggal
99. General Telecom
100. Geutanyoe Abadi Sejahtera
101. Gihon Telekomunikasi Indonesia
102. Global Digital Niaga
103. Global Indonesia Komunikatama
104. Global One Solusindo
105. Graha Simas Sejati
106. Grahamitra Lestarijaya
107. Gurita Kencana Wirausaha
108. H. Ojo Sopyan Alamsyah SH
109. Hadiputranto Hadinoto & Partners
110. Halilintar Lintas Semesta

111. Hansindo Setiaprama
112. Hariff Daya Tunggal Engineering
113. Hkt Global (Singapore)
114. Hoki Moro Citra
115. Howden Insurance Brokers Indonesia
116. Huawei International Pte. Ltd
117. Huawei Tech. Investment Co., Ltd.
118. Ida Sriwidianingsih
119. Indikreasi Sinema
120. Indo Aircon
121. Indo Semar Sakti
122. Indomax Mediacom
123. Indonesia Comnets Plus
124. Indonesia Mega Global Telecom
125. Indonusa Mora Prakarsa
126. Indosat
127. Indosmart Komunikasi Global
128. Infokom Elektrindo
129. Informasi Teknologi Indonesia
130. Infrastruktur Bisnis Sejahtera
131. Integrated Cards Solution
132. Inti Bangun Sejahtera
133. Intitek Virtulindo Mandiri
134. Ipsos Indonesia
135. Iris Wireless Llc
136. Isopanel Dunia

[Authorized Translation]

137. Jakarta Interactive

138. Jakarta International School

139. Jakuba Megah Pratama

140. Jamsostek

141. Jaring Citra Media

142. Jasnita Telekomindo

143. Jawa Ad Marketing Communication

144. Karya Jaya Sukses Prima

145. Karya Niaga Utama

146. Karya Sejahtera Abaditama

147. Kasmin Marpaung

148. Kaswall Dinamika Indonesia

149. KEMKOMINFO

150. Kereta Api

151. Kharisma Bhakti Mulya

152. Kjpp lhot, Dollar & Raymond

153. Komet Infra Nusantara

154. Komet Konsorsium

155. Komite Olahraga Nasional Indonesia

156. Komli Indonesia

157. Kompas Cyber Media

158. Konsulindo Informatika Perdana

159. Konvergensi Digital Indonesia

160. Koperasi Karyawan Mitra Usaha

161. Kopnatel Jaya

162. Kpmg Services

163. Kreasi Cakrawala Utama
164. Kreasi Daya Sentosa
165. Kreasi Online Indonesia
166. Kreatama Konsep Selaras
167. Kreatif Bersama
168. Kudamas Citra Mandiri
169. Lasmana Swasti Prashida
170. Lativi Mediakarya
171. Laurensia Rineke Gunawan
172. Lembaga Penyiaran Publik Rri
173. Lembaga Penyiaran RRI Padang
174. Lentera Agung Kencana
175. Lingga Jati Al Manshurin
176. Link Net
177. Lintas Mediatama Jaya
178. Lintas Teknologi Indonesia
179. Lintas Telesindo Prima
180. Listakwarta Putra
181. LI
182. Lpp Rri
183. Lynchpin Bondsholder Management
184. Mac Sarana Djaya
185. Madison Pacific Trust
186. Magma
187. Makara Sindo
188. Mandrajasa Trimitra Indonesia

189. Manunggal Indah Abadi

190. Mast Mobile Media

191. Maxima Cipta Intergrasi

192. Mazeltov Putra Kaswall

193. Media Inti Promosi

194. Media One Indonesia

195. Media Planning Kaiser

196. Medi Tree Indonesia

197. Mediaworld Indonesia

198. Megah Makmur

199. Mekar Prana Indah

200. Menara Selular Nusantara

201. Metaplas Harmoni

202. Mi2 Daluvia Sejati

203. Milbank, Tweed, Hadley & Mccloy Llp

204. Mips Technoligies Inc

205. Mitra Intergrasi Informatika

206. Mitracomm Ekasarana

207. Mitrayasa Sarana Informasi

208. Miyowa Sa

209. Mnc Skyvision

210. Monsermob Indonesia

211. Mora Advertising Contents

212. Mora Telematika Indonesia

213. Morgan Stanley

214. Multi Berkat Internusa

215. Multi Interkoneksi

216. Multi Kencana Rona Utama

217. Multi Kontrol Nusantara

218. Multigraph Digital

219. Multinasional Automated Clearing

220. Music Factory Indonesia

221. Mustika Alam Makmur

222. Musakki

223. Mythic Perspektif Indonesia

224. Naga Swarasakti

225. Nap Info Lintas Nusa

226. Naragita Dinamika Komunika

227. Naratama Indah Asri

228. Nasio Karya Pratama

229. Nec Indonesia

230. Netwave Multimedia

231. Nirwana Pelita Jaya

232. Ntt Indonesia

233. Nurama Indotama

234. Nusatel Arindo Gutara

235. Nusatrindo Sejati

236. Olivia Indah

237. O'Melveny & Myers Llp

238. Onmobile Global

239. Optima Kaswall

240. Oscar Telecom Distribusi

241. P Technology
242. Packet Systems Indonesia
243. Pakuwon Jati
244. Pandu Saran Global
245. Panorama Tours Indonesia
246. Para Bandung Propertindo
247. Parastar Distrindo
248. Pass Tujuh Belas Associates
249. Pasundan Utama Televisi
250. Pelangi Mitra
251. Pelangi Prima Sejati
252. Perdana Berkah
253. Perdana Telecomindo Utama
254. Perhim Penghuni Rumah Susun Wisma
255. Perhimpunan Penghui Atr
256. Persada Multi Mandiri
257. Persero Angkasa Pura II
258. Pertamina
259. Pesona Creative 13
260. Phisindo Zamrud Nusantara
261. Pioneer Management Services
262. Pira Bara Cipta
263. PI. Kantor Akuntan Publik Handoko
264. Plus Digital
265. Ppat Dina Hindrasari Sunarhadi
266. Ppat Drs. Soebiantoro

[Authorized Translation]

267. Primanaya Telekomunikasi
268. Prima Media Selaras
269. Prima Wira Utama
270. Prisma Citra Persada
271. Pro Aktif Mediathama
272. Profesional Telekomunikasi
273. Provices Indonesia
274. PT Huawei Tech. Investment
275. Putraduta Buanasentosa
276. Quantum Pratama Media
277. Quartee Technologies
278. Raba Komunikatama
279. Radikal
280. Radio Ardan Swaratama
281. Radio Bonansa Media Swara
282. Radio Gaya Jaya Sakti
283. Radio Gema Megantara Pratama
284. Radio Kharisma Nada Andhika
285. Rafikomindo Pratama
286. Rainbow Asia Posters
287. Rd Rita Diana Syarifah SH
288. Redknee (Ireland) Limited
289. Redtree Indonesia
290. Rekajasa Akses
291. Retower Asia
292. Roemah Media

293. Rouse Consulting International

294. Royal Inti Mahkota Indonesia

295. Royal Standard Jaya Lestari

296. Samafitro

297. Sani Sentosa Abadi

298. Sarana Inti Persada

299. Sarana Jaringan Mas

300. Sarana Solusindo Informatika

301. Sbu Pos Admail

302. Sekawan Abadi Prima

303. Selling Incentive

304. Selular Media Infotama

305. Sentosa Electric

306. Serasi Autoraya

307. SGS Lintas Nusantara

308. Shinta Utama

309. Sianyu Perkasa

310. Sinar Mentari Erajaya

311. Sinar Mitra Solutions

312. Sintesa Promosindo

313. Sisindokom Lintasbuana

314. Skymedia

315. Snet Indonesia

316. Soltius Indonesia

317. Solu Sindo Kreasi Pratama

318. Solusi Tunas Pratama

319. Sony Music Entertainment

320. Sprint Asia Technology

321. Ss8 Networks

322. Standard & Poor’S International

323. Suara Istana

324. Summarecon Agung

325. Summit Lautan Mas

326. Suntec Business Solution

327. Surya Bangun Perkasa Transport

328. Taiace Engineering Sdn Bhd

329. Taiace Indonesia

330. Tamesti Palikssa Sejahtera

331. Tanjung Putra Pertiwi

332. Tata Communications (America)

333. Tata Communications International

334. Teknologi Multimedia Indonesia

335. Teleakses Solusindo

336. Telekomunikasi Indonesia

337. Telenet Internusa

338. Telstra Singapore

339. Tempindo Pratamasurya Jaya

340. Tenaga Prima Persada

341. Terrabit Networks

342. Tommy Octavianto

343. Total Integrity Service

344. Tower Bersama

345. Trend Communications International

346. Tri Bhakti

347. Tridaya Cipta Kreasi

348. Trinity Optima Production

349. Triyakom

350. Tunas Mandiri

351. TVRI (Persero)

352. Ultima Cipta Selaras

353. Uniqpak Sarana Antaran

354. United Towerindo

355. Universitas Muhammadiyah Hamka

356. Usaha Bersama

357. Violet Indonesia

358. Viva Media Baru

359. Vonny Monalisa Suryadi

360. Vopium A/S

361. Wahana Ajitama

362. Wahana Lintas Sentral Telekom

363. Wahana Sakti Surabaya

364. Wahana Semesta Bandung Ekspres

365. Wahana Semesta Lampung

366. Wahanaria Cemerlang

367. Waluyo

368. Warner Music Indonesia

369. Wira Aryatama

370. X Commerce Inc (Dba Magento)

371. XL Axiata

372. Yamiku

373. Yayasan Yatim & Dhuafa Bait Al-Quran

374. Zentech Prima Kreasindo

375. Zeus Prima Garda

2. To sentence the Debtor or Petitionee of Suspension of Debt Payment Obligation (Petitionee of PKPU) and all of its creditors to be subjected to and adhere to as well as implement such Reconciliation Agreement content;

3. To pronounce the Suspension of Debt Payment Obligation (PKPU) Number 59/Pdt.Sus-PKPU/2014/PN Niaga Jkt. Pst for the sake of the law ends;

4. To sentence the Debtor or Petitionee for Suspension of Debt Payment Obligation (PKPU) to pay this petition charge by Rp 1,327,000 (one million three hundred twenty-seven thousand rupiah);

In testimony whereof it was judged in a deliberation meeting of the Council of Judges ofCommercial Court ofDistrict Court of Central Jakarta on TUESDAY, dated December 9, 2014 by us, JAMALUDDIN SAMOSIR, SH., MH as the Chief of Council of Judges, SAIFUL ARIF, SH., MH and BAMBANG KUSTOPO, SH., MH, respectively as the Member Judges, which judgment was pronounced in a hearing open for the public on the same day and date by the said Council of Judge, assisted by RAVITA LINA, SH as the Substituting Registrar in the presence of the

Attorney of the Petitioner for PKPU, the Debtor and Administrator Team of PT Bakrie Telecom Tbk (in PKPU);

| Member Judges | Chief of Council Judges |
|---|---|
| [signed] | [signed] |
| SAIFUL ARIF, S.H., M.H | JAMALUDDIN SAMOSIR, S.H., M.H. |
| [signed] | |
| BAMBANG KUSTOPO, SH., MH | |

Substituting Registrar

[signed]

RAVITA LINA, SH

Charges:

- Duty Stamp .............................................. Rp 6,000.00
- Stationery .............................................. Rp 75,000.00
- Editorship .............................................. Rp 30,000.00
- PNBP .............................................. Rp 30,000.00
- Summon, etc.............................................. Rp 1,200,000.00

Total .............................................. Rp 1,327,000.00

---

I, **Rahmi Yunari Ali, SS**, an authorized and sworn translator, by virtue of Decision of Governor of DKI Jakarta No. 2238/2004, do hereby declare that on this day Monday, December 4, 2017, I make the translation of this document in accordance with its Indonesian version.