**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

In re:                                                          Chapter 15

PT BAKRIE TELECOM TBK,                                          Case No. 18-10200 (SHL)

          Debtor in a Foreign Proceeding.

-------------------------------------------------------------x

**CORRECTED MODIFIED BENCH DECISION**
**DENYING MOTION FOR SUMMARY JUDGMENT**[1]

**A P P E A R A N C E S :**

**SCHNADER HARRISON SEGAL & LEWIS LLP**
*Counsel for Jastiro Abi as Foreign Representative*
140 Broadway, Suite 3100
New York, New York 10005-1101
By:    Kenneth R. Puhala, Esq.
        Theodore L. Hecht, Esq.

**GREENBERG TRAURIG, LLP**
*Counsel for Universal Investment Advisory SA,*
  *Universal Absolute Return SP, Vaquero Master*
  *EM Credit Fund, Ltd., Harshil Kantilal Kothari,*
  *Footbridge Capital, LLC and Growth Credit Fund IC*
333 S.E. 2nd Avenue
Miami, Florida 33131
By:    Mark D. Bloom, Esq.

      -and-

200 Park Avenue
New York, New York 10166
By:    James W. Perkins, Esq.
        Anne C. Reddy, Esq.

---

[1]      This written decision memorializes the Court's bench ruling that was read into the record on April 18, 2019 [ECF No. 76]. Because of its origins as a bench ruling, this decision has a more conversational tone. While the substance of the decision remains the same, edits have been made for ease of comprehension.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before this Court is the *Response in Opposition to Petition for Recognition of Indonesian PKPU Proceeding and Motion for Summary Judgment Denying Recognition*, at ECF Number 50, which I'll refer to as the Motion, filed by Universal Investment Advisory SA, Universal Absolute Return SP, Vaquero Master EM Credit Fund, Ltd., Harshil Kantilal Kothari, Footbridge Capital, LLC and Growth Credit Fund IC, whom I will refer to as the Objecting Noteholders. The Motion seeks summary judgment in this Chapter 15 case to deny recognition of the Debtor's Indonesian Proceeding, or the PKPU Proceeding.

## BACKGROUND

Debtor PT Bakrie Telecom Tbk, or BTEL, was in the business of providing a fixed digital radio cellular telecommunication national network and services. *See Declaration of Petitioner Jastiro Abi . . .* (referred to herein as the Abi Declaration) at ECF No. 6 ¶ 2. However, it currently has very limited business activities and negligible revenue. It is in the process of trying to implement an Indonesian court-approved debt restructuring plan, or the PKPU Plan, that would allow it to avoid liquidation and conduct more significant business operations. *See id.*

BTEL's current financial woes stem from a default on certain senior notes issued pursuant to an indenture and supplemental indenture. *See Foreign Representative's Response to Noteholders' Statement of Undisputed Material Facts . . .* (referred to herein as the Undisputed Facts) at ECF No. 65 ¶ 1. Bakrie Telecom Pte. Ltd. (referred to herein as the Issuer), a subsidiary of BTEL, issued $380 million in 11.5% guaranteed senior notes due 2015 on behalf of

2

BTEL.  *See id.*  The Indenture is governed by New York law.  *See id.* ¶ 2.  The Indenture

contains a forum selection clause providing that the Issuer, BTEL, and each of the Subsidiary

Guarantors (as defined below) irrevocably and unconditionally [submit] to the non-exclusive

jurisdiction of any New York State or United States Federal court sitting in the Borough of

Manhattan, the City of New York over any suit, action or proceeding arising out of or relating to

the Indenture, any Note, or any Guarantee (as discussed below).  *See* Abi Declaration, Ex. A §

12.07(b).  The Bank of New York Mellon is the Indenture Trustee under the Indenture.  *See*

Undisputed Facts ¶ 3.  Jastiro Abi—the purported foreign representative who filed this case on

behalf of the Debtor—was a Director of both BTEL and of the Issuer at the time of the Offering.

*See id.* ¶ 4.

    BTEL solicited potential investors in the offering of the Notes by, among other things,

distributing offering memoranda and traveling to New York, where it distributed an investor

presentation to underwriters and potential investors.  *See generally id.* ¶¶ 6–9.  The investor

presentation indicated that BTEL would use the offering proceeds to refinance its existing debt

and for capital expenditures.  *See id.* ¶ 10.  BTEL caused the Issuer to be created for the sole

purpose of issuing the Notes and loaning the offering proceeds to BTEL, which the Issuer did

pursuant to an Intercompany Loan Agreement and Supplemental Intercompany Loan Agreement.

*See id.* ¶ 18.  As security for repayment of the Notes, the Issuer granted the Indenture Trustee an

assignment of all creditor rights under the Intercompany Loan Agreements and a power of

attorney upon an event of default on the Notes.  *See id.* ¶¶ 21–22; *see generally id.* ¶¶ 23–25.

    Additionally, as primary obligations to secure repayment of the Notes, BTEL guaranteed

the Notes pursuant to a Parent Guarantee.  *See id.* ¶ 31.  The Parent Guarantee provides

noteholders and the Indenture Trustee direct recourse to BTEL without requiring them to pursue

3

the Issuer for non-payment. *See id.* ¶ 33. Petitioner Abi executed the Parent Guarantee on behalf of BTEL and understood that BTEL was obligated to repay the Notes if the Issuer failed to do so. *See id.* ¶ 34. PT Bakrie Network and PT Bakrie Connectivity similarly guaranteed the Notes pursuant to a Subsidiary Guarantee. *See id.* ¶ 31. I will refer to them as the Subsidiary Guarantors. The Parent Guarantee and the Subsidiary Guarantee are governed by New York law. *See id.* ¶ 32.

BTEL, the Issuer, and the Subsidiary Guarantors ultimately defaulted on scheduled interest payments due on the Notes in November 2013 and May 2014. *See id.* ¶ 41. Before the scheduled payment in May 2014, BTEL issued a written notice to all noteholders stating that (i) it was engaged in discussions with a Steering Committee of key noteholders regarding the current financial and operational position of the company and a potential restructuring of the Notes, and (ii) it would not be making any further interest payments on the Notes pending the resolution of such discussions. *See id.* ¶ 50. In response, the Objecting Noteholders—who are purchasers and beneficial holders of some $105 million in face amount of the Notes, or over 25% of the outstanding $380 million in Notes issued—and three other noteholders formed an Ad Hoc Committee to engage in discussions with BTEL about its financial and operational plans. *See id.* ¶¶ 36, 52. That summer, the Ad Hoc Committee worked with BTEL and its financial consultant to conduct due diligence and evaluate the merits of BTEL's restructuring efforts. *See id.* ¶ 53; *see generally id.* ¶¶ 54–58. But by August 2014, discussions between BTEL and the Ad Hoc Committee had broken down. *See id.* ¶ 59.

Accordingly, in September, three of the Objecting Noteholders commenced litigation in New York state court against BTEL, the Issuer, and the Subsidiary Guarantors for breach of the Notes. *See id.* ¶ 62. They subsequently issued to and served on BTEL, the Issuer, and the

4

Indenture Trustee a notice of acceleration declaring all principal and interest immediately due and owing under the Notes and demanding immediate payment. *See id.* ¶ 63.

Meanwhile, on October 23, 2014, one of BTEL's other creditors filed a PKPU application against BTEL in the Central Jakarta Commercial Court (the "Commercial Court"). *See id.* ¶ 65. A PKPU proceeding is a court-enforced suspension of payments process in Indonesia that is designed to provide a debtor a definite period of time to restructure its debt and reorganize its affairs pursuant to a composition plan with its creditors. *See* Abi Declaration ¶ 12. BTEL engaged in months of restructuring negotiations with the noteholders, ultimately resulting in the Commercial Court granting a Temporary Suspension of Payment in the PKPU. *See* Undisputed Facts ¶¶ 68, 70. The Suspension of Payment named Titik Tejaningsih as Supervisory Judge and appointed William Eduard Daniel and Imran Nating as Administrators. *See id.* ¶ 71. The Administrators then set a 29-day schedule within which a restructuring plan was to be finalized, voted on, and confirmed. *See id.* ¶ 74.[2]

For BTEL's PKPU Plan to be accepted, the proposal was required to be approved by the requisite majority of creditors attending and voting at the meeting at which the Plan was considered, namely a majority in number and two-thirds in value of holders of each class of debt that attended and voted at the meeting. *See* Abi Declaration ¶ 16. Broadly, the Objecting Noteholders complain that, even though they filed claims, they were excluded from the PKPU process. *See generally* Undisputed Facts ¶¶ 75–113. They contend that they were prevented from meaningfully participating in the PKPU Proceeding because the Administrators used something called the "record and reports" to evaluate and determine who could vote on BTEL's

---

[2]    The Foreign Representative argues that the PKPU schedule was actually set by the Commercial Court, not the Administrators. But the Court does not find this distinction meaningful for purposes of today's bench ruling.

PKPU Plan, and the Administrators denied the claims filed by the Ad Hoc Committee and Steering Committee because they were not recorded on the record and report. *See generally id.* ¶¶ 88–94. Rather, BTEL listed the Issuer as its creditor owing the $380 million on the record and report, and the Administrators allowed this claim under the Intercompany Loan Agreements. *See generally id.* ¶¶ 91–92. The Objecting Noteholders assert that the Indenture Trustee did not consent to the Issuer voting the Note debt instead of the noteholders (and told the Administrators as much), that the Issuer lacked standing to vote the Note debt and was not authorized to do so under the terms of the Indenture, and that the PKPU Plan would not have received the requisite votes needed for approval if the Issuer had abstained from voting. *See generally id.* ¶¶ 100–124. They also claim that the Administrators ignored multiple letters they sent concerning, among other things, information requests, how to submit their claim, and a request for extension of the PKPU Proceeding. *See generally id.* ¶¶ 80–87.

BTEL's PKPU Plan ultimately did receive the requisite creditor support and was approved in December 2014. *See id.* ¶ 119. Neither the Indenture Trustee nor any of the Objecting Noteholders appealed the Indonesian Court's decision, but the Minister of Communication and Informatics of the Republic of Indonesia did. *See* Abi Declaration ¶ 19–20. This appeal was denied by the Supreme Court of Indonesia (the "Indonesian Supreme Court"). *See id.* ¶ 21, Ex. C.

The same day that their claims were rejected in the PKPU Proceeding, the Objecting Noteholders commenced a second action in the New York state court against BTEL, BTEL's minority shareholder PT Bakrie & Brothers Tbk (referred to herein as "B&B"), and some present and former commissioners and directors of the Issuer, BTEL, and the Subsidiary Guarantors (referred to herein as the Individual Defendants) for fraud and other tortious conduct in

connection with the Offering.  *See* Abi Declaration ¶ 28.  The Objecting Noteholders also sought

a declaratory judgment that the PKPU Proceeding was invalid with respect to the Notes and the

Indenture.  *See* Undisputed Facts ¶ 137.  These claims were subsequently consolidated with the

breach of Notes and other claims already pending in the New York state court.  *See id.* ¶ 138.

The New York court granted summary judgment on the Objecting Noteholders' breach of

contract claim and sustained the claims against the Issuer and Subsidiary Guarantors for fraud in

connection with the Offering but dismissed the claims against the Individual Defendants and

B&B for lack of personal jurisdiction.  *See id.* ¶¶ 139–140.  On cross-appeals, the New York

Appellate Division affirmed summary judgment in favor of the Objecting Noteholders as to

liability on the Notes, Indenture, and Guarantees, sustained the fraud claims, reinstated the

claims against the Individual Defendants and B&B, and ordered jurisdictional discovery.  *See id.*

¶ 141–142.

In December 2017, the New York trial court ordered the parties to proceed with

jurisdictional discovery.  *See id.* ¶ 143.  Less than two weeks later, BTEL executed a

"Declaration of Appointment of Foreign Representative and Authorization to File Chapter 15

Petition" that appointed Petitioner Abi to serve as BTEL's foreign representative and authorizing

him to file a petition under Chapter 15 of the Bankruptcy Code.  *See id.* ¶ 144.  He filed the

Chapter 15 case in late January 2018.  *See id.* ¶ 145.  Shortly after the filing, BTEL, the Issuer,

and the Subsidiary Guarantors stipulated to entry of judgment in the amount of $161,614,872.09

on the Objecting Noteholders' breach of contract claim in the New York litigation.  *See id.* ¶ 146.

The money judgment was so ordered and entered in the Office of the Clerk, but the Objecting

Noteholders have stipulated not to execute or enforce the money judgment pending resolution of

the Chapter 15 case.  *See id.* ¶ 148.

In late 2018, the Objecting Noteholders filed the Motion for summary judgment denying recognition of the PKPU Proceeding, and this Court heard argument on the Motion in late January 2019.  The Motion seeks summary judgment, arguing that the Debtor cannot satisfy the requirements for recognition given the undisputed facts.  More specifically, the Objecting Noteholders contend that the Debtors cannot satisfy the following requirements for recognition:

1) The property requirement of Bankruptcy Code Section 109(a);
2) The appointment of a foreign representative within the meaning of Sections 101(24) and 1515(a) of the Bankruptcy Code; and
3) The requirement that the proceeding be collective as defined by Section 101(23) and not be manifestly contrary to U.S. public policy as required by Section 1506.

While the Debtor has opposed the Objecting Noteholders' request for summary judgment, the Debtor itself has not moved for summary judgment, content to let these issues be addressed at trial.

For the reasons I will explain, the Court concludes that the summary judgment Motion of the Objecting Noteholders should be denied.

## DISCUSSION

### I. Legal Standard

"Summary judgment is not proper if there is any evidence from which a reasonable inference could be drawn in the non-moving party's favor as to an issue on which summary judgment is sought."  *See, e.g., In re WorldCom, Inc.*, 2007 WL 1836599, at *2 (Bankr. S.D.N.Y. June 26, 2007) (citing *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).  "A court reviewing a motion for summary judgment must 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'"  *Beyer v. Cnty. of Nassau*, 524 F.3d 160,

163 (2d Cir. 2008) (quoting *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir.

2003)).

A Chapter 15 case is commenced by the foreign representative of a debtor filing a

petition for recognition of a foreign proceeding. *See* 11 U.S.C. §§ 1504, 1515(a). The petition

must be accompanied by certain evidentiary documents that are presumed authentic in the

absence of contrary evidence. *See* 11 U.S.C. §§ 1515(b), 1516(b); *In re Bear Stearns High-

Grade Structured Credit Strategies Master Fund, Ltd. (In Provisional Liquidation)*, 374 B.R.

122, 128 (Bankr. S.D.N.Y. 2007).

Section 1517 of the Bankruptcy Code identifies the requirements for recognition of a

foreign proceeding. It provides that

an order recognizing a foreign proceeding shall be entered if—

(1) such foreign proceeding . . . is a foreign main proceeding or foreign nonmain
proceeding within the meaning of [S]ection 1502;
(2) the foreign representative applying for recognition is a person or body; and
(3) the petition meets the requirements of [S]ection 1515.

11 U.S.C. § 1517(a). Recognition is mandatory if all three requirements of Section 1517(a) are

met. *See* 11 U.S.C. § 1517(a). "But recognition is not a rubber stamp exercise," and the burden

rests on the foreign representative to prove each of the requirements of Section 1517. *In re

Creative Fin., Ltd. (In Liquidation)*, 543 B.R. 498, 514 (Bankr. S.D.N.Y. 2016).

Section 1506 of the Bankruptcy Code includes an overriding public policy exception,

providing that a court may refuse to take an action under Chapter 15 if such action "would be

manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. The exception is

read narrowly, with legislative history stating that "the word 'manifestly' in international usage

restricts the public policy exception to the most fundamental policies of the United States."

9

*Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 139 (2d Cir. 2013). Thus, "even the absence of certain procedural or constitutional rights will not itself be a bar under [Section] 1506." *In re OAS S.A.*, 533 B.R. 83, 104 (Bankr. S.D.N.Y. 2015) (quoting *Ad Hoc Grp. of Vitro Noteholders v. Vitro, S.A.B. de C.V. (In re Vitro, S.A.B. de C.V.)*, 701 F.3d 1031, 1069 (5th Cir. 2012) ("*Vitro II*")).

## II.    "Property In the United States" Requirement

The Court begins by addressing the issue of this Court's jurisdiction over the Debtor. The Objecting Noteholders have moved to deny recognition of the Debtor's foreign proceeding on the basis that the Debtor does not have property in the United States sufficient to satisfy Bankruptcy Code Section 109's property requirement. *See* Motion ¶¶ 124–26.

The Second Circuit has held that a debtor must satisfy the property requirements of Section 109 of the Bankruptcy Code in order to have its foreign insolvency proceeding recognized in the United States. *See Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 247, 250–51 (2d Cir. 2013). Section 109(a) states that "only a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor under [Chapter 15]." 11 U.S.C. § 109(a). Accordingly, a debtor must either reside, have a domicile in, have a principal place of business in, or have property in the United States before a court may grant recognition of its foreign proceeding. *See id.* Section 109's property requirement is satisfied by maintaining even a nominal amount of property in the United States, and nothing in the statute "direct[s] there to be any inquiry into the circumstances surrounding the debtor's acquisition of the property." *In re B.C.I. Fins. Pty Ltd.*, 583 B.R. 288, 294 (Bankr. S.D.N.Y. 2018). Moreover, courts in this District have broadly construed the term "property" to encompass a variety of intangible assets for purposes of satisfying Section 109. Examples of

10

property sufficient to satisfy the requirement include funds held in a retainer account in the possession of the foreign representative's counsel, deposits in a New York bank account, and causes of action with a situs in New York owned by the foreign debtor. *See In re Berau Capital Res. PTE Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015); *In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 372–74 (Bankr. S.D.N.Y. 2014).

An indenture subject to New York governing law and containing New York forum selection clauses constitutes property in the United States and thereby satisfies Section 109's eligibility requirement. *See In re Berau*, 540 B.R. at 82–83. In *Berau*, the foreign debtor did not have a place of business in the United States. But it did have an attorney retainer held by its New York counsel, and it was an obligor on a US $450 million debt indenture that was expressly governed by New York law. *See id.* at 82. The court in *Berau* concluded that, even though an attorney retainer alone would have been sufficient to satisfy Section 109's eligibility requirement, the foreign debtor's United States dollar denominated debt indenture governed by New York law provided another "substantial basis" for finding that the debtor satisfied Chapter 15's eligibility requirements. *See id.* The court reasoned that "[c]ontracts create property rights for the parties to the contract," and that "[a] debtor's contract rights are intangible property of the debtor." *Id.* at 83. Accordingly, the *Berau* court concluded that the indenture constituted property of the foreign debtor in the United States sufficient to satisfy Section 109's property requirement. *See id.*

Applying those principles here, the Court concludes that the Indenture and the related Notes here satisfy the property requirement set forth by the Second Circuit in *In re Barnet*. The facts of the present case are substantially similar to those in *Berau*. Like the debtor in *Berau*, the Debtor in this case is an obligor on an Indenture containing New York choice of law and forum

11

selection clauses. Thus, using the same rationale as was used in *Berau,* the Court concludes that the Indenture governing the Notes creates property rights for the Debtor sufficient to satisfy Section 109's property requirement.

The Objecting Noteholders contend that the logic of the *Berau* case, which would otherwise serve as a basis to satisfy Section 109, should not apply where a debtor has "disregard[ed] and repudiate[ed] its New York law-governed obligations." *See Objecting Noteholders' Reply in Support of Motion* . . . (the "Objecting Noteholders' Reply) at ECF No. 66 ¶ 60. In so arguing, the Objecting Noteholders appear to contend that the Court should weigh equitable principles in applying the property requirements of Section 109 and *Barnet*. But this argument ignores that the actual analysis in *Berau* focused on the situs of the debtor's property in the form of dollar denominated debt that was governed by New York law and subject to a New York forum selection clause. Using the touchstone of three statutory provisions of New York law, the *Berau* court concluded that the situs of such property was in New York. *See In re Berau*, 540 B.R. at 82–84; *cf. In re B.C.I. Fins. Pty Ltd.*, 583 B.R. at 296–304 (concluding that intangible property in the form of fiduciary duty claims had its situs in New York); *In re Suntech Power Holdings Co.*, 520 B.R. 399, 411–413 (Bankr. S.D.N.Y. 2014) (finding a bank account held in New York and used, in part, to pay the debtor's U.S. bankruptcy counsel was sufficient property to satisfy Section 109). This Court has previously negated attempts to add subjective requirements to the straightforward property requirement found in Section 109. *See In re B.C.I. Fins. Pty Ltd.*, 583 B.R. at 294; *In re Octaviar*, 511 B.R. at 373. Indeed, the Objecting Noteholders have not cited any case either within or outside this jurisdiction that has construed the statute to include such a subjective inquiry. This Court therefore rejects the Objecting

12

Noteholders' attempt here to read a subjective equitable requirement into Section 109's property requirement.

## III.   <u>Appointment of Foreign Representative</u>

The Objecting Noteholders argue that the PKPU Proceeding is not entitled to recognition because Petitioner Abi is not a foreign representative within the meaning of Section 101(24) of the Bankruptcy Code.  *See generally* Motion ¶¶ 89–96; Objecting Noteholders' Reply ¶¶ 30–37. As such, they continue, the petition fails to meet the procedural requirements set forth under Section 1515, and an order of recognition may not be entered in accordance with Section 1517. *See* Motion ¶¶ 90, 91.

Pursuant to Section 101(24) of the Bankruptcy Code, a "foreign representative" is "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding."  11 U.S.C. § 101(24).  In commencing a case under Chapter 15 of the Bankruptcy Code, the foreign representative applies to the bankruptcy court by filing a petition "for recognition of a foreign proceeding in which the foreign representative has been appointed."  11 U.S.C. § 1515(a).

Broadly speaking, the Objecting Noteholders argue that Abi is not a properly appointed foreign representative because his appointment did not occur until three years after the conclusion of the PKPU Proceeding, meaning that his appointment did not occur "in" the foreign proceeding.  *See* Motion ¶¶ 91–94; *see also* 11 U.S.C. § 101(24) (stating that a foreign representative is a person or body "*authorized in a foreign proceeding . . . .*") (emphasis added); 11 U.S.C. § 1515(a) ("A foreign representative applies to the court for recognition of a foreign proceeding *in which the foreign representative has been appointed . . . .*") (emphasis added).

13

Citing to the Fifth Circuit's decision in *Vitro II*, the Objecting Noteholders argue that the language in Section 101(24) requires Abi to have been appointed "'in the context of' . . . 'during, or in the course of, a foreign proceeding.'"  Motion ¶ 91 (citing *Vitro II*, 701 F.3d at 1047).

The Objecting Noteholders' argument has three aspects.

First, the Objecting Noteholders point out that Abi's purported appointment occurred solely through the Declaration of Appointment of Foreign Representative and Authorization to File Chapter 15 Petition signed by two directors of BTEL—three years after the PKPU Proceeding had concluded.  *See* Motion ¶ 92.  "Given the three-year lapse," they posit, "the Declaration was unequivocally **not** adopted 'during, or in the course of' a foreign proceeding, as is required to establish the authority of the foreign representative to seek recognition under 11 U.S.C. § 1517(a)(2) or 11 U.S.C. § 1515(b)(2)."  *Id.*

Second, the Objecting Noteholders assert that the appointment could not have been "in the context of" the PKPU Proceeding for the same reason: "'in the context of' means within 'the situation in which something happens: the group of conditions that exist where and when something happens.'"  *Id.* ¶ 93 (citing Merriam Webster's Dictionary online).

Third, the Objecting Noteholders claim that the appointment could not be proper under Indonesian law because the Administrators exercised joint control and authority with the BTEL Board over any action taken during the PKPU Proceeding regarding management or ownership of the Debtor's assets.  *See id.* ¶¶ 95, 96.  As such, the Board could not take unilateral action in appointing Abi.  *See id.* ¶ 95.  The Objecting Noteholders distinguish this situation from that of foreign representatives in two other cases: *Ad Hoc Grp. of Vitro Noteholders v. Vitro, S.A.B. de C.V. (In re Vitro, S.A.B. de C.V.)*, 470 B.R. 408, 411–12 (N.D. Tex. 2012), *aff'd*, 701 F.3d 1031, 1047 (5th Cir. 2012) ("*Vitro I*") and *In re OAS S.A.*, 533 B.R. 83, 95 (Bankr. S.D.N.Y. 2015).  As

14

to *Vitro I*, the Objecting Noteholders note that the debtor retained broad control over its affairs and thus could appoint its own representatives.  As to *OAS*, the Objecting Noteholders highlight that the debtor's management similarly retained control over the debtor's business and assets and thus could appoint its foreign representative.  *See* Motion ¶ 95.

Taking these three reasons together, the Objecting Noteholders summarize their argument as follows: Chapter 15 case law permits appointment of a foreign representative made by the debtor's board, rather than the foreign court, where the board retains control of corporate governance in the foreign proceeding under the foreign restructuring law, and the appointment is made in the "context" or "course of" that proceeding.  *See* Objecting Noteholders' Reply ¶ 30.

But the Court concludes that the Objecting Noteholders are not entitled to summary judgment based on the present record on this issue for a variety of reasons.  As a threshold matter, the requirement that a foreign representative be authorized in a foreign proceeding is not an onerous one.  It has been read broadly in order to facilitate the purposes of Chapter 15.  *See Vitro I*, 470 B.R. at 411.  In discussing whether a foreign representative is required to be appointed directly by a foreign court or administrative body, the *Vitro I* court observed:

> [It] is reasonable to understand the phrase "authorized in a foreign proceeding" more broadly, i.e., to mean authorized in the context of a foreign bankruptcy proceeding.  If the latter interpretation is correct, then a foreign representative who was appointed by a corporation engaged in a foreign bankruptcy proceeding could be considered "authorized in a foreign proceeding.

*Id.*  That court ultimately held that the foreign representatives in question—two individuals who had been appointed at the debtor's board meeting—had been properly appointed since Section 101(24) permits "those authorized 'to administer the reorganization or the liquidation of the debtor's assets or affairs'" to serve as foreign representatives.  *Id.* at 412 (citing 11 U.S.C. § 101(24)).  In affirming this ruling, the Fifth Circuit took the same view.  It opined that

15

> [Section 101(24)'s] requirement that a representative be 'authorized in a foreign
> proceeding' is certainly compatible with appointment by a foreign court, but it is hardly
> necessary. As the district court observed, it would be equally compatible with a
> requirement that an individual be appointed 'in the context of' a foreign proceeding. . . .
> It could also mean during, or in the course of, a foreign proceeding.

*Vitro II*, 701 F.3d at 1047.

The Objecting Noteholders nonetheless assert that this case "presents the exceptional

circumstance of a board waiting until so long after conclusion of the foreign proceeding that the

appointment cannot reasonably be said to have occurred in such 'course of context.'" Objecting

Noteholders' Reply ¶ 30. As such, their issue seems to be less about *who* made the appointment,

but *when* the appointment was made. The Debtor does not dispute that the foreign proceeding is

closed and cannot be reopened. *See Foreign Representative Jastiro Abi's Opposition to the*

*Objecting Noteholders' Motion* . . . (the "Foreign Representative's Opposition to Motion") at

ECF No. 63 ¶ 104 ("BTEL's PKPU Plan has been approved by the Commercial Court and the

actively court-supervised portion of BTEL's PKPU Proceeding has for the time being

concluded[.]"). But the Debtor contends that, despite the three-year gap between the closing of

the PKPU Proceeding and Abi's appointment, the appointment was nevertheless made "in the

context of" BTEL's foreign proceeding. More specifically, it argues that "BTEL's foreign

restructuring continues because BTEL must still implement its PKPU Plan pursuant to

Indonesia's statutory PKPU framework. Under Article 291 of the PKPU Law, BTEL's failure to

implement the PKPU Plan could result in BTEL's being subjected to a court-supervised

liquidation in the Commercial Court." *Id.* ¶ 106.

Admittedly, the Debtor has provided a less-than-fulsome record concerning the

appointment of Abi as its foreign representative. But the Debtor has explained that (1) Abi is a

director of BTEL, *see* Abi Declaration ¶ 1, (2) Abi was appointed by BTEL's board of directors

pursuant to a corporate resolution, *see id.* ¶ 35, and (3) Abi is authorized to administer the

reorganization of the Debtor's affairs and represent the Debtor in this Chapter 15 case, *see id.* ¶

36.  At oral argument, Debtor's counsel put some additional context around these facts by

explaining—in essence—that the Debtor had hoped to resolve the New York litigation without

seeking relief under Chapter 15, but those efforts were unsuccessful.  *See* Jan. 18, 2019 Hearing

Transcript at 69:16–77:6 [ECF No. 73].  While such an explanation is not evidence, construing

the facts we do have in the light most favorable to the Debtor as the non-moving party, the above

facts are sufficient to defeat summary judgment.  Indeed, it appears clear that the Debtor seeks

Chapter 15 relief as the method to effectuate the PKPU Plan and allow the Debtor to resume

operations.  The Objecting Noteholders do not posit an alternative rationale.

In reaching today's conclusion, the Court is unaware of any authority explicitly

precluding the appointment of a foreign representative for purposes of pursuing Chapter 15 relief

after the foreign proceeding has been closed.[3]  And, given the policy underlying Chapter 15, it

would be hard to imagine why such action would be categorically prohibited.

The Objecting Noteholders caution against recognizing the foreign representative here

because, "[w]ere the Court to hold [that Abi was properly appointed as a foreign representative],

then any entity that ever has gone through a foreign proceeding could determine years later that,

as here, it wants to appoint a foreign representative for the purposes of seeking recognition under

and obtaining the benefits of Chapter 15."  Motion ¶ 94.  But the Objecting Noteholders'

---

[3]     In fact, the Debtor has represented that, "as here, in all three PKPU proceedings where this Court has granted Chapter 15 recognition (*Arpeni, Berlian Laju Tanker* and *Bumi*), the PKPU proceeding had been formally closed under Indonesian law before the appointment of the foreign representatives in those cases—in each case, by the board of directors."  Foreign Representative's Opposition to Motion ¶ 4 (citing *PT Bumi Resources Tbk*, No. 17-10115 (MKV) (Bankr. S.D.N.Y.); *In re PT Berlian Laju Tank Tbk*, No. 13-10901 (SMB) (Bankr. S.D.N.Y.); *In re PT Arpeni Pratama Ocean Line Tbk*, No. 11-15691 (ALG) (Bankr. S.D.N.Y.)).

argument ignores the fact that the PKPU Plan—which was indisputably approved "in the context

of, during, and in the course of" the foreign proceeding—remains to be implemented.  And, as

the Debtor points out, it is unclear what supposedly improper benefits a foreign debtor would

have to gain by pursuing such a strategy.  *See* Foreign Representative's Opposition to Motion ¶

112.  In any event, the Court must evaluate each case on the merits based on its own unique facts

and circumstances.  The Court concludes that the mere fact of the delay in seeking Chapter 15

relief after a foreign proceeding has been closed—in and of itself—does not preclude a finding

that this foreign representative was properly appointed.  In the end, the Court concludes that a

trial here is appropriate to examine the circumstances surrounding the timing of the foreign

representative's appointment and the significance, if any, of the delay.

Finally, the Court rejects the Objecting Noteholders' argument that the appointment of

the foreign representative is ineffective under Indonesian law because it was not approved by the

Administrators who exercise joint control and authority with the BTEL Board over any action

taken during the PKPU Proceeding with respect to management or ownership of the Debtor's

assets.  *See* Motion ¶ 95.  The *Vitro I* court explicitly addressed—and rejected—a nearly

identical argument, albeit in the context of Mexican law, holding that the matter of whether a

foreign representative is properly appointed "is a matter of United States—not Mexican—law."

*Vitro I*, 470 B.R. at 413 (noteholder's legal expert admitting that "why these United States

Courts decided to allow [an officer or director of a Mexican debtor] to serve as foreign

representative is beyond my knowledge, because it's a matter of United States law") (internal

quotations omitted).  Accordingly, the ultimate issue will be whether the appointment comported

with the applicable sections of the Bankruptcy Code, namely Sections 101(24), 1515 and 1517.

The Court looks forward to further factual development on this issue at trial.

18

IV.    **"Collective" Proceeding Requirement and Public Policy**

The Objecting Noteholders argue that summary judgment should be granted because the

PKPU Proceeding was not a collective proceeding because it failed to include the obligations

allegedly owed by the Debtor to the Indenture Trustee and the Objecting Noteholders or to

account for the Objecting Noteholders' interests.

Section 101(23) of the Bankruptcy Code requires that a foreign proceeding be collective

in nature.  Collective proceedings are those that consider "'the rights and obligations of *all*

creditors'—that is for the general benefit of creditors." *Armada (Singapore) Pte Ltd. v. Shah (In*

*re Ashapura Minechem Ltd.)*, 480 B.R. 129, 136 (S.D.N.Y. 2012) (quoting *In re Betcorp Ltd.*,

400 B.R. 266, 281 (Bankr. D. Nev. 2009)).  Such proceedings contemplate the "consideration

and eventual treatment of claims of various types of creditors, as well as the possibility that

creditors may take part in the foreign action." *Id.* (quoting *In re British Am. Ins. Co.*, 425 B.R.

884, 902 (Bankr. S.D. Fla. 2010)).  A collective proceeding "must be instituted for the benefit of

creditors generally rather than for a single creditor or class of creditors." *In re British Am. Ins.*

*Co.*, 425 B.R. at 902; *see also In re Betcorp*, 400 B.R. at 281 (holding that voluntary winding up

fits the collective criterion, while "a receivership remedy instigated at the request, and for the

benefit, of a single secured creditor" would not); *In re Bd. of Dirs. of Hopewell Int'l Ins., Ltd.*,

275 B.R. 699, 707 (S.D.N.Y. 2002) (finding a foreign scheme of arrangement for creditors to file

claims collective in nature because all creditors could object); *In re Gold & Honey, Ltd.*, 410

B.R. 357, 368 (E.D.N.Y. 2009) (finding a foreign proceeding not to be collective because it was

"more akin to a[n] individual creditor's replevin or repossession action than it is to a

reorganization or liquidation by an independent trustee").

19

When determining whether a proceeding was collective in nature, a court should examine "both the law governing the foreign action and the parameters of the particular proceeding as defined in, for example, orders of a foreign tribunal overseeing the action." *In re Ashapura*, 480 B.R. at 136 (quoting *In re British Am. Ins. Co.*, 425 B.R. at 902).

"A collective proceeding is designed to provide equitable treatment to creditors, by treating similarly situated creditors in the same way, and to maximize the value of the debtor's assets for the benefit of all creditors . . . ." *Id.* at 136–37 (quoting U.N. Communication on International Law, Legislative Guide on Insolvency Law ¶ 25 (2005)). But a collective proceeding need not require that "all creditors receive a share of the distribution." *Id.* at 137 (citing *In re British Am. Ins. Co.*, 425 B.R. at 903).

"Other characteristics of a collective proceeding include: adequate notice to creditors under applicable foreign law, provisions for the distribution of assets according to statutory priorities, and a statutory mechanism for creditors to seek court review of the proceeding. However, the standard for notice is not a demanding one." *Id.* (citing *In re ABC Learning Centres Ltd.*, 445 B.R. 318, 328-29 (Bankr. D. Del. 2010); *In re British Am. Ins. Co.*, 425 B.R. at 902).

The Objecting Noteholders allege in this case that the Debtor manipulated the PKPU Proceeding to achieve the denial of the Indenture Trustee's claim. They basically rely on the result of the PKPU Proceeding—that the Indenture Trustee's claim was denied for voting purposes, while the Issuer was permitted to vote.

In support of their position, the Objecting Noteholders cite to the statutory sections of the Indonesian Law on Bankruptcy and Suspended Debt Repayments that deal with the filing and treatment of claims. This statute requires that claims filed with the administrators be

20

accompanied by supporting evidence. *See* English Translation of PKPU Law (the "PKPU Law"), attached Exhibit 83 to the Declaration of Mark D. Bloom (the "Bloom Declaration"), at ECF No. 57-83, Article 270. Article 272 of the PKPU Law directs administrators to make a list of the creditor's claims, which list includes certain pertinent information, including "whether the claims are recognized or denied by the manager." *Id.* The Objecting Noteholders focus heavily on Article 271 of PKPU Law, which provides that the creditor list compiled by the administrators "must be verified against the records and reports from the debtors." *Id.*; *see also* Declaration of Kevin Omar Sidharta in Support of Objecting Noteholders' Motion (the "Sidharta Declaration"), at ECF No. 54 ¶ 59. The Objecting Noteholders assert that the record and report used by the Administrators in the PKPU Proceeding to verify the claims submitted by the creditors and to prepare the list of claims, including their recognition or denial under Article 272, was prepared by the Debtor using data from the Debtor's internal records. *See* Sidharta Declaration at ¶¶ 58–59. The Objecting Noteholders then point to the decisions of the Commercial Court and the Indonesian Supreme Court, which both state that the Administrators denied the Indenture Trustee's claim because it was not contained in the record and report of the Debtor in accordance with Article 271. *See* Directory of Judgment of Supreme Court of Republic of Indonesia, attached as Exhibit F to the Declaration of Kenneth Puhala in Support of Foreign Representative's Opposition to Motion (the "Puhala Declaration") [ECF No. 64-6] at 32, 38; Judgment Ratification of Homologation, attached as Exhibit 79 to the Bloom Declaration [ECF No. 57-79] at 20. The implication is that the Administrators were either misled by the Debtor or that the Administrators' hands were tied, and they were required by Indonesian law to conform to the report and recommendation provided by the Debtor, which the Objecting Noteholders claim the Debtor manipulated.

21

But there is a question of fact regarding the process that took place with respect to the Administrators' consideration of the claims in this case. The Debtor has provided evidence that both counsel to the Objecting Noteholders and to the Indenture Trustee were permitted to make submissions and argument to the Administrators and the Supervisory Judge as to why the Issuer should not be permitted to vote and that the Indenture Trustee should instead be able to submit a claim on behalf of the Objecting Noteholders. *See* Aji Wijaya Deposition Transcript 113:4-13; 171:17-172:11; 185:6-188:13; 225:12-25 (June 28, 2018) (the "Wijaya Deposition Transcript"), attached as Exhibit 92 to the Bloom Declaration [ECF No. 57-92]; Letter of Soemadipradja & Taher to Administrators on behalf of BNY Mellon, attached as Exhibit 68 to Bloom Declaration [ECF No. 57-68]; Letters of William Soerjonegoro & Partners to Administrators, attached as Exhibit 69 to Bloom Declaration. [ECF No. 57-69]; Letters of Kudri & Djamaris to the Administrators on behalf of the Objecting Noteholders, attached as Exhibits 70, 71, 72 and 73 to the Bloom Declaration [ECF Nos. 57-70, 57-71, 57-72, 57-73]; Letter of Kudri & Djamaris to the Supervisory Judge on behalf of the Objecting Noteholders, attached as Exhibit 78 to the Bloom Declaration [ECF No. 57-78]; *see also* Undisputed Facts ¶ 94 (citing Wijaya Deposition Transcript 182:2-188:13). Clearly, the Objecting Noteholders and Indenture Trustee were able to put their positions before the officials overseeing the Indonesian proceedings.

There is evidence that additional safeguards exist in the PKPU process in the Indonesian court system. For instance, after a composition plan is accepted by the required majority of creditors, PKPU Law provides that the Commercial Court may still reject the plan if, *inter alia*, the plan was reached "because of swindle, or conspiracy with one creditor or more, or because of the use of other unfair attempts without considering whether or not the debtor or other party has cooperated to achieve the matter." PKPU Law Article 285(2)(c). But the Commercial Court

22

here instead chose to approve the PKPU Plan. *See generally* Judgment Ratification of

Homologation, attached as Exhibit 79 to the Bloom Declaration. And PKPU Law also provides

that ratification of the composition plan by the Commercial Court can be further appealed to the

Indonesian Supreme Court, the highest court in Indonesia. *See* PKPU Law Article 295(1).

While the Objecting Noteholders and Indenture Trustee chose not to appeal the Commercial

Court decision, that decision was appealed by the Minister of Communications and Informatics

of the Republic of Indonesia based upon the same voting process arguments that had been made

by the Indenture Trustee and the Objecting Noteholders. *See* Directory of Judgment of Supreme

Court of Republic of Indonesia at 137–140, attached as Exhibit F to Puhala Declaration. But

these arguments were rejected by the Indonesian Supreme Court. *See id.* at 143–146.

Additionally, there is testimony that creditors in a similar position to the Objecting

Noteholders' supported the plan. Specifically, the Steering Committee of Noteholders supported

the PKPU Plan and process, even though they also were not permitted to vote. *See* Abi

Deposition Transcript 212:16-213:4; 213:17-214:12; 269:11-272:16 (June 27, 2018), attached as

Exhibit 91 to the Bloom Declaration [ECF No. 57-91].[4]

While the Objecting Noteholders argue that the PKPU Plan would have been denied if

the Indenture Trustee had been permitted to vote, there are also questions of fact regarding this

---

[4]       Parenthetically, the Court notes that the Debtor raised this point in its opposition to summary judgment.
*See* Foreign Representative's Opposition to Motion ¶¶ 31–32, 67. The Objecting Noteholders argue that the
testimony upon which the Debtor relies is hearsay and should not be considered. This argument, however, was not
raised in the Objecting Noteholders' Reply, but rather in a sur-reply submitted after oral argument. *See* Post-
Hearing Letter of Objecting Noteholders to Court, dated January 28, 2019 [ECF No. 71]. As such, the Court will
not consider the argument. *See, e.g.*, *United States v. Barnes*, 158 F.3d 662, 672 (2d Cir. 1998) ("Normally, we will
not consider arguments raised for the first time in a reply brief, let alone at or after oral argument."); *Goldberg v.
UBS AG*, 690 F. Supp. 2d 92, 98-99 (E.D.N.Y. 2010) (stating with respect to argument raised for first time at oral
argument that because it "was not raised until this late point, defendant cannot raise it now. . . ."); *White v. First Am.
Registry*, 592 F. Supp. 2d 681, 683 (S.D.N.Y. 2009) (refusing to hear arguments that were raised for the first time in
reply papers); *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 137 (S.D.N.Y. 2008) ("As to [defendant's]
second argument . . . this argument was raised for the first time at oral argument and so was waived in terms of this
motion.").

assertion.  *See* Puhala Declaration ¶¶ 14, 15 (asserting that if both Steering Committee and Indenture Trustee were permitted to vote, the PKPU Plan would have been approved by an affirmative vote of 72.15% of the unsecured creditors); *see also* Undisputed Facts ¶ 124 (citing Puhala Declaration ¶¶ 2–15).  Based on the current record, the Court is not in a position to resolve these competing views about voting on summary judgment.

Additionally, questions of fact exist as to the independence of the Administrators and Supervisory Judge in the process itself.  The case of *In re Manley Toys Ltd.*, 580 B.R. 632 (Bankr. D. N.J. 2018), dealt with assertions strikingly similar to those currently before the Court. In *Manley*, creditors argued that a Hong Kong foreign proceeding was not collective because the debtor allegedly "took steps to ensure that the liquidation would benefit only the [d]ebtor and affiliated companies by using affiliates (and payments by affiliates to non-insider creditors) to control the Creditors' Meeting."  *Id.* at 641.  The creditors also alleged that the debtor and its affiliates had "manipulated the [d]ebtor's creditor list by having affiliated entities pay the [d]ebtor's obligations and then accepting assignments of those claims."  *Id.  Manley* held that the alleged wrongdoing of the parties was insufficient to render the proceeding non-collective because the liquidators had independent obligations and were in control of the liquidation.  *See id.* at 641-42.  The court stated that "Hong Kong law provides mechanisms for the [l]iquidators to protect the interests of non-insiders.  As such, the potentially improper behavior of the [d]ebtor and its insiders does not mean that the proceeding is not collective."  *Id.* at 642.  The court further held that even if the liquidators were taking direction from insiders, as had been alleged, "the proceeding is nevertheless collective, because . . . creditors have remedies in the Hong Kong courts."  *Id.*

24

There is evidence in this case to support the Debtor's position that the Administrators maintained independence in the PKPU administration process.  For instance, PKPU Law clearly states that it is the administrator that decides whether the claims are recognized or denied.  *See* PKPU Law Article 272.  Even the Objecting Noteholders' own Indonesian law expert does not categorically opine that Article 271 of the PKPU Law requires administrators to blindly adhere to a debtor's record and report, stating instead that the administers are "*free to object* (i.e., not recognize) a creditor's claim that was not listed in the debtor's record and report but is being submitted to participate in the PKPU proceeding. . . ."  Sidharta Declaration ¶ 60 (emphasis added).  Under PKPU Law, the administrators (along with the debtor) are also involved in the management of the debtor's assets during the PKPU proceeding.  *See* PKPU Law Article 225(3) (stating that managers "along with the debtor manage the wealth of the debtor.").  Specifically, the debtor needs approval from the administrators prior to taking any action to affect assets or management.  *See* Undisputed Facts ¶ 72 (citing Wijaya Deposition Transcript 54:17-55:11; Sidharta Declaration ¶ 43).  The supervisory judge also provides independent oversight regarding the claims and voting process, as PKPU Law provides that the judge may assess claims that have been rejected by the administrators to determine whether those claims should be allowed to participate in the voting process on the proposed PKPU plan.  *See* PKPU Law Article 280.

The Debtor also disputes the Objecting Noteholders' assertion that during the creditor verification meeting, the Administrators evaluated and determined the creditors that were entitled to vote based exclusively on the record and report submitted by the Debtor.  *See* Undisputed Facts ¶ 88.  Rather, the Debtor maintains that the process involved, *inter alia*, "(i) the debtor's submission of a record and report, (ii) creditors' submission of required documentation of their claims, (iii) a reconciliation of the various documents conducted by the debtor and the neutral

Administrators, (iv) an opportunity for creditors to appear and make arguments to the

Administrators and the supervisory judge, and (v) final approval of the Administrators'

determinations by the supervisory judge." *See id.* ¶ 88 (citing Wijaya Deposition Transcript

154:19-155:7; 178:9-179:5; 182:21-184:2; 185:6-189:19; 192:4-195:14).

The Objecting Noteholders also assert that BTEL not only created the record and report,

but also edited it subsequent to its submission. *See id.* ¶ 96. While the Debtor admits that it

submitted the initial record and report, the Debtor asserts that the Administrators reviewed it,

reconciled it and signed the final version. *See id.* ¶ 89 (citing Wijaya Deposition Transcript

154:19-155:7; 178:9-179:5; 182:21-184:2; 185:6-189:19; 192:4-195:14). Additionally, the

Debtor asserts that the document was modified to incorporate information that had been provided

by the Administrators. *See id.* ¶ 96 (citing Wijaya Deposition Transcript 192:23-195:10).

There are additional facts in the record about the collective nature of the Debtor's PKPU

Proceeding that prevent summary judgment on this issue in favor of the Objecting Noteholders.

For instance, a collective proceeding contemplates the "consideration and eventual treatment of

claims of various types of creditors. . . ." *In re Ashapura*, 480 B.R. at 136. As reflected in the

decision of the Commercial Court—which was affirmed by the Indonesian Supreme Court—the

PKPU Plan restructured all of BTEL's more than $770 million of indebtedness. *See* Judgment

Ratification of Homologation at 24-85, attached as Exhibit 79 to the Bloom Declaration. This

included (a) the Notes; (b) a $40 million secured credit facility; (c) approximately $15 million

related to hedging facilities; (d) over $68 million owed on tower leases; (e) over $158 million

due to an equipment supplier holding legal title to the equipment; and (f) approximately $108

million in other past due payables. *See id.* The PKPU Plan provides for 30% of the amount due

under the Notes to be paid in cash, in installments over a 66-month period, with an interest rate

26

of 4%. *See* Abi Declaration ¶ 23. The remaining 70% of the amount due under the Notes will be

satisfied through Mandatory Convertible Bonds with a maturity date of ten years and a

conversion price of 200 IDR per share. *See id.* at ¶ 24.

The Objecting Noteholders suggest that the results of the PKPU Proceeding were

influenced by corruption in the Indonesian judiciary system, citing to the Country Reports on

Human Rights practices for 2017, issued by the U.S. Department of State. *See* Motion ¶¶ 72–75.

But the Objecting Noteholders have not provided the Court with any evidence regarding

corruption with respect to PKPU proceedings in general or with respect to this proceeding in

particular. Given other issues of fact the Court has identified above as to the PKPU Proceeding,

reliance here on the Country Report alone is an insufficient basis on which to grant summary

judgment for the Objecting Noteholders.

Raising arguments similar to those already discussed, the Objecting Noteholders finally

argue that the PKPU Proceeding should not be recognized because it was manifestly contrary to

U.S. public policy. But "[t]he public policy exception set forth in [S]ection 1506 is narrowly

construed and invoked only under exceptional circumstances that concern matters of

fundamental importance to the United States." *In re Poymanov*, 571 B.R. 24, 38 (Bankr.

S.D.N.Y. 2017) (collecting cases). The party invoking the exception bears the burden of proof.

*See id.* at 38–39. "The relief granted in the foreign proceeding and the relief available in a U.S.

proceeding need not be identical. A U.S. bankruptcy court is not required to make an

independent determination about the propriety of individual acts of a foreign court. The key

determination required by this Court is whether the procedures used in [the foreign proceeding]

meet [U.S.] fundamental standards of fairness." *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R.

685, 697 (Bankr. S.D.N.Y. 2010). "Where . . . the proceedings in the foreign court progressed

27

according to the course of a civilized jurisprudence and where the procedures followed in the

foreign jurisdiction meet our fundamental standards of fairness, there is no violation of public

policy." *In re Rede Energia S.A.*, 515 B.R. 69, 107 (Bankr. S.D.N.Y. 2014).  As the Objecting

Noteholders' argument on Section 1506 relies on the same arguments already discussed, it is

subject to the same issues and caveats already identified.  These include issues of fact regarding

how the PKPU Proceeding worked here and the independence of the officials that participated

therein.  Accordingly, the Court will deny summary judgment on the basis of Section 1506 of the

Bankruptcy Code.

## **CONCLUSION**

For all the reasons set forth above, the Court denies the summary judgment Motion of the

Objecting Noteholders.

Dated: New York, New York
      May 30, 2019


                                          */s/ Sean H. Lane*
                                          UNITED STATES BANKRUPTCY JUDGE

28