**UNITED STATES BANKRUPTCY COURT**          <u>FOR PUBLICATION</u>
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

In re:                                                      Chapter 15

PT BAKRIE TELECOM TBK,                                      Case No. 18-10200 (SHL)

            Debtor in a Foreign Proceeding.

-------------------------------------------------------------x

<u>**POST-TRIAL MEMORANDUM OF DECISION**</u>

**A P P E A R A N C E S :**

**SCHNADER HARRISON SEGAL & LEWIS LLP**
*Counsel for Jastiro Abi as Foreign Representative*
140 Broadway, Suite 3100
New York, New York 10005-1101
By:     Kenneth R. Puhala, Esq.
        Theodore L. Hecht, Esq.


        -and-

1600 Market Street
Suite 1600
Philadelphia, Pennsylvania 19103
By:     Richard A. Barkasy, Esq.

**GREENBERG TRAURIG, LLP**
*Counsel for Universal Investment Advisory SA, Universal Absolute Return SP, Vaquero Master EM Credit Fund, Ltd., Harshil Kantilal Kothari, Footbridge Capital, LLC and Growth Credit Fund IC*
200 Park Avenue
New York, New York 10166
By:     James W. Perkins, Esq.
        Anne C. Reddy, Esq.
        Ryan A. Wagner, Esq.
        Elizabeth J. Sullivan, Esq.

**BAKER MCKENZIE**
*Counsel for Universal Investment Advisory SA, Universal Absolute Return SP, Vaquero Master EM Credit Fund, Ltd., Harshil Kantilal Kothari, Footbridge Capital, LLC and Growth Credit Fund IC*

1111 Brickell Avenue, Suite 1700
Miami, Florida 33131
By:     Mark D. Bloom, Esq. (*pro hac vice*)


**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the proposed foreign representative Jastiro Abi's (the "Foreign

Representative") request for recognition of a foreign insolvency proceeding in Indonesia as a

foreign main proceeding under Chapter 15 of the United States Bankruptcy Code.  The Foreign

Representative also requests additional relief under Sections 1521 and 1507 of the Bankruptcy

Code in the form of enforcement of the Indonesian court-approved debt restructuring plan, or the

PKPU Plan ("PKPU" defined *infra*).  The PKPU Plan was approved by a judgment of the

Central Jakarta Commercial Court (the "Commercial Court") and then affirmed by the Supreme

Court of the Republic of Indonesia (the "Indonesian Supreme Court").  A group of noteholders

object to the grant of recognition and additional relief on multiple grounds.[1]

After a decision denying the Objecting Noteholders' request for summary judgment, *In re

PT Bakrie Telecom Tbk*, 601 B.R. 707 (Bankr. S.D.N.Y. 2019), the Court held a trial in this

matter.  Based on the evidence and applicable law, and for the reasons that follow, the Court

recognizes the foreign proceeding as a foreign main proceeding under Section 1517 of the

Bankruptcy Code but denies the additional relief requested by the Foreign Representative under

Sections 1521 and 1507 of the Bankruptcy Code.  This decision constitutes the Court's findings

of fact and conclusions of law.

---

[1]     These "Objecting Noteholders" consist of Universal Investment Advisory SA, Universal Absolute Return
SP, Vaquero Master, EM Credit Fund, Ltd., Harshil Kantilal Kothari, Footbridge Capital, LLC, and Growth Credit
Fund IC (collectively, the "Objecting Noteholders").

## BACKGROUND

The Parties submitted a Joint List of Stipulated Facts, *see* Joint List of Stipulated Facts, Ex. A (the "Stipulation") [ECF No. 102], and then presented additional evidence at Trial.[2]  The facts below are taken from both sources.

PT Bakrie Telecom Tbk ("BTEL" or the "Debtor"), the foreign debtor, is an Indonesian company in the business of providing a fixed digital radio cellular telecommunications national network and services, but currently has only very limited business activities and negligible revenue.  Jastiro Abi Witness Statement ("Abi Testimony") ¶¶ 1, 5 [ECF No. 93].  BTEL's financial difficulties and eventual restructuring efforts stem from a default on payments due under certain senior notes.  In May 2010 and January 2011, Bakrie Telecom Pte. Ltd. (the "Issuer"), a wholly-owned subsidiary of BTEL, issued—on behalf of BTEL—two international debt offerings (the "Offering") totaling $380 million in 11.5% Guaranteed Senior Notes due in May 2015 (the "Notes").  Stipulation ¶¶ 1, 10.  The Notes were issued under an indenture and a supplemental indenture (together, the "Indenture") governed by New York law.  *Id.* ¶¶ 1, 2.  The Bank of New York Mellon (the "Indenture Trustee") is the trustee under the Indenture.  *Id.* ¶ 3. The Indenture authorizes the Indenture Trustee to submit proofs of claim on behalf of the noteholders in a restructuring proceeding.  *See id.* ¶ 51.  Under the Indenture, the right of a noteholder to receive payment, among other things, cannot be impaired or affected without the noteholder's consent.  Stipulation ¶ 72.  The Indenture further provides that "[w]ithout the consent of the holders of at least a majority in aggregate principal amount of the Notes then

---

[2]      Unless otherwise specified, references to the Case Management/Electronic Case Filing ("ECF") docket are to Case No.18-10200.  There is an extensive evidentiary record in this proceeding.  Trial testimony is cited as "Trial Tr. [page:line], [date] ( [witness] )."  Testimony provided by written declaration is cited as "[Witness] Testimony ¶ __."  Exhibits are cited as "FRX __" for the Foreign Representative's exhibits and "ONX __" for the Objecting Noteholders' exhibits.

outstanding, the [I]ssuer and [BTEL] will not . . . amend, modify, or alter the Intercompany Loan [defined below] in any manner adverse to the holders of the Notes . . . ." *Id.* ¶ 73.

On the same dates that the Indenture was executed, the Issuer loaned the proceeds of the Offering to its parent company, BTEL, under an Intercompany Loan Agreement and a Supplemental Intercompany Loan Agreement (together, the "Intercompany Loan Agreements"). *Id.* ¶ 12. The Intercompany Loan Agreements are governed by Indonesian law. *Id.* ¶ 13. Jastiro Abi, the proposed Foreign Representative, was a Director of both BTEL and the Issuer during the Offering; he executed the Indenture and the Intercompany Loan Agreements on behalf of BTEL and executed the Notes on behalf of the Issuer. *Id.* ¶¶ 4–5, 11, 14.

The Issuer and Indenture Trustee then entered into an Assignment of Intercompany Loan Agreement (the "Assignment") and subsequently a Supplemental Assignment of Intercompany Loan Agreement (the "Supplemental Loan Assignment," and together, the "Assignments"), both governed by Singapore law and both executed by Mr. Abi on behalf of the Issuer. *Id.* ¶¶ 15–17. Under the Assignments, the Issuer assigned its rights against BTEL under the Intercompany Loan Agreements to the Indenture Trustee. *Id.* ¶¶ 52–54. BTEL had notice of the Assignments. *Id.* ¶ 18. Additionally, BTEL guaranteed repayment of the Notes under a Parent Guarantee, while two of its subsidiaries, PT Bakrie Network and PT Bakrie Connectivity (the "Subsidiary Guarantors"), also guaranteed repayment of the Notes under a Subsidiary Guarantee. *Id.* ¶ 21. Both Guarantees are governed by New York law. *Id.* ¶ 22. Of particular note for this case, the Parent Guarantee provided noteholders and the Indenture Trustee direct recourse to BTEL without requiring them to pursue the Issuer for non-payment. *See id.* ¶ 23. Mr. Abi executed the Parent Guarantee on behalf of BTEL and understood that BTEL was obligated to repay the Notes if the Issuer failed to do so. *See id.* ¶ 24.

4

When BTEL began to encounter financial difficulties, it was forced to write down the value of its assets in 2012 and 2013. *See id.* ¶ 25. BTEL, the Issuer, and the Subsidiary Guarantors ultimately defaulted on scheduled interest payments due on the Notes in November 2013 and May 2014; these default interest payments remain outstanding. *See id.* ¶¶ 26–27. Before the scheduled payment in May 2014, BTEL issued a written notice to all noteholders stating that (i) it was engaged in discussions with a steering committee of key noteholders (the "Steering Committee") regarding the current financial and operational position of the company and a potential restructuring of the Notes, and (ii) it would not be making any further interest payments on the Notes pending the resolution of such discussions. *See id.* ¶¶ 30, 34. Just prior to the defaults, BTEL had engaged with a financial consultant, FTI Consulting ("FTI"), to "develop[] and negotiat[e] a debt restructuring proposal" and act as the "primary contact person with the Senior Noteholders (or their advisors) through the restructuring negotiation." *Id.* ¶ 28. In response, the Objecting Noteholders—who are purportedly purchasers and beneficial holders of some $106 million in the face amount of the Notes, or over 25% of the outstanding $380 million in Notes issued—and three other noteholders formed an ad hoc committee of noteholders (the "Ad Hoc Committee") to engage in discussions with BTEL about its financial and operational plans. *See id.* ¶¶ 1, 36, 42; *see also* Abi Testimony ¶¶ 7, 55; Gregorious Petrus Aji Wijaya Witness Statement ¶ 53 ("Wijaya Testimony") [ECF No. 94]; Written Testimony of Kevin Omar Sidharta as Expert Witness for Objecting Noteholders ¶ 47 ("Sidharta Testimony") [ECF No. 99]; Written Testimony of Defrizal Djamaris as Witness for Objecting Noteholders ¶ 36 ("Djamaris Testimony") [ECF No. 100-1]. In the summer of 2014, the Ad Hoc Committee worked with BTEL and its financial consultant to conduct due diligence and evaluate the merits of BTEL's restructuring efforts. *See* Stipulation ¶¶ 37-40. The Ad Hoc Committee and BTEL

entered into a Memorandum of Understanding and a Confidentiality Agreement, under which

FTI populated a data room for the Ad Hoc Committee to perform due diligence. *See id.* ¶¶ 37,

39. But by August 2014, discussions between BTEL and the Ad Hoc Committee had broken

down. *See id.* ¶ 40.

In September 2014, three of the Objecting Noteholders commenced litigation in New

York state court against BTEL, the Issuer, and the Subsidiary Guarantors for breach of the Notes.

*See id.* ¶ 41. They subsequently issued to and served on BTEL, the Issuer, and the Indenture

Trustee a notice of acceleration declaring all principal and interest immediately due and owing

under the Notes and demanding immediate payment.[3] *See id.* ¶ 42. After another interest

payment default in late 2014, the Indenture Trustee also issued to the Issuer, BTEL, and the

Subsidiary Guarantors a Notice of Acceleration, which demanded immediate payment. *Id.* ¶ 43.

One month after the New York litigation commenced, an Indonesian creditor, PT

Netwave Multi Media ("Netwave"), to whom BTEL owed approximately $400,000, initiated a

"Penundaan Kewajiban Pembayaran Utang"[4] ("PKPU") proceeding against BTEL (the "PKPU

Proceeding") in the Indonesian Commercial Court. *Id.* ¶¶ 44–45, 50. A PKPU proceeding is a

court-enforced suspension of payments process in Indonesia that is designed to provide a debtor

with a definite period of time to restructure its debt and reorganize its affairs under a composition

plan with its creditors. *See* Abi Testimony ¶ 25. After the PKPU petition was filed, FTI advised

the proposed Foreign Representative on ways to "dilute" or "cram down" the Ad Hoc

Committee. *Id.* ¶ 46. In November 2014, the Commercial Court granted BTEL a Temporary

---

[3]     The Indenture contains a forum selection clause providing that the Issuer, BTEL, and each of the
Subsidiary Guarantors "irrevocably and unconditionally submits to the non-exclusive jurisdiction of any New York
State or United States Federal court sitting in the Borough of Manhattan, the City of New York over any suit, action
or proceeding arising out of or relating to the Indenture, any Note, [or] any Guarantee," as discussed below. *See* Abi
Decl., Ex. A § 12.07(b) [ECF No. 6-4].

[4]     This is an Indonesian phrase meaning "suspension of payments." Abi Testimony ¶ 25.

Suspension of Payment ("SOP").  *See* Stipulation ¶ 47.  Titik Tejaningsih was named as

Supervisory Judge and William Eduard Daniel and Imran Nating were appointed as

Administrators to oversee the PKPU Proceeding.  *Id.* ¶ 48.  The Commercial Court then set a 29-

day schedule within which the PKPU Plan was to be finalized, voted on, and confirmed; it also

scheduled a first creditors' meeting and creditor verification meeting.  *See* Stipulation ¶ 50.

Upon implementation of the SOP, BTEL was prohibited by law during the period before plan

approval from taking any action that affected assets or management without the approval of the

Administrators.  *Id.* ¶ 49.

    During this 29-day schedule, the Objecting Noteholders instructed the Indenture Trustee

to file proofs of claim on their behalf, and the Indenture Trustee did so in late November 2014.

*See id.* ¶ 51.  In support of the claim, the Indenture Trustee submitted the Indenture,

Intercompany Loan Agreement, and Parent Guarantee of BTEL to the Administrators, explaining

in a letter that the amount due under the Notes and Indenture were guaranteed by BTEL as

primary obligor and that the Issuer had assigned its rights against BTEL under the Intercompany

Loan Agreements to the Indenture Trustee.  Stipulation ¶¶ 52–54.  The Issuer also filed a proof

of claim for the entire amount due under the Notes, attaching the Intercompany Loan

Agreements to its filing.  *Id.* ¶¶ 64–65; *see also* Foreign Representative's Proposed Findings of

Fact & Conclusions of Law ("Foreign Representative's FFCL") ¶ 71 [ECF No. 108]; Objecting

Noteholders' Proposed Findings of Fact and Conclusions of Law (the "Objecting Noteholders'

FFCL") at 21 ¶¶ 124, 126 [ECF No. 109].

    In late November 2014, counsel for the Ad Hoc Committee sent a letter to the

Administrators asserting that BTEL's draft plan lacked sufficient information for the creditors to

make an "informed vote" on the proposed PKPU Plan.  *Id.* ¶¶ 55–56.  In December 2014, the Ad

Hoc Committee again sent letters to the Administrators stating that their requests for documents

and information had been ignored and requesting that the PKPU Proceeding's schedule be

extended, but this request was not granted.  *See id.* ¶¶ 57–60.

Under Article 271 of the PKPU Law,[5] BTEL submitted its "records and reports" (the

"Record and Report") to the Administrators.  *Id.* ¶ 62.  Under PKPU Law, the Record and Report

is a list compiled by an Indonesian debtor of, *inter alia*, its creditors and the amounts owed by

the debtor that is to be compared to the Administrators' list of creditors.  *See* Trial Tr. 181:25–

182:20, Nov. 21, 2019 (Wijaya) [ECF No. 104]; Sidharta Testimony ¶¶ 84–87; Wijaya

Testimony ¶¶ 24, 60.  A creditor verification meeting is then held at which the Administrators

prepare a list of the claims, including "whether the claims are recognized or denied."  Foreign

Representative's FFCL ¶ 46 (quoting Wijaya Testimony ¶ 25); Objecting Noteholders' FFCL at

25 ¶ 153.  The claims are subsequently reviewed by the Supervisory Judge who determines

which creditors are eligible to vote.  Foreign Representative's FFCL ¶ 47 (citing Wijaya

Testimony ¶ 26).  BTEL did not list the $380 million of Notes or the Indenture Trustee as a

creditor on the Record and Report it submitted to the Administrators at the creditor verification

meeting held in early December 2014.  Stipulation ¶ 63.  Instead, BTEL listed the Issuer as the

creditor for the $380 million of Notes.  *Id.* ¶ 64.  At the creditor verification meeting, the

Administrators allowed the claim submitted by the Issuer under the Intercompany Loan

Agreements and denied the claim filed by the Indenture Trustee.  *Id.* ¶¶ 65–66.

After the creditor verification meeting, the Indenture Trustee informed the Issuer, BTEL,

and the Subsidiary Guarantors by letter that the Intercompany Loan Agreements provided the

---

[5]      The "PKPU Law" is a section of Indonesia's Bankruptcy and Suspension of Debt Payment Obligations law
that governs PKPU proceedings, including the filing and treatment of claims.  *See* Foreign Representative's FFCL
¶¶ 30–33, 42 (citing Wijaya Testimony ¶¶ 7–9, 21).

Indenture Trustee with the sole right to make a claim against BTEL and that it did not consent to the Issuer submitting a claim for the indebtedness evidenced by the Notes. *Id.* ¶ 67. Such consent, the Indenture Trustee argued in a letter to the Administrators, was necessary for the Issuer to submit its claim and vote at the creditors' meeting on the proposed PKPU plan because the Issuer had assigned all of its rights, interest, and benefits to the Indenture Trustee. *See id.* ¶¶ 67–71. The Indenture Trustee also argued that the Issuer agreed under the Assignment that it would not, without the Indenture Trustee's consent, "make or agree to any material amendment, modification or variation of the Intercompany Loan Agreement or release [BTEL] from any of its obligations under the Intercompany Loan Agreement." *Id.* ¶ 70. Further, the Indenture Trustee argued, the Issuer had appointed the Indenture Trustee as its "attorney" in the event of default to enforce the rights under the Intercompany Loan Agreement. *Id.* ¶ 71. In the letter, the Indenture Trustee concluded that the Issuer had no standing to submit the Issuer claim and no standing to vote on the proposed PKPU plan without the consent or direction of the Indenture Trustee. *Id.* By email, BTEL's counsel requested the Indenture Trustee's consent to vote in favor of the proposed PKPU Plan, but the Indenture Trustee refused. *See id.* ¶¶ 74–75. BTEL's counsel also informed the Indenture Trustee that BTEL would seek a ratification of the action and waiver of default if the Indenture Trustee withheld consent and the proposed PKPU plan passed. *See id.* ¶ 74.

The Ad Hoc Committee subsequently submitted a letter to the Supervisory Judge asserting that the Issuer had improperly filed a claim without the consent of the Indenture Trustee. *See id.* ¶ 77. On December 8, 2014, the creditors with claims approved by the Administrators appeared before the Supervisory Judge for discussion and to vote on the proposed PKPU plan. *Id.* ¶ 78. The Supervisory Judge then verified the Administrators' decision and

permitted the Issuer to vote the entire $380 million claim under the Intercompany Loan Agreements. *See id.* ¶ 79. Ultimately, the PKPU Plan was approved by the required majority of creditors according to PKPU Law Article 281 and memorialized in the Commercial Court's decision (the "Commercial Court Judgement") issued the following day. *See id.* ¶ 80. The Issuer was one of 325 creditors that voted in favor of the PKPU Plan, but its claim represented approximately 56% of the total amount of unsecured indebtedness restructured by the plan. *See id.* ¶¶ 81–82. The other 324 unsecured creditors that voted to approve the PKPU Plan represented only 38.6% of the total unsecured claim amount. *Id.* ¶ 83. The remaining unsecured creditors either voted against the plan or abstained. *Id.* ¶ 84. After the vote was taken, the Ad Hoc Committee sent notice to the Issuer that the Issuer's vote was an *ultra vires* act taken without the Indenture Trustee's consent. *Id.* ¶ 90.

The PKPU Plan eliminated millions of dollars in past due interest and provided that 30% of the debt on the Notes was to be paid in cash over an extended period of time and 70% was to be converted to Mandatory Convertible Bonds with a term of ten years at Indonesian rupiah ("Rp" or "IDR") 200 per share. *Id.* ¶¶ 85–86. But the 30% cash portion could only be paid after first satisfying a "waterfall" of certain other obligations. *Id.* ¶ 87. If BTEL has insufficient funds to satisfy the waterfall—and it has not had sufficient funds to date—the 30% cash portion can be deferred for more than 10 years and converted to Mandatory Convertible Bonds. *See id.* ¶¶ 88–89.

Later in 2014, the PKPU Proceeding officially concluded under the requirements of PKPU Law Article 288. *Id.* ¶ 91. Neither the Indenture Trustee nor any of the Objecting Noteholders appealed the Commercial Court Judgment, but the Minister of Communication and Informatics of the Republic of Indonesia did. *See* Abi Testimony ¶ 34; Stipulation ¶¶ 92, 94.

This appeal was denied by the Indonesian Supreme Court in October 2015 (the "Indonesian Supreme Court Judgment"), affirming the Commercial Court Judgment. *See* Stipulation ¶ 93.

About the same time that the Commercial Court granted the Issuer the right to vote as the creditor on the Notes, the Objecting Noteholders commenced a second action in the New York state court for fraud and other tortious conduct in connection with the Notes Offering and for a declaratory judgement that the PKPU Proceeding was invalid with respect to the Notes and Indenture. *See id.* ¶¶ 80, 96. These claims were subsequently consolidated with the already pending case alleging breach of Notes and other claims. *See id.* ¶ 97.

The New York court granted summary judgment on the Objecting Noteholders' breach of contract claim and sustained the claims against the Issuer and Subsidiary Guarantors for fraud in connection with the Offering but dismissed the claims against the individual defendants and PT Bakrie and Brothers ("B&B") for lack of personal jurisdiction. *See id.* ¶¶ 98–99. On cross-appeals, the New York Appellate Division affirmed the summary judgment granted in favor of the Objecting Noteholders as to liability on the Notes, Indenture, and Guarantees, and sustained the fraud claims. *See id.* ¶ 101. The Appellate Division also reinstated the claims against the individual defendants and B&B, and ordered jurisdictional discovery. *See id.* ¶¶ 100, 102. In December 2017, the New York trial court ordered the parties to proceed with jurisdictional discovery. *See id.* ¶ 102.

Less than two weeks later, BTEL executed a "Declaration of Appointment of Foreign Representative and Authorization to File Chapter 15 Petition" that appointed Mr. Abi to serve as BTEL's foreign representative and authorized him to file a petition under Chapter 15 of the Bankruptcy Code. *See id.* ¶ 103; Abi Testimony ¶ 6. Mr. Abi filed this Chapter 15 case in late January 2018. *See* Stipulation ¶ 104. Shortly after the filing, BTEL, the Issuer, and the

Subsidiary Guarantors stipulated to entry of judgment on the Objecting Noteholders' breach of

contract claim in the New York litigation in the amount of $161,614,872.09. *See id.* ¶ 107.  The

money judgment was so ordered and entered in the Office of the Clerk, but the Objecting

Noteholders have stipulated not to execute or enforce the money judgment pending resolution of

this Chapter 15 case. *See id.* ¶¶ 108–09.

The Objecting Noteholders filed a motion for summary judgment in this case seeking to

deny recognition of the PKPU Proceeding, but this Court denied the Objecting Noteholders'

motion given unresolved issues of fact. *See generally In re PT Bakrie Telecom Tbk*, 601 B.R.

707 (Bankr. S.D.N.Y. 2019).  At the trial that followed, Jastiro Abi and Gregorius Petrus Aji

Wijaya testified by written declaration for the Foreign Representative and Kevin Omar Sidharta

and Defrizal Djamaris testified by written declaration for the Objecting Noteholders. *See* Abi

Testimony; Wijaya Testimony; Sidharta Testimony; Djamaris Testimony.  Each witness

appeared live for cross-examination and any rebuttal testimony. *See* Trial Tr. 32:6–147:16, Nov.

21, 2019 (Abi), 154:20–236:6, Nov. 21, 2019 (Wijaya) [ECF No. 104]; Trial Tr. 24:17–44:24,

Nov. 22, 2019 (Djamaris), 45:21–50:15, Nov. 22, 2019 (Sidharta) [ECF No. 105].

## DISCUSSION

### I.    Recognition of a Foreign Main Proceeding

#### A.   The Legal Standard

A Chapter 15 case is commenced through the filing a petition for recognition of a foreign

proceeding by a foreign representative of a debtor. *See* 11 U.S.C. §§ 1504, 1515(a).  The

petition must be accompanied by certain evidentiary documents that are presumed authentic in

the absence of contrary evidence. *See* 11 U.S.C. §§ 1515(b), 1516(b); *In re Bear Stearns High-*

*Grade Structured Credit Strategies Master Fund, Ltd. (In re Provisional Liquidation)*, 374 B.R.

122, 127 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008).  Section 101(23) of the

Bankruptcy Code defines a "foreign proceeding" as "a collective judicial or administrative

proceeding in a foreign country, . . . under a law relating to insolvency or adjustment of debt in

which proceeding the assets and affairs of the debtor are subject to control or supervision by a

foreign court, for the purpose of reorganization or liquidation."  11 U.S.C. § 101(23).

Section 1517 of the Bankruptcy Code identifies the requirements for recognition of a

foreign proceeding.  It provides that

an order recognizing a foreign proceeding shall be entered if—

(1) such foreign proceeding . . . is a foreign main proceeding or foreign nonmain
proceeding within the meaning of [S]ection 1502;
(2) the foreign representative applying for recognition is a person or body; and
(3) the petition meets the requirements of [S]ection 1515.

11 U.S.C. § 1517(a); *In re Inversora Eléctrica de Buenos Aires S.A.*, 560 B.R. 650, 653 (Bankr.

S.D.N.Y. 2016); *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 698 (Bankr. S.D.N.Y. 2017).

Recognition is mandatory if all three requirements of Section 1517(a) are met.  *See* 11 U.S.C. §

1517(a); *In re Millard*, 501 B.R. 644, 653–54 (Bankr. S.D.N.Y. 2013) (holding Section 1517(a)

imposes a mandatory requirement for recognition when its requirements have been met); *In re Oi*

*Brasil Holdings Cooperatief U.A.*, 578 B.R. 169, 194 (Bankr. S.D.N.Y. 2017).  "But recognition

is not a rubber stamp exercise," and the burden rests on the foreign representative to prove each

of the requirements of Section 1517.  *In re Creative Fin., Ltd. (In Liquidation)*, 543 B.R. 498,

514 (Bankr. S.D.N.Y. 2016); *see also In re Kemsley*, 489 B.R. 346, 358 (Bankr. S.D.N.Y. 2013)

(citing *In re Bear Stearns*, 374 B.R. at 126.

Section 1506 of the Bankruptcy Code sets forth an overriding public policy exception,

providing that a court may refuse to take an action under Chapter 15 if such action "would be

manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  But this

13

exception is read narrowly, with legislative history observing that "the word 'manifestly' in international usage restricts the public policy exception to *the most fundamental policies of the United States*." *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 139 (2d Cir. 2013) (quoting H.R.Rep. No. 109–31, pt. 1, at 109 (2005), 2005 U.S.C.C.A.N. 88). Thus, "even the absence of certain procedural or constitutional rights will not itself be a bar under [Section] 1506." *In re OAS S.A.*, 533 B.R. 83, 104 (Bankr. S.D.N.Y. 2015) (quoting *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1069 (5th Cir. 2012) ("*Vitro II*")).[6]

B.  The Objecting Noteholders Arguments as to Recognition

The Objecting Noteholders raise several arguments in opposition to recognition.

a.  Foreign Representative

The first question before the Court is whether Mr. Abi has been properly appointed as the Foreign Representative of the Debtor.  Under Section 101(24) of the Bankruptcy Code, a "foreign representative" is "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24).  To commence a case under Chapter 15 of the Bankruptcy Code, the foreign representative files a petition "for recognition of a foreign proceeding in which the foreign representative has been appointed." 11 U.S.C. § 1515(a).

The Objecting Noteholders contend that Mr. Abi has not satisfied the requirements of a foreign representative because he was not appointed until three years after the PKPU Proceeding was formally closed.  They argue, therefore, that his appointment does not meet the statutory

---

[6]     Against the Objecting Noteholders' objection, the Court has already held that the Debtor has "property" in the United States that satisfies the requirements of Section 109 of the Bankruptcy Code.  *See PT Bakrie Telecom*, 601 B.R. at 714–16 (concluding that the Indenture and related Notes satisfy the property requirements set forth in *Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 250–51 (2d Cir. 2013)).

requirements of Chapter 15 because "it did not occur 'during, or in the course of' or 'in the

context of' a foreign main proceeding" under Sections 101(24), 1515, and 1517(a)(2) of the

Bankruptcy Code.  *See* Objecting Noteholders' FFCL at 48 ¶ 22 (citing *Vitro II*, 701 F.3d at

1047; *In re OAS*, 533 B.R. at 94).

But as the Court has previously observed, "the Court is unaware of any authority

explicitly precluding the appointment of a foreign representative for purposes of pursuing

Chapter 15 relief after the foreign proceeding has been closed."  *In re PT Bakrie Telecom*, 601

B.R. at 718 (internal reference omitted).  "[G]iven the policy underlying Chapter 15, it would be

hard to imagine why such action would be categorically prohibited."  *Id.*  Indeed, bankruptcy

courts have rejected similar arguments, concluding that the foreign main proceeding continued to

qualify as a foreign proceeding despite being "closed" under Section 101(23) of the Bankruptcy

Code when the foreign court was still "overseeing matters," similar to the concept of retained

jurisdiction under a Chapter 11 plan.  *See In re Zhejiang Topoint Photovoltaic Co., Ltd.*, 600

B.R. 312, 319–20 (Bankr. D.N.J. 2019); *cf. In re Oversight and Control Commn. of Avanzit, S.A.*,

385 B.R. 525, 535–36, 538 (Bankr. S.D.N.Y. 2008) (holding that the rationale of a Chapter 11

remaining "pending" after confirmation but before entry of a final decree applies equally to a

foreign proceeding).  That is the circumstance here.  BTEL's restructuring remains ongoing

because the PKPU Plan must still be implemented.  *See* Abi Testimony ¶¶ 52, 54.  Indeed, a

failure to implement the PKPU Plan could result in a declaration of bankruptcy and BTEL's

liquidation under Articles 170 and 291 of the PKPU Law.  Wijaya Testimony ¶ 66; Trial Tr.

48:1–11, Nov. 22, 2019 (Sidharta).  Not surprisingly then, the Indonesian Supreme Court and

Commercial Court involved in BTEL's restructuring preserved BTEL's right to pursue

recognition under Chapter 15 of the Bankruptcy Code.  *See* FRX-1 at 82–83; ONX-86 at 133–34.

The Court's conclusion here also is consistent with the well-established view that the requirement for a foreign representative to be authorized in a foreign court is not onerous and has been read broadly to facilitate the purpose of Chapter 15. *See In re Vitro, S.A.B. de C.V.*, 470 B.R. 408, 411–12 (N.D. Tex. 2012) ("*Vitro I*") (noting that courts routinely approve the appointment of a foreign representative by a debtor without authorization by a foreign court), *aff'd*, *Vitro II*, 701 F.3d 1031; *In re OAS*, 533 B.R. at 95 (same).

This Court's prior summary judgment decision left open whether further factual development might present a more problematic reason for the delay in appointing Mr. Abi.[7] But it did not. Rather, it demonstrated that the timing for filing this Chapter 15 case was based on practical considerations. The Debtor had hoped that it could prevail in the New York state court litigation with the Objecting Noteholders and thus avoid the need for a Chapter 15 proceeding. *See* Abi Testimony ¶¶ 49–51; Foreign Representative's FFCL ¶¶ 189–90. Once that was no longer possible, the Chapter 15 case became necessary. Notably, the Objecting Noteholders have not posited an alternative rationale for the delay. *See In re PT Bakrie Telecom*, 601 B.R. at 718.[8]

---

[7]     In the prior decision, the Court held that the "mere fact of the [Debtor's] delay in seeking Chapter 15 relief after a foreign proceeding has been closed" did not preclude a finding that Mr. Abi was properly appointed as foreign representative, and that it would be "appropriate to examine the circumstances surrounding the timing of the foreign representative's appointment and the significance, if any, of the delay." *In re PT Bakrie Telecom*, 601 B.R. at 719.

[8]     The Foreign Representative also cites prior cases where this Court has granted recognition to an Indonesian PKPU proceeding where the foreign representative was appointed after the plan was approved by the Commercial Court and control was returned to the debtors. Foreign Representative's FFCL ¶ 185; *see, e.g.*, *In re PT Bumi Resources Tbk*, Case No. 17-10115 (MKV) [Decl. of Andrew Christopher Beckham, Ex. C and D, ECF No. 5] (showing the foreign representative was appointed after the plan was approved by the foreign court); *In re PT Berlian Laju Tanker Tbk*, Case No. 13-10901 (SMB) [Decl. of Cosimo Borrelli ¶ 23, 30, ECF No. 6] (showing the foreign representative was appointed after the plan was approved by the foreign court); *In re PT Arpeni Pratama Ocean Line Tbk*, Case No. 11-15691 (ALG) [Decl. of Fida Unidjaja ¶ 3, Exs, A & B, ECF No. 5] (showing the foreign representative was appointed after the plan was approved by the foreign court).

For all these reasons, therefore, the Court concludes that Mr. Abi is the duly appointed "foreign representative" of the Debtor within the meaning of section 101(24) of the Bankruptcy Code.

**B. "Collective" Proceeding Requirement and Public Policy**

The Objecting Noteholders next argue that recognition should not be granted because the Indonesian PKPU Proceeding does not satisfy the requirements of being a collective foreign proceeding.

Section 101(23) of the Bankruptcy Code requires that a foreign proceeding be collective in nature. Collective proceedings are those that consider "'the rights and obligations of *all* creditors'—that is for the general benefit of creditors." *Armada (Singapore) Pte Ltd. v. Shah (In re Ashapura Minechem Ltd.)*, 480 B.R. 129, 136 (S.D.N.Y. 2012) (quoting *In re Betcorp Ltd.*, 400 B.R. 266, 281 (Bankr. D. Nev. 2009)). Such proceedings contemplate the "consideration and eventual treatment of claims of various types of creditors, as well as the possibility that creditors may take part in the foreign action." *Id.* (quoting *In re British Am. Ins. Co.*, 425 B.R. 884, 902 (Bankr. S.D. Fla. 2010)). A collective proceeding "must be instituted for the benefit of creditors generally rather than for a single creditor or class of creditors." *In re British Am. Ins. Co.*, 425 B.R. at 902; *In re Bd. of Dirs. of Hopewell Int'l Ins., Ltd.*, 275 B.R. 699, 707 (S.D.N.Y. 2002) (finding a foreign scheme of arrangement for creditors to file claims collective in nature because all creditors could object); *In re Gold & Honey, Ltd.*, 410 B.R. 357, 368, 370 (E.D.N.Y. 2009) (finding a foreign proceeding not to be collective where it was "more akin to a[n] individual creditor's replevin or repossession action than it is to a reorganization or liquidation by an independent trustee"). "A collective proceeding is designed to provide equitable treatment to creditors, by treating similarly situated creditors in the same way, and to maximize the value

17

of the debtor's assets for the benefit of all creditors . . . ." *In re Ashapura,* 480 B.R. at 136–37

(quoting U.N. Communication on International Law, Legislative Guide on Insolvency Law ¶ 25

(2005)).  But a collective proceeding need not require that "all creditors receive a share of the

distribution." *Id*. at 137 (citing *In re British Am. Ins. Co.*, 425 B.R. at 903).

When determining whether a proceeding was collective in nature, a court should examine

"both the law governing the foreign action and the parameters of the particular proceeding as

defined in, for example, orders of a foreign tribunal overseeing the action." *Id.* at 136 & n.37,

141 & n.85 (quoting *In re British Am. Ins. Co.*, 425 B.R. at 902).  "Other characteristics of a

collective proceeding include: adequate notice to creditors under applicable foreign law,

provisions for the distribution of assets according to statutory priorities, and a statutory

mechanism for creditors to seek court review of the proceeding." *Id.* at 137 (internal citations

omitted) (citing *In re ABC Learning Centres Ltd.*, 445 B.R. 318, 328–29 (Bankr. D. Del. 2010));

*see also id.* (noting that the standard for notice is not demanding).  All creditors also must

receive notice and be able to protect their rights for a foreign proceeding to be collective.  *In re

O'Reilly*, 598 B.R. 784, 792 (Bankr. W.D. Pa. 2019).  But some courts have concluded that a

collective proceeding can exist even where creditors are not allowed to participate, so long as the

proceeding otherwise considers the rights and obligations of all creditors.  *In re ENNIA Caribe

Holding N.V.*, 594 B.R. 631, 638–39 (Bankr. S.D.N.Y. 2018) (citing *In re Ashapura*, 480 B.R. at

141).

Against the backdrop of this standard, the Objecting Noteholders argue that the PKPU

Proceeding was not "collective in nature" given who was allowed—and who was not allowed—

to vote on the PKPU Plan based on the Notes.  The Objecting Noteholders complain that their

right to vote on the PKPU Plan was eliminated due to the exclusion of their rights under the

Notes from BTEL's Record and Report.  *See* Objecting Noteholders' FFCL at 46 ¶¶ 14–17

(applying first prong of *Ashapura* test).  According to the Objecting Noteholders, this allowed

the Debtor to "pre-determine" who qualified as a "creditor" because the Administrators relied on

the Record and Report to determine who was a creditor in the PKPU Proceeding.  *Id.* at 24 ¶ 148;

29 ¶¶ 176–77; 34–35 ¶¶ 203–11.  Thus, the Objecting Noteholders argue that BTEL controlled

the parameters of the PKPU Proceeding by excluding the obligations of the Objecting

Noteholders in favor of the Intercompany Loans of Debtor's wholly owned subsidiary and Issuer

of the Notes, BTEL-Singapore.  *See* Objecting Noteholders' FFCL at 29 ¶¶ 176–77; 46–47 ¶ 18

(applying second prong of *Ashapura* test).

    The Foreign Representative disagrees.  It argues that the PKPU Plan has "all the

earmarks of a collective proceeding" because it provided "equal treatment to all noteholders,

including the Objecting Noteholders."  Foreign Representative's FFCL ¶ 154.  The Foreign

Representative notes that the Objecting Noteholders "received notice and were extremely active

participants in the PKPU Proceeding" and were able to make "multiple submissions and

arguments to both the Administrators and the Supervisory Judge."  *Id.* ¶ 155.  The Foreign

Representative further asserts that the mere fact that the Objecting Noteholders' arguments were

rejected does not defeat the collective nature of the proceedings.  *Id.* ¶ 158.  And while the

Administrators must verify the claims they receive against the Record and Report from the

Debtors under PKPU Law Article 271, the Foreign Representative notes that the Administrators

do not blindly adhere to the information provided by the Debtors.  *Id.* ¶¶ 168–69.

    Given the entire record after trial, the Court concludes that the PKPU Proceeding is

"collective" because "the rights and obligations of *all* creditors" were considered by the foreign

court.  *See In re Ashapura*, 480 B.R. at 136, 140 ("The main test of whether a proceeding is

collective is whether *all* creditors' interests were considered in the proceeding."). The interests

of all of Debtor's creditors were addressed in the PKPU Proceeding. *See In re PT Bakrie

Telecom*, 601 B.R. at 723–24 (finding the PKPU Plan restructured all of BTEL's $770 million of

indebtedness); Abi Testimony ¶¶ 36–39 (30% of the amount due under the Notes are to be paid

in cash, in installments over a 66-month period, with an interest rate of 4%, with the remaining

70% of the amount due under the Notes to be satisfied through Mandatory Convertible Bonds

with a maturity date of ten years and a conversion price of 200 IDR per share); *see also In re

Manley Toys Ltd.*, 580 B.R. 632, 642 (Bankr. D. N.J. 2018); *In re Ashapura*, 480 B.R. at 141.

The PKPU Proceeding did not focus only on a single creditor or class of creditors. *In re British

Am. Ins. Co.*, 425 B.R. at 902; *In re Betcorp*, 400 B.R. at 281 (holding that voluntary winding up

fits the collective criterion, while "a receivership remedy instigated at the request, and for the

benefit, of a single secured creditor" would not).

The Objecting Noteholders' objection is not really about the collective nature of the

proceeding but rather who was allowed to vote a particular debt. But courts have found a

proceeding to be collective under circumstances similar to those here. *See*, *e.g.*, *In re ENNIA

Caribe Holding*, 594 B.R. at 639. In that case, the non-debtor-owner of the debtor argued that

the foreign proceeding was not collective because it did not provide creditors with the right to

participate, a fact that was disputed by the debtor's foreign representative. *See id.* The

bankruptcy court disagreed. It noted that the relevant foreign insolvency statute broadly

protected the interests of creditors and held that even if "[the non-debtor owner were] correct that

the Proceeding does not allow creditors to participate, this does not prevent the Court from

finding that the Proceeding is collective in nature." *Id.* at 638–39. Other courts have reached a

similar conclusion. *See In re Ashapura*, 480 B.R. at 141 (the bankruptcy court stated at a hearing

that "even if there were no opportunity by practice and custom for unsecured creditors to

participate, I think this may still be a collective proceeding, because it involves parties other than

just one class of creditor or just party-in-interest"). While the Objecting Noteholders contend

that they were unfairly treated during the PKPU Proceeding, these arguments go more to whether

their rights as creditors were appropriately protected for the purpose of the additional relief

sought here, a topic addressed more fully below. *See infra* Section II.

There are other factors here that favor a finding that the PKPU Proceeding was a

collective one, including the notice provided to creditors, the appellate review of the trial court's

decision, and the statutory priorities for the distribution of assets. *See In re Ashapura*, 480 B.R.

at 141; *In re ABC Learning Centres Ltd.*, 445 B.R. at 328–29; *In re British Am. Ins. Co.*, 425

B.R. at 902. Of particular note is the appellate record in Indonesia. While the Objecting

Noteholders and Indenture Trustee chose not to appeal the Commercial Court decision, the

Minister of Communications and Informatics of the Republic of Indonesia did appeal "based

upon the same voting process arguments that had been made by the Indenture Trustee and the

Objecting Noteholders." *See* Directory of Judgment of Supreme Court of Republic of Indonesia

(the "Indonesian Supreme Court Judgment"), FRX-1 at 137–40; *see also* PKPU Law Article

295(1) (providing that ratification of the composition plan by the Commercial Court can be

further appealed to the Indonesian Supreme Court, the highest court in Indonesia). Those

arguments were heard and rejected by the Indonesian Supreme Court. *See* Indonesian Supreme

Court Judgment, FRX-1 at 143–46; *In re PT Bakrie Telecom*, 601 B.R. at 721–22.[9]

---

[9]    The Court also notes that previous Indonesian PKPU proceedings have been recognized as foreign main proceedings under Chapter 15 by a variety of courts. See, e.g., *In re PT Bumi Resources Tbk*, Case No. 17-10115 (MKV) (Bankr. S.D.N.Y. March 17, 2017); *In re PT Berlian Laju Tanker Tbk*, Case No. 13-10901 (SMB) (Bankr. S.D.N.Y. Jan. 8, 2015); *In re PT Arpeni Pratama Ocean Line Tbk*, Case No. 11-15691 (ALG) (Bankr. S.D.N.Y. Jan. 12, 2012); *see also In re PT Delta Merlin Dunia Textile, et al.*, Case No. 19-13214 (SHL) (Bankr. S.D.N.Y. February 4, 2020) (granting recognition to Indonesian PKPU proceedings as foreign main proceedings).

Having considered and rejected the Objecting Noteholders' specific arguments as to recognition, the Court concludes that the remaining requirements for recognition have been met and, therefore, this Court recognizes BTEL's PKPU Proceeding as a foreign main proceeding under Section 1517.[10]

## II.    Request for Additional Relief, Including Enforcement of the PKPU Plan

Relying on Sections 1521 and 1507 of the Bankruptcy Code, the Foreign Representative also requests the additional relief of enforcing the PKPU Plan in the United States. *See* Motion for Recognition and Enforcement of Indonesian PKPU Plan ¶¶ 43–44 [ECF No. 36]; *see also* Trial Tr. 6:16–24, 15:7–12, Nov. 21, 2019. As the Foreign Representative contends that the Commercial Court Judgment contains a discharge of the Debtor and all other parties under the Notes, the Foreign Representative essentially seeks a third-party non-debtor release of claims relating to the Notes. Motion for Recognition and Enforcement of Indonesian PKPU Plan ¶¶ 98–103. Without such relief, the Foreign Representative contends, BTEL would be forced into liquidation to the detriment of its other creditors. *Id. ¶ 102.* In opposing this additional relief, the Objecting Noteholders argue that the third-party releases are not contained in the PKPU Plan and thus not properly before the Court. Objecting Noteholders' Combined Response in Opposition to Petition for Recognition and Motion for Enforcement of Indonesian PKPU Plan ¶ 131 [ECF No. 87] (the "Objecting Noteholders' Opposition"). They also argue that the PKPU Plan should not be enforced because they were not treated fairly in the PKPU Proceeding given the way voting was handled. *Id. ¶¶* 133–37, 140–41.

---

[10]    The Objecting Noteholders do not contest, and the Court finds, that BTEL also satisfied the remaining requirements under Section 1517(a) in that the foreign representative applying for recognition is a person or body, and the petition meets the requirements of Section 1515.

A. <u>The Legal Standards for Additional Relief</u>

Upon recognition of a foreign proceeding as the foreign main proceeding, Section 1520 of the Bankruptcy Code provides certain immediate relief. *See* 11 U.S.C. § 1520(a) (providing that the automatic stay will apply to all the debtor's property that is located within the territorial jurisdiction of the United States). But other additional relief is not automatic after recognition and instead may be requested under two different provisions: Sections 1521 and 1507. *See* 11 U.S.C. §§ 1521 ("Relief that may be granted upon recognition") and 1507 ("Additional assistance").

The first of the two relevant provisions—Section 1521(a)—provides that "[u]pon recognition of a foreign proceeding . . . where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief . . . ." 11 U.S.C. § 1521(a). Such "appropriate relief" includes a non-exhaustive list of certain types of relief that is enumerated by the statute, including "any additional relief that may be available to a trustee, except for relief available under [S]ections 522, 544, 545, 547, 548, 550, and 724(a)" of the Bankruptcy Code. 11 U.S.C. § 1521(a)(7). Courts have found such "appropriate relief" under Section 1521(a) to be the same type of relief that was previously available under Chapter 15's predecessor, Section 304 of the Bankruptcy Code. *Vitro II*, 701 F.3d at 1054. But relief under Section 1521(a) may only be granted if the "interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a); *see also In re Intl. Banking Corp. B.S.C.*, 439 B.R. 614, 626–27 (Bankr. S.D.N.Y. 2010) (same). "[S]ufficient protection" embodies three basic principles: "the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the

processing of claims in the [foreign] proceeding, and the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law." *In re Atlas Shipping A/S*, 404 B.R. 726, 740 (Bankr. S.D.N.Y. 2009) (quoting *In re Artimm, S.r.L.*, 335 B.R. 149, 160 (Bankr. C.D. Cal. 2005)). Courts have acknowledged that "the policy underlying [Section] 1522 is that there should be 'a balance between relief that may be granted to the foreign representative and the interests of the person that may be affected by such relief.'" *In re Rede Energia S.A.*, 515 B.R. 69, 90 (Bankr. S.D.N.Y. 2014) (quoting *In re Int'l Banking Corp.*, 439 B.R. at 627).

The second provision for additional relief—Section 1507—provides that "if recognition is granted, [the court] may provide additional assistance to a foreign representative . . . ." 11 U.S.C. § 1507(a). Under this section,

> the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure--(1) just treatment of all holders of claims against or interests in the debtor's property; (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding . . . .

11 U.S.C. § 1507(b)(1–2). The first factor in Section 1507(b) of "just treatment" is "generally satisfied upon a showing that the applicable [foreign] law 'provides . . . a comprehensive procedure for the orderly and equitable distribution of [the debtor]'s assets among all of its creditors.'" *In re Rede Energia S.A.*, 515 B.R. at 95 (citing *In re Bd. of Dirs. of Telecom Arg, S.A.*, 528 F.3d 162, 170 (2d Cir. 2008) (discussing the "just treatment" factor under former Section 304(c)). The second factor under Section 1507 requires that the additional assistance reasonably assure "protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding." 11 U.S.C. § 1507(b)(2). This factor is satisfied where "creditors are given adequate notice of the timing and procedures for filing claims, and such procedures do not create additional burdens for a foreign creditor

24

seeking to file a claim." *In re Oi S.A.*, 587 B.R. 253, 268 (Bankr. S.D.N.Y. 2018) (citing *In re Treco*, 240 F.3d 148, 158 (2d Cir. 2001)); *see also In re Hourani*, 180 B.R. 58, 68 (Bankr. S.D.N.Y. 1995).

"The relationship between [Section] 1507 and [Section] 1521 is not entirely clear." *In re Toft,* 453 B.R. 186, 190 (Bankr. S.D.N.Y. 2011) (citing *Bear Stearns,* 389 B.R. at 333, *aff'g* 374 B.R. 122. As the considerations for Sections 1521 and 1507 overlap, courts have debated which standard should apply in a given case. *See, e.g.*, *Vitro II*, 701 F.3d at 1054 (quoting *In re Toft,* 453 B.R. at 190); *In re Atlas Shipping,* 404 B.R. at 741. Some courts have concluded that courts should look first to whether relief is available under Section 1521 before considering a grant of relief under Section 1507. *Vitro II*, 701 F.3d at 1054 (concluding that a court should first consider the specific relief enumerated under Section 1521 before considering relief under Section 1507); *but see In re Rede Energia*, 515 B.R. at 91 (noting that it remains to be seen whether the "analysis crafted by the *Vitro* court [as to Sections 1521 and 1507] is embraced by other courts.") (citing *Vitro II*, 701 F.3d at 1054). But often courts have found it unnecessary to determine the primacy of these two provisions if the outcome would be the same under either section. *See In re Rede Energia*, 515 B.R. at 95; *cf. In re Atlas Shipping,* 404 B.R. at 741 (granting relief under Section 1521 and concluding that it was unnecessary to determine whether "additional assistance" was available under Section 1507).

In any event, relief under either Section 1507 or Section 1521 is within the discretion of the Court and depends upon principles of comity. *Compare* 11 U.S.C. § 1517 (if requirements for recognition are met, relief "shall" be granted) *with* 11 U.S.C. §§ 1521 and 1507 (both providing that the court "may" provide additional relief after recognition); *see In re Tri-Contl. Exch. Ltd.*, 349 B.R. 627, 636–37 (Bankr. E.D. Cal. 2006) (The bankruptcy court has "broad

latitude to mold [additional] relief to meet specific circumstances.") (citing H.R. Rep. No. 109–31, at 116 (2005)); *In re Atlas Shipping*, 404 B.R. at 738 ("While recognition of the foreign proceeding turns on the objective criteria under § 1517, 'relief [post-recognition under Sections 1521 and 1507] is largely discretionary and turns on subjective factors that embody principles of comity'") (quoting *In re Bear Stearns*, 389 B.R. at 333); *In re Toft,* 453 B.R. at 190 (same). So while recognition of a foreign proceeding requires the application of specified "objective criteria," post-recognition relief "turns on subjective factors that embody principles of comity." *In re Atlas Shipping*, 404 B.R. at 738 (quoting *In re Bear Stearns*, 389 B.R. at 333) (citing 11 U.S.C. §§ 1507, 1517, 1521, 1525)."[11]

"Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 543 n.27 (1987). Comity is granted by a nation with "due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protections of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895). Generally, comity "is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other." *Id.* The principles of comity have long been recognized in the U.S. *See, e.g., id.* at 205–06 (holding a foreign judgment should generally be accorded comity if "its proceedings are according to the course of a civilized jurisprudence," *i.e.,* fair and impartial).

---

[11]    *See also In re Atlas Shipping*, 404 B.R. at 738 ("Once a case is recognized as a foreign main proceeding, [C]hapter 15 specifically contemplates that the court will exercise its discretion consistent with principles of comity) (citing Allan L. Gropper, *Current Developments in International Insolvency Law: A United States Perspective*, 15 J. BANKR. L. & PRAC. 2, Art. 3, at 3–5 (Apr. 2006)); *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. at 696; *cf.* 11 U.S.C. § 1509(b)(3) (if the court grants recognition under Section 1517, it "shall grant comity or cooperation to the foreign representative.").

"It is well established [in the Second Circuit] that we defer to foreign bankruptcy proceedings on international comity grounds only if those proceedings "do not violate the laws or public policy of the United States and . . . abide[ ] by 'fundamental standards of procedural fairness.'" *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005) (quoting *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir. 1999)); *see also Marcus v. Dufour*, 796 F. Supp. 2d 386, 392 (E.D.N.Y. 2011) (citing *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004)), *aff'd*, 481 Fed. App'x 19 (2d Cir. 2012) ("[F]ederal courts evaluate three factors [in applying principles of comity]: (1) whether the foreign court was competent and used 'proceedings consistent with civilized jurisprudence'[,] (2) whether the judgment was rendered by fraud, and (3) whether the foreign judgment was prejudicial because it violated American public policy notions of what is decent and just.").

In sum, federal courts assessing whether to extend comity look to (1) whether the foreign proceeding abided by fundamental standards of procedural fairness; (2) whether the foreign proceeding violated the laws or public policy of the United States; and (3) whether the foreign judgment was affected by fraud. *See Hilton*, 159 U.S. at 205–06; *Altos Hornos*, 412 F.3d at 428; *Marcus*, 796 F. Supp. 2d at 392. The moving party—typically the party seeking enforcement of a foreign judgment—holds the burden of showing that comity is appropriate. *See Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 999 (2d Cir. 1993) (citing *Drexel Burnham Lambert Group, Inc. v. Galadari*, 777 F.2d 877, 880 (2d Cir. 1985)).

With respect to the first inquiry of procedural fairness, courts have focused on eight factors as indicia of procedural fairness:

(1) whether creditors of the same class are treated equally in the distribution of assets; (2) whether the liquidators are considered fiduciaries and are held

accountable to the court; (3) whether creditors have the right to submit claims which, if denied, can be submitted to a bankruptcy court for adjudication; (4) whether the liquidators are required to give notice to the debtors' potential claimants; (5) whether there are provisions for creditors' meetings; (6) whether a foreign country's insolvency laws favor its own citizens; (7) whether all assets are marshalled before one body for centralized distribution; and (8) whether there are provisions for an automatic stay and for the lifting of such stays to facilitate the centralization of claims.

*Allstate*, 994 F.2d at 999 (citing *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 459–60 (2d Cir. 1985)).

With respect to the second inquiry about the public policy of the United States, a court "is to guard against forcing American creditors to participate in foreign proceedings in which their claims will be treated in some manner inimical to this country's policy of equality." *Cunard*, 773 F.2d at 459 (quoting *Banque de Financement, S.A., v. First Nat'l Bank of Boston,* 568 F.2d 911, 921 (2d Cir. 1977)). "[C]omity w[ill] not be granted if it would result in prejudice to United States citizens." *Id.* (citing *In re Colo. Corp.*, 531 F.2d 463, 468 (10th Cir. 1976)).

With respect to the third inquiry relating to potential fraud, "[a] court in the United States will not recognize a foreign judgment obtained by fraud if the effect of the fraud was to deprive the losing party of an adequate opportunity to present its case and there was no adequate opportunity for correction of the fraud in the foreign proceeding, including a timely appeal." RESTATEMENT (FOURTH) OF FOREIGN RELATIONS LAW § 484 cmt. d (Am. Law Inst. 2018); *see also Ackermann v. Levine*, 788 F.2d 830, 841 (2d Cir. 1986) ("[A]lleged fraud must relate to matters other than issues that could have been litigated and must be a fraud on the court.") (internal quotations and citation omitted).

Additionally, the Supreme Court in *Hilton* made clear that deference to a foreign court under principles of comity contemplates a clear and formal record:

the foreign judgment appears to have been rendered by a competent court, having jurisdiction of the cause and of the parties, and upon due allegations and proofs, and opportunity to defend against them, and its proceedings are according to the course of a civilized jurisprudence, and are stated in a clear and formal record[,] . . . unless some special ground is shown for impeaching the judgment, as by showing that it was affected by fraud or prejudice, or that, by the principles of international law, and by the comity of our own country, it should not be given full credit and effect.

*Hilton*, 159 U.S. at 205–06. This requirement for comity has been noted more recently by other courts, including by the Third Circuit, which observed that "[t]he test of acceptance . . . of foreign judgments for which domestic recognition is sought, is whether the foreign proceedings accord with civilized jurisprudence, and are stated in a clear and formal record." *Lloyd v. Am. Exp. Lines, Inc.*, 580 F.2d 1179, 1189 (3d Cir. 1978) (citing *Hilton*, 159 U.S. at 205–06). *See also Pony Express Records, Inc. v. Springsteen*, 163 F. Supp 2d 465, 472–73 (D.N.J. 2001) (finding that the foreign judgment satisfied all of the *Hilton* factors, including the clear and formal record requirement); *cf. In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 700 (Bankr. S.D.N.Y. 2010) (enforcing the foreign plan based on the robust record of the Canadian insolvency proceeding).[12]

---

[12]    Other areas of American jurisprudence recognize the importance of an adequate record for effective judicial review. One such example is the deferential review of agency action under the Administrative Procedure Act. *Cf.* 5 U.S.C. § 551, *et seq.*; *Nat'l Nutritional Foods Ass'n v. Weinberger*, 512 F.2d 688, 701 (2d Cir. 1975) ("[E]ven under the 'arbitrary, capricious' standard agency action will not be upheld where inadequacy of explanation frustrates review . . . . Indeed the very absence of a detailed record . . . makes it advisable for the agency . . . to provide a thorough and comprehensible statement of the reasons for its decision. Where the agency's finding is not sustainable on the administrative record made, then the . . . decision must be vacated and the matter remanded to (the agency) for further consideration.") (internal citations omitted); *Nat'l Welfare Rts. Org. v. Mathews*, 533 F.2d 637, 648 (D.C. Cir. 1976) ("[J]udicial review is meaningless where the administrative record is insufficient to determine whether the action is arbitrary and capricious."); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43–44 (1983) ("Congress required a record of the rulemaking proceedings to be compiled and submitted to a reviewing court . . . and intended that agency findings under the Act would be supported by 'substantial evidence on the record considered as a whole'") (internal citations omitted); *Lukens Steel Co. v. Kreps*, 477 F. Supp. 444, 451 (E.D. Pa. 1979) ("In applying the arbitrary and capricious standard, the court's review is confined to the administrative record, where the record affords a sufficient contemporaneous explanation of the administrative decision to permit a determination as to whether the result was arbitrary, capricious, or an abuse of discretion.").

Notwithstanding the importance of comity in considering a request for relief post-recognition, "Chapter 15 [also] does impose certain requirements and considerations that act as a brake or limitation on comity." *In re Fairfield Sentry Ltd.*, 768 F.3d 239, 245 (2d Cir. 2014) (quoting *Vitro II*, 701 F.3d at 1054) (stating that comity is "an important factor in determining whether relief will be granted" under Chapter 15 but is not a *per se* rule); *Vitro II*, 701 F.3d at 1054 (the bankruptcy court in *Vitro I* found Sections 1521, 1507, and 1506 each precluded the relief the debtor sought under principles of comity) (citing *Vitro I*, 473 B.R. at 133).

B. <u>Third-Party Releases</u>

Before considering the third-party release at issue here, it is helpful to first review the significance of third-party releases generally and how such releases are viewed under United States bankruptcy law. Generally speaking, a third-party release contemplates releasing a non-debtor party from certain obligations and rights based on that party's "material contribution[s]" to the bankruptcy case, so long as the releases are "important" and "necessary" "to accomplish a particular feature of a restructuring." *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 727 (Bankr. S.D.N.Y. 2019) (citing *In re Metromedia Fiber Network*, 416 F.3d 136, 143 (2d Cir. 2005)). A third-party release can act as a complete release, waiver, and discharge of that party from a claim of any nature (i.e., claims, obligations, rights, causes of action, and liabilities) arising out of or in connection with the debtor and its plan of reorganization. *See In re Metromedia Fiber Network*, 416 F.3d at 141, 142 ("By it, a nondebtor can shield itself from liability to third parties. In form, it is a release; in effect, it may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code."). But such third-party releases are available in bankruptcy cases in some but not all jurisdictions in the United States.

30

Some circuits, including the Second Circuit, permit third party releases under specific limited circumstances. *See In re Metromedia Fiber Network*, 416 F.3d at 141–42 (a non-debtor release is proper in only rare cases); *SEC v. Drexel Burnham Lambert Grp., Inc.* (*In re Drexel Burnham Lambert Grp., Inc.*), 960 F.2d 285, 293 (2d Cir. 1992) ("In bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan.").   In these circuits, a bankruptcy court should examine whether the proposed third-party release itself is important to the plan and whether its breadth is necessary to the plan. *See In re Metromedia Fiber Network*, 416 F.3d at 143 ("A nondebtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to success of the plan."); *see also Class Five Nev. Claimants v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 280 F.3d 648, 658 (6th Cir. 2002) (requiring bankruptcy court to make "specific factual findings that support its conclusions" before authorizing a nondebtor release). *See also id.* at 657–58 (a third-party release "is a dramatic measure to be used cautiously . . . ."); *Gillman v. Cont'l Airlines* (*In re Cont'l Airlines*), 203 F.3d 203, 212–13 (3d Cir. 2000) (recognizing that nondebtor releases have been approved only in "extraordinary cases"); *id.* ("A central focus of these . . . reorganizations was the global settlement of massive liabilities against the debtors and co-liable parties.  Substantial financial contributions from non-debtor co-liable parties provided compensation to claimants in exchange for the release of their liabilities and made these reorganizations feasible.").

Other circuits, including the Fifth, Ninth, and Tenth Circuits, do not permit third-party releases in bankruptcy cases. *See Bank of N.Y. Tr. Co. v. Official Unsecured Creditors' Comm.* (*In re Pac. Lumber Co.*), 584 F.3d 229, 252 (5th Cir. 2009) (rejecting the bankruptcy court's authority to confirm third-party releases on the basis that the releases have consequences not

intended by Congress); *Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1401–02 (9th Cir. 1995) (holding that third-party releases violate Section 524(e) of the Bankruptcy Code); *Landsing Diversified Props.-II v. First Nat'l Bank & Tr. Co. of Tulsa (In re W. Real Estate Fund, Inc.)*, 922 F.2d 592, 600 (10th Cir. 1990) ("Congress did not intend to extend such [discharge] benefits to third-party bystanders.").

Courts in the Second Circuit have permitted a third-party release in Chapter 15 cases after analyzing the circumstances for the grant of such relief in the foreign proceeding.  For example, the court in *Agrokor* found that *Vitro II*—in which the Fifth Circuit declined to grant comity because the Mexican plan was only approved due to the counting of insider votes—did not preclude recognition and the enforcement of a settlement agreement containing a third-party release.  *In re Agrokor d.d.*, 591 B.R. 163, 173 (Bankr. S.D.N.Y. 2018).  The court in *Agrokor* reached this conclusion "[b]ecause the Settlement Agreement . . . was approved by the required majority vote of creditors, even excluding the 'insider' affiliate votes . . . .  Of the total number of creditors entitled to vote, 78.52% of non-insiders by claim amount voted in favor of the plan—this is comfortably above the requisite two-thirds of all voting creditors by claim amount necessary to confirm the plan without including the votes of affiliates."  *Id.*  Similarly, the court in *In re Sino-Forest* enforced a Canadian court-approved settlement containing a global release provision as a form of "additional assistance" under section 1507.  The court noted that as such "third-party releases are not categorically prohibited [in the Second Circuit], it cannot be argued that the issuance of such releases is manifestly contrary to public policy" within the meaning of Section 1506.  *In re Sino-Forest Corp.*, 501 B.R. 655, 665–66 (Bankr. S.D.N.Y. 2013) (*citing In re Metromedia Fiber Network*, 416 F.3d at 141).  *See also In re Avanti Commc'ns. Grp. PLC*, 582 B.R. 603, 618 (Bankr. S.D.N.Y. 2018) ("[T]he Avanti Scheme has near unanimous support

(all creditors that voted cast votes in favor of the Scheme), and that support does not rely on

votes by insiders."); *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. at 700 (finding there was

near unanimous approval of the plan by the creditors, who were not insiders of the debtor).  Even

in Circuits where third-party releases in United States bankruptcy cases are categorically

impermissible, *see, e.g.*, *In re Pac. Lumber Co.*, 584 F.3d at 252; *In re Zale Corp.*, 62 F.3d at

761, such relief may be permitted to foreign proceedings under Chapter 15.  *See Vitro II*, 701

F.3d at 1061, 1064 ("[A]cknowledge[ing] . . . that [the Fifth Circuit's] view on [third-party

releases] is not universally shared by [its] sister circuits . . . [and such] relief may nevertheless be

appropriate under [Section] 1507," even while ultimately upholding the bankruptcy court's

decision to deny additional relief because the debtor failed to show that the extraordinary

circumstances required for enforcing third-party releases in the U.S. existed.).

C.  Section 1521

Turning back to the specific relief sought here, the parties disagree about whether a third-

party release was even included in the PKPU Proceeding.  *See* Foreign Representative's FFCL ¶¶

280–90 (arguing the PKPU Plan binds the Objecting Noteholders because they receive

consideration under the plan and that the requested injunctive relief against the Objecting

Noteholders is necessary to implement the PKPU Plan) (citing Wijaya Testimony ¶ 67); *see also*

Objecting Noteholders' FFCL at 37 ¶¶ 225–27 (arguing their expert witness provided an

"unrebutted opinion" that the PKPU Law generally does not provide for third-party releases

unless explicitly set forth in the plan and, thus, that the PKPU Plan and Proceedings here did not

provide for a third-party release) (citing Sidharta Testimony ¶ 97).  In assessing this issue, the

Court looks to the three provisions in the Commercial Court Judgment that are cited by the

Foreign Representative as the supposed source of a third-party release as to the Notes. The

Court will address each of these in turn.

The first provision states:

> By the homologation of this Reconciliation Plan . . . the Company will no longer
> have obligation to fulfill all agreement or documents relating to the issue of the
> Senior Notes which expire, including but not limited to the fulfillment of all
> existing guarantees in the frame of issue of Senior Notes namely the Corporate
> Guarantee provided by the Company, guarantee provided by the Grantor, as well
> as other guarantee if any.

Judgment Ratification of Homologation (the "Commercial Court Judgment"), ONX-86 at 64

(cited in Foreign Representative's FFCL ¶ 284). This first provision is set forth under Section

1.6(IV)(A) of the Commercial Court Judgment, a section that governs the manner of payment of

debt owed under the Senior Notes. It appears to provide a release of the Debtor (i.e., the

"Company") as to its obligations arising under the Senior Notes (i.e., the Notes held by various

parties including the Objecting Noteholders). This includes a release of the Debtor as to any

guarantees provided by the "Grantor" under the Senior Notes. But the Indonesian Judgment

does not appear to define "Grantor," nor has the Foreign Representative provided any

explanation of the term anywhere in his papers. The Foreign Representative also does not cite—

much less explain—the sentence immediately following this provision, which seems to impact

the scope of obligations under any guarantee of the Senior Notes. That sentence provides that, to

the extent guarantee obligations are triggered, payments will be made by the Company in

accordance with Clause 3.6(IV).[13]  Taken as a whole, therefore, this first provision grants a

---

[13]    This sentence states in full:

> In the event of judgment of the judicative board already having the permanent force of law and
> admitted by the Indonesian law stating that the Company and Grantors are obliged to make
> payment due to the drawdown of any guarantee provided in the issue of Senior Notes, then such
> obligation payment ***will be made by the Company*** by following the provision of Clause 3.6.IV and
> the obligation payment portion will reduce the payment portion of Senior Notes Proceeds Fund
> Debt equally[.]

discharge of BTEL's obligations under the Notes, but it is not clear to what extent it provides a

release to any other party as to the Notes.

The second provision relied upon by the Foreign Representative is also unclear.  It

provides:

> In case of Senior Notes Holder outside the territory of Indonesia, they are obliged
> to issue the general confirmation as the full and final settlement of all claims they
> have relating to the existing Debt of Senior Notes Proceeds Fund based on other
> law wherever prevailed and undertakes to revoke each current legal
> process/remedy overseas. In case of Senior Notes holders not willing to release
> the bill based on any law, they are not entitled to receive the new securities.

Commercial Court Judgment, ONX-86 at 60–61 (also contained in Section 1.6(IV)(A) of the

Commercial Court Judgment).  Once again, the Foreign Representative does not explain how this

language operates to provide a third-party release—rather than merely a release of the

obligations of the Debtor—but instead simply quotes the language without elaboration.  Foreign

Representative's FFCL ¶ 283.  In addition, the Foreign Representative does not address the other

text providing context for this provision, which raises questions about exactly what obligations

still exist under the Senior Notes.[14]

The third provision provides the best support for the Foreign Representative's position.  It

states:

> Any terms and conditions of this Reconciliation Plan . . . cancel and supersede
> any agreement and covenant both in writing and orally existed already before the

---

Commercial Court Judgment, ONX-86 at 64–65 (emphasis added).

[14]    This second provision falls under subsection (9), which provides:

> **If required** the Company will try to request for or take a required effort/action in order the Debt of
> Senior Notes Proceeds will be settled/paid in accordance with the provision of point IV including
> but not limited to the action and provisions as follows . . .

Commercial Court Judgment, ONX-86 at 58 (emphasis added).  This language is further modified by the subsequent
sentence which appears to provide an opt-out for "Senior Notes holder" to the extent it is permitted by law.  *Id.* at
59.  The Foreign Representative does not discuss any of this language.

> date of Homologation including but not limited to any written agreement and
> covenant relating to the . . . Senior Notes Proceeds Fund Debt . . . together with
> the undertaking, agreement and covenant provided by the Company both in
> writing and orally relating to the Subsidiaries debts, including the judgments of
> the judicative board or arbitration board in any jurisdiction and relating to the
> debts of the Company and its Subsidiaries existed before the Date of
> Homologation.  Therefore, all agreements, covenants both in writing or orally
> including the judgments of the judicative and arbitration boards in any jurisdiction
> word per word have been superseded by the terms and conditions in this
> Reconciliation Agreement.

Commercial Court Judgment, ONX-86 at 150–51 (cited in Foreign Representative's FFCL ¶

285).  This provision is set forth under Section 1.9 of the Commercial Court Judgment which

provides "[o]ther provisions on restructuring."  This provision cancels any agreements and

covenants (both written and oral) that existed prior to the date of "Homologation," including

"any written agreement and covenant relating to . . . Senior Notes Proceeds Fund Debt."  *Id.*

This third provision is noteworthy for its breadth in covering—and superseding—all the

obligations as to the Notes.

But finding a source for the third-party release in the language of the foreign judgment

does not end the inquiry.  The Court must next consider whether such a third-party release is

appropriate when viewed through the prism of comity.  That is more problematic.  As a practical

matter, enforcing a third-party release in this case would release the Issuer, the Subsidiary

Guarantors, and individual directors and commissioners of BTEL and the Issuer from any

liability in the ongoing New York litigation initiated by the Objecting Noteholders.  *See*

Objecting Noteholders' Opposition ¶ 6; Motion for Recognition and Enforcement of Indonesian

PKPU Plan ¶¶ 39, 98–100.  In deciding whether to extend comity to enforce the PKPU Plan

containing this third-party release, the Court must consider whether the foreign proceeding

abided by fundamental standards of procedural fairness as demonstrated by a clear and formal

record.  These considerations overlap with those of Sections 1521 and 1507, which assure the

just treatment and protection against prejudice of claim holders in the United States through adequate procedural protections. *See* 11 U.S.C. §§ 1521, 1522(a), 1507(b)(1–2); *In re Atlas Shipping*, 404 B.R. at 740; *In re Rede Energia*, 515 B.R. at 94–95; *In re Oi*, 587 B.R. at 268.[15] Here, there is no clear and formal record that sets forth whether or how the foreign court considered the rights of creditors when considering this third-party release.  Indeed, the record contains no information about how this third-party release was presented to the Indonesian court for consideration or whether any creditors were heard—or even had the ability to be heard—as to a third-party release.  *Cf. In re Metcalfe & Mansfield Alt. Investments*, 421 B.R. at 698–99 (noting that "Canadian courts afford creditors a full and fair opportunity to be heard in a manner consistent with standards of U.S. due process"); *In re Avanti Commc'ns. Grp.*, 582 B.R. at 618 ("Avanti's Scheme Creditors had a full and fair opportunity to vote on, and be heard in connection with, the Scheme."); *Soc'y of Lloyd's v. Reinhart*, 402 F.3d 982, 987–88 (10th Cir. 2005) (finding the proceedings under UK law in the UK courts afford creditors a full and fair opportunity to be heard in a manner consistent with U.S. due process standards); *see also Allstate*, 994 F.2d at 999 (listing the eight factors, discussed *supra*, that courts consider when evaluating procedural fairness).

Moreover, there is nothing in the record about the justification for any third-party release. The Commercial Court Judgment does not provide any explanation, nor is there any explanation anywhere else in the records of the PKPU Proceeding.  It simply exists in the foreign judgment. The Foreign Representative does not even offer a justification in his pleadings, and instead is content to simply rely on the language of the Commercial Court Judgment itself.  But relying on

---

[15]    One of the Objecting Noteholders—Footbridge Capital, LLC, a Delaware limited liability company—is a U.S. based creditor, *see* Foreign Representative's FFCL ¶¶ 124–132, and thus the considerations as to just treatment and protection against prejudice in Sections 1507 and 1521 are implicated here.

the Commercial Court Judgment is insufficient where it does not provide any justification for the release, either under Indonesian law or otherwise. The lack of such explanation is particularly noteworthy given the testimony of the Objecting Noteholders' expert witness that a third-party release is not standard for Indonesian PKPU proceedings but instead must be justified under Indonesian law. *See* Sidharta Testimony ¶ 97. This testimony was not rebutted by the Foreign Representative.

This record is problematic when viewed against the Supreme Court's guidance in *Hilton* on the need for a "clear and formal record" in evaluating comity. *Hilton*, 159 U.S. at 205–06. Other more recent decisions reflect the same concern. In *Lloyd*, for example, the Third Circuit applied the principles of comity as articulated in *Hilton* in deciding whether to accept a Japanese conviction as evidence of a final judgment under the Federal Rules of Evidence. *Lloyd*, 580 F.2d at 1188–90 (citing *Hilton*, 159 U.S. at 205–06). In deciding to grant comity, the Third Circuit reviewed the record of the Japanese criminal proceeding and noted that the extensive and meticulous records met the clear and formal record requirement. *Id.* at 1189 & n.20 (citing a "meticulous" police report containing photographs, medical records, search and seizure protocol, and detailed descriptions of the incident; the thoroughness of the investigation by Japanese authorities; and the defendant's opportunity to be represented by counsel). Similarly, a district reviewed the thoroughness of the relevant foreign proceedings when considering the preclusive effect of a UK judgment on federal copyright claims under principles of comity. *Pony Express*, 163 F. Supp 2d at 472–73. The court in *Pony Express* found that the UK litigation and judgment satisfied all of the *Hilton* factors, including the clear and formal record requirement. *Id.* The court specifically noted, *inter alia*, that

> the British court carefully and thoroughly considered their respective allegations
> and proofs, provided [the defendant in the foreign proceeding] with ample

opportunity to defend itself, and recorded the court's final decision clearly within
that opinion . . . . The opinion of the High Court runs to 74 pages, and details
extensive evidence presented to the court, as well as the court's thorough analysis
of that evidence.

*Id.* at 473.

The record here as to the third-party release also stands in stark contrast to perhaps the
most similar precedent available: the Chapter 15 case of *In re Metcalfe & Mansfield Alt. Invs.*,
421 B.R. 685. In *Metcalfe*, the court granted the additional relief of enforcing a plan with a
third-party release based on a robust record in the Canadian insolvency proceedings. *Id.* at 693.
The court in *Metcalfe* reviewed the decisions of the Ontario Court and the Ontario Court of
Appeals, noting that both courts "issued lengthy, reasoned written decisions upholding the
jurisdiction of the Ontario Court under the CCAA to approve the non-debtor release and
injunction provisions" and "more than 30 parties appealed the Ontario Court decision approving
those provisions." *Id.* The court in *Metcalfe* found that the Canadian courts' treatment of the
issue of third-party releases reflected a "similar sensitivity to the circumstances justifying
approving such provisions" as the Second Circuit's decision in *Metromedia*. *Id.* at 698.[16] The

---

[16]    In reaching its result, the Court in *Metcalfe* also observed that "U.S. federal courts have repeatedly granted
comity to Canadian proceedings." *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. at 698–99; *see also In re Bd. of
Dirs. of Hopewell Intl. Ins. Ltd.*, 238 B.R. at 66; *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*,
216 F. Supp. 2d 198, 212 (S.D.N.Y. 2002) ("There is no question that bankruptcy proceedings in Canada—a sister
common law jurisdiction with procedures akin to our own—are entitled to comity under appropriate
circumstances.") (internal quotation marks and citations omitted); *Tradewell, Inc. v. American Sensors Elecs., Inc.*,
1997 WL 423075, at *1 n.3 (S.D.N.Y. July 29, 1997) ("It is well-settled in actions commenced in New York that
judgments of the Canadian courts are to be given effect under principles of comity.") (internal quotation marks and
citation omitted); *Cornfeld v. Inv'rs Overseas Servs., Ltd.*, 471 F.Supp. 1255, 1259 (S.D.N.Y. 1979) ("It is well-
settled in New York that the judgments of the Canadian courts are to be given effect under principles of comity.
Trustees in bankruptcy appointed by Canadian courts have been recognized in actions commenced in the United
States. More importantly, Canada is a sister common law jurisdiction with procedures akin to our own, and thus
there need be no concern over the adequacy of the procedural safeguards of Canadian proceedings.") (internal
quotation marks and citations omitted). The foreign court here does not have the same well-established reputation.
*See Fox v. Bank Mandiri (In re Perry H. Koplik & Sons, Inc.)*, 357 B.R. 231, 239–44 (Bankr. S.D.N.Y. 2006)
(refusing to recognize various Indonesian decisions based on State Department Report on Indonesia that discussed
systematic corruption in the Indonesian judicial system) (citing *Bridgeway Corp. v. Citibank*, 45 F. Supp. 2d 276,
287 (S.D.N.Y. 1999), *aff'd*, 201 F.3d 134 (2d Cir. 2000)).

decisions of other bankruptcy courts granting additional relief under Chapter 15 reflect a similar approach. For example, the court in *Sino-Forest* also extended comity to a Canadian court proceeding enforcing third-party releases based on the clear record before it. *In re Sino-Forest Corp.*, 501 B.R. at 658–61. In reaching this conclusion, the court in *Sino-Forest* examined the specific provisions of a settlement agreement, the Canadian court's settlement endorsement clearly setting forth the basis for its decision with respect to the third-party releases after holding a hearing in which objections were considered and overruled, and a written decision of the Court of Appeals of Ontario dismissing the appeal on the same reasoning. *Id. See also In re Avanti Commc'ns. Grp.*, 582 B.R. at 609–10, 618 (reviewed the "Scheme" containing third-party releases and the UK court's review and endorsement of the Scheme, and found that the "[c]reditors had a full and fair opportunity to vote on, and be heard in connection with, the Scheme"); *cf. In re Sivec SRL*, 476 B.R. 310, 324 (Bankr. E.D. Okla. 2012) (the Court was unconvinced that the interests of the U.S. creditor in that case would be protected in the Italian proceeding and, thus, refused to extend comity based on, *inter alia*, inadequate and conflicting information provided to the Court regarding the authority of an Italian judge to determine the parties' dispute in the Italian bankruptcy proceeding, the authorship and veracity of requests for comity allegedly submitted by this judge, and the status of the Italian proceeding).

The Court's decision today is not a ruling on the permissible scope of third-party releases under Indonesian law. Indeed, the releases in a foreign proceeding subject to Chapter 15 need not be identical to those that a U.S. court would endorse in a Chapter 11 case. *See In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. at 697; *In re Oi*, 587 B.R. at 273; *In re Rede Energia*, 515 B.R. at 104; *Allstate*, 994 F.2d at 999; *In re Pet. of Brierley*, 145 B.R. 151, 166 (Bankr. S.D.N.Y. 1992); *SNP Boat Serv. S.A. v. Hotel Le St. James*, 483 B.R. 776, 786 (S.D. Fla. 2012). *Cf. In re*

*Bd. of Dirs. of Multicanal S.A.,* 307 B.R. 384, 391 (Bankr. S.D.N.Y. 2004) (noting that neither

case law nor Section 304 (the statutory predecessor to Chapter 15) require a determination that

the foreign proceeding is identical to the U.S. proceeding); *In re Metcalfe & Mansfield Alt. Invs.*,

421 B.R. at 696 ("This Court is not being asked to approve such provisions in a plenary case;

rather, the Court is being asked to order enforcement of provisions approved by the Canadian

courts."). But to grant comity to the PKPU Plan and its third-party release, there must be at least

a rudimentary record in the foreign proceeding as to the basis for such releases and procedural

fairness of the underlying process. Without such a record, a party seeking comity becomes free

to cobble together a rationale for the decision reached after the fact. *See Al-Haramain Islamic*

*Found., Inc. v. Bush*, 507 F.3d 1190, 1203 (9th Cir. 2007); *cf. Animal Sci. Prod., Inc. v. Hebei*

*Welcome Pharm. Co.*, 138 S. Ct. 1865, 1868 (2018) (noting that "the transparency of the foreign

legal system" is a relevant consideration when deciding the weight to afford "a foreign state's

views about the meaning of its own laws" under principals of international comity). Of course,

the parties are free to return to the Indonesian Court to further develop the record on this issue,

consistent with the substantive and procedural requirements of Indonesian law. But based on the

current record, the Court cannot conclude that the Foreign Representative has met its burden for

granting the additional relief.

    D.  <u>Voting in the PKPU Proceeding</u>

       Turning to the other main argument raised by the Objecting Noteholders, they complain

that the Commercial Court permitted an insider of the Debtors—the Issuer—to vote the Notes,

rather than the Indenture Trustee or Steering Committee. *See* Objecting Noteholders' FFCL at

27 ¶ 166; 29 ¶ 177; 52–54 ¶¶ 38, 40; 59 ¶ 61. The Objecting Noteholders argue that this was

done at the direction of the Debtors, who listed the Issuer as the creditor for the notes in the

Debtor's Record and Report that was part of the PKPU Proceeding.  *See* Objecting Noteholders'
FFCL at 29 ¶ 176; 46–47 ¶¶ 18–19; 54 ¶ 41.  The Foreign Representative responds by arguing
that the Indonesian court made its own determination on the voting issue—informed by the
actions of the Administrators—rather than blindly defer to the Debtor's Record and Report.  *See*
Foreign Representative's FFCL ¶¶ 168, 245.

Unlike the third-party release, the record is clear that the Indonesian court made an
affirmative decision to grant the right to vote to the Issuer, rather than the Noteholders or the
Indenture Trustee.  While the initial decision was made by the Administrators, the issue was
eventually brought to the Indonesian court for a decision as to what party should be permitted to
vote the Note.  *See* Stipulation ¶¶ 65–71, 77–79.  Also unlike the third-party release, the parties
presented argument on the voting issue before the Indonesian courts.  *See* Indonesian Supreme
Court Judgment, FRX-1 at 137-40, 143-46; Foreign Representative's FFCL ¶ 155.  In these
ways, the record on the voting issue is more robust than the record as to the third-party release.

But the record is nonetheless not particularly fulsome on the voting issue.  The only
discussion by the Commercial Court about voting the Notes refers only to the Debtor's Record
and Report:

> Administrator Team disclaimed those 13 invoices of the creditors because after
> being verified, the fact was found that such claims were not contained in the
> record and report of the Debtor whereas based on Article 271 of Law on
> Insolvency and Debt Payment Obligation Suspension ("Law on Insolvency") all
> calculations already incorporated by Administrator Team must be verified to the
> record and report of the Debtor.

Commercial Court Judgment, ONX-86 at 20.  Similarly, the Indonesian Supreme Court upheld
the Commercial Court Judgment with the same rationale, stating that the "Administrator Team
disclaimed [the Bank of New York Mellon's claim] because after being verified, the fact was
found that such claims were not contained in the record and report of the Debtor based on Article

271." Indonesian Supreme Court Judgment, FRX-1 at 32.  In explicitly relying on the Record and Report of the Debtor, it highlights the Objecting Noteholders' concern that the Debtor was essentially allowed to decide who should vote the Notes, notwithstanding the substantive protections afforded Noteholders to recover directly against BTEL.

Despite placing such importance on the Record and Report, however, the Foreign Representative did not introduce a copy of it as evidence in this case, thus preventing the Court and the Objecting Noteholders from ever examining it.[17]  Mr. Djamaris testified that the Objecting Noteholders spent several months trying to obtain the true Record and Report from the Debtor, but never received it.  See Djamaris Testimony ¶¶ 84–100.  That testimony was not rebutted by the Debtor, who never offered any explanation for the document's absence from this case.[18]  The Foreign Representatives instead presented nuanced and extensive argument about the Objecting Noteholders' lack of standing to vote as beneficial noteholders.  More specifically, the Foreign Representative argues that because the Objecting Noteholders did not become registered "holders" of the Notes until February 2015—two months after the Commercial Court

---

[17]    The failure to produce a document at trial may result in an adverse inference if "'(i) the party having control over the evidence had an obligation to preserve or timely produce it; (ii) the party that destroyed or failed to timely produce evidence had a 'culpable state of mind'; and (iii) the missing or tardily produced evidence is 'relevant' to the party's claim or defense 'such that a reasonable trier of fact could find that it would support that claim or defense.'"  In re NTL, Inc. Sec. Litig., 244 F.R.D. 179, 192 (S.D.N.Y. 2007), aff'd sub nom., Gordon Partners v. Blumenthal, 2007 WL 1518632 (S.D.N.Y. May 17, 2007) (quoting Phoenix Four, Inc. v. Strategic Res. Corp., 2006 WL 1409413 at *4 (S.D.N.Y. May 23, 2006)).

[18]    The minutes of the second and third creditors' meetings before the Administrators and a Supervisory Judge do not provide much more information.  See ONX-145; ONX-146.  During the second creditors' meeting held in late 2014, for example, the Administrators disallowed the Indenture Trustee's claims because of concerns of "double claim[s] from several parties," including the Indenture Trustee and the noteholders.  See ONX-145 at 5.

At the third creditor meeting, BTEL's counsel argued that the Assignments did not transfer the right to collect the debt to BNY Mellon, the Indenture Trustee.  ONX-146 at 4.  During this third creditor meeting, the Objecting Noteholders' Indonesian counsel ultimately appealed the Administrators' decision to disallow the Indenture Trustee's claim to the Supervisory Judge.  See ONX-146 at 3.  After consulting with the Administrators, the Supervisory Judge upheld the Administrators' determination, once again relying on the same grounds as the judgment: "The Administrators concluded that the Verification Meeting, the guideline in verifying the receivables is Article 271 of Bankruptcy Law, which determined that each bill submitted during PKPU process should match the Debtor records."  ONX-146 at 4–5; see also Stipulation ¶¶ 77–80.

approved BTEL's PKPU Plan—the Objecting Noteholders lacked rights as "holders" under the

Indenture under New York law and thus lacked standing to instruct the Indenture Trustee to vote

in the PKPU Proceeding. *See* Foreign Representative's FFCL ¶¶ 253–56. The Foreign

Representative also argued why—among the various options available to vote the bond debt—

the option chosen by the Indonesian court makes sense. *Id.* ¶¶ 241–48. In different

circumstances, these arguments might carry the day. The problem is that none of the Indonesian

courts' decisions—or the record of the proceeding—include these rationales.

Questions about the reason for choosing the Issuer—a wholly owned subsidiary of the

Debtor and thus an insider—to vote the Notes are important when viewed in the context of

American jurisprudence. While the Foreign Representative is correct that merely being an

insider does not bar that party from voting, American courts are nonetheless concerned about

transparency, fairness, and due process as to the exercise of control by insiders in insolvency

proceedings. *See Vitro II*, 701 F.3d at 1068 (declining to grant comity to a Mexican plan

containing a third-party release where the plan was only approved due to the counting of insider

votes). Under the Bankruptcy Code, insiders may vote on Chapter 11 plans but they are

separately classified as insider and non-insider votes, requiring at least one impaired class of

creditors to vote in favor of the plan. *See* 11 U.S.C. § 1129(a)(10) ("If a class of claims is

impaired under the plan, at least one class of claims that is impaired under the plan has accepted

the plan, determined without including any acceptance of the plan by any insider."); *In re Drexel

Burnham Lambert Grp., Inc.*, 138 B.R. 723, 771 (Bankr. S.D.N.Y. 1992) ("Under § 1129(a)(10),

at least one impaired class of claims must accept the plan, determined without including any

acceptance of the plan by any insider.").[19] Of course, it is well established that foreign courts do

---

[19]    *See also In re Hotel Assocs. of Tucson*, 165 B.R. 470, 474 (B.A.P. 9th Cir. 1994) ("[A] a plan cannot be confirmed unless at least one 'impaired class' accepts the plan, excluding acceptance by any insider."); *In re*

not need to apply the law as American courts to receive recognition or even the grant of additional relief.  *See In re Oi*, 587 B.R. at 273 ("It is simply not this Court's role to second guess the wisdom of the [foreign] courts or overrule their decisions, which would be fundamentally inconsistent with comity."); *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. at 697 ("A U.S. bankruptcy court is not required to make an independent determination about the propriety of individual acts of a foreign court."); *In re Rede Energia*, 515 B.R. at 104 ("This Court will not decline to extend comity and grant additional relief simply because Brazilian bankruptcy law is not identical to U.S. bankruptcy law."); *Allstate*, 994 F.2d at 999 (finding no requirement that Australian liquidation proceedings be identical to United States bankruptcy proceedings); *In re Pet. of Brierley,* 145 B.R. at 166 ("Nothing dictates that the foreign law be a carbon copy of our law. . . ."); *SNP Boat Serv.*, 483 B.R. at 786 ("To inquire into a specific foreign proceeding is not only inefficient and a waste of judicial resources, but more importantly, necessarily undermines the equitable and orderly distribution of a debtor's property by transforming a domestic court into a foreign appellate court where creditors are always afforded the proverbial 'second bite at the apple.'").  In the end, the Court does not need to determine whether the voting issue would bar the requested additional relief of enforcing the PKPU Plan because the Court has already denied that relief based on concerns about the third-party release.  But to the extent that the parties return to the Indonesian court to establish a more fulsome record as to the third-party release, they might also take the opportunity to further develop the record on the voting issue.

E.    Other Issues

*Frascella Enters., Inc.*, 360 B.R. 435, 443 (Bankr. E.D. Pa. 2007) ("There is no per se requirement that unsecured insider claims be separately classified from other unsecured claims.") (citing *In re United Marine, Inc.,* 197 B.R. 942, 946 (Bankr. S.D. Fla. 1996)); *In re Coram Healthcare Corp.*, 315 B.R. 321, 350 n.18 (Bankr. D. Del. 2004) (clarifying that courts should not consider "any acceptance" of the plan by an insider in determining whether there is an accepting class of creditors under Section 1129(a)(10)).

Given the Court's conclusions above as to Section 1521, the Court also finds that the Foreign Representative is not entitled to the relief requested as "additional assistance" under Section 1507. More specifically, the Court is unable to determine based on this record whether the requested additional relief here would be "consistent with the principles of comity and satisf[y] the fairness considerations set forth in [S]ection 1507(b)." *In re Rede Energia*, 515 B.R. at 90.

There are two remaining issues raised by the Objecting Noteholders. They are worthy of brief comment in the event that further proceedings ever occur in this case.

First, the Objecting Noteholders contend that the PKPU Proceeding was influenced by corruption, citing the Country Reports on Human Rights practices for 2017, issued by the U.S. Department of State. *See In re PT Bakrie Telecom*, 601 B.R. at 724. But the Objecting Noteholders did not provide the Court with any evidence regarding corruption with respect to PKPU proceedings in general or with respect to this proceeding in particular.[20] At trial, neither of the Objecting Noteholders' two witnesses, Defrezal Djamaris and Kevin Omar Sidharta, raised any specific allegations of corruption specific to this PKPU Proceeding. *See* Trial Tr. 28:4–6, 33:9–14, 34:9–18, 35:8–15, 36:5–16, Nov. 22, 2019. Additionally, Mr. Sidharta, the Objecting Noteholders' Indonesian Law expert, testified that he was not offering an opinion on whether the PKPU Proceeding at hand involved corruption. *See* Trial Tr. 47:15–16, 50:9–13, Nov. 22, 2019. As the Objecting Noteholders neither identified nor even alleged any specific instances of corruption in the PKPU Proceeding, the Court concludes that these allegations do not provide a basis for any relief to the Objecting Noteholders.

---

[20]    This was true despite the Court noting the lack of such evidence in its prior summary judgment decision. *See In re PT Bakrie Telecom*, 601 B.R. at 724 (noting that the State Department report was, by itself, insufficient to grant summary judgment to the Objecting Noteholders on the grounds that the foreign proceeding was not "collective.").

Second, the Objecting Noteholders complain that the relief requested by BTEL violates the public policy exception of Section 1506 of the Bankruptcy Code. *See* Objecting Noteholders' FFCL at 68–69 ¶¶ 97–98; 11 U.S.C. § 1506 ("Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States."). The exception is read narrowly, with legislative history stating that "the word 'manifestly' in international usage restricts the public policy exception to *the most fundamental policies of the United States*." *In re Fairfield Sentry Ltd.*, 714 F.3d at 139. Thus, "even the absence of certain procedural or constitutional rights will not itself be a bar under [Section] 1506." *In re OAS*, 533 B.R. at 104 (quoting *Vitro II*, 701 F.3d at 1069). The party invoking the public policy exception bears the burden of proof. *See In re Ashapura Minechem Ltd.*, 2011 WL 5855475, at *4 (Bankr. S.D.N.Y. Nov. 22, 2011), *aff'd*, 480 B.R. 129 (S.D.N.Y. 2012). The Court has not been presented with anything that would satisfy the high standard of Section 1506. In reaching this conclusion, the Court notes that *Metcalfe* specifically rejected the argument that Section 1506 precludes granting third-party releases in appropriate cases since "[t]he relief granted in the foreign proceeding and the relief available in a U.S. proceeding need not be identical." *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. at 697 (citations omitted). Similarly, the evidence presented on voting and other issues does not reflect actions manifestly contrary to the public policy of the United States.

## CONCLUSION

For all the reasons set forth above, the Court recognizes the foreign proceeding as a foreign main proceeding under Section 1517 of the Bankruptcy Code but denies the additional relief requested by the Foreign Representative under Sections 1521 and 1507 of the Bankruptcy Code. The Foreign Representative shall settle an order pursuant to this Decision on five days'

notice.  The proposed order must be submitted by filing a notice of the proposed order on the

Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as

an exhibit to the notice.  A copy of the notice and proposed order shall also be served upon

opposing counsel.

Dated: New York, New York
      April 15, 2021

*/s/ **Sean H. Lane***
UNITED STATES BANKRUPTCY JUDGE